## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| FERRELL COMPANIES, INC., as Plan Sponsor and Plan Administrator of the Ferrell Companies, Inc., Employee Stock Ownership Plan, | ) ) ) ) | Case No. 2:19-CV-2656-JAR-ADM |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| GREATBANC TRUST COMPANY, Directed Trustee of the Ferrell Companies, Inc. Employee Stock Ownership Trust, | ) ) ) ) | |
| Defendant. | ) ) | |
| GREATBANC TRUST COMPANY, Trustee of the Ferrell Companies, Inc. Employee Stock Ownership Trust, | ) ) ) ) | |
| Counterclaim-Plaintiff, | ) ) | |
| v. | ) ) | |
| FERRELL COMPANIES, INC., as Plan Sponsor and Plan Administrator of the Ferrell Companies, Inc., Employee Stock Ownership Plan, | ) ) ) ) ) | |
| Counterclaim-Defendant. | ) ) | |

## BRIEF IN SUPPORT OF GREATBANC TRUST COMPANY'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

*Of Counsel:*

WINSTON & STRAWN LLP
James P. Smith III (*pro hac vice* to be filed)
(NY # 2634491)
Matthew L. DiRisio (*pro hac vice* to be filed)
(NY # 4228995)
200 Park Avenue
New York, NY 10166
Telephone: 212-294-6700
Facsimile: 212-294-4700
jpsmith@winston.com
mdirisio@winston.com

Respectfully submitted,
SHOOK, HARDY & BACON
Todd W. Ruskamp, D.Kan #70412
Jessica A. E. McKinney, D.Kan #78649
2555 Grand Boulevard
Kansas City, Missouri  64108
Telephone: 816.474.6550
Facsimile: 816.421.5547
truskamp@shb.com
jamckinney@shb.com

*Attorneys for Defendant/Counterclaim-Plaintiff
GreatBanc Trust Company*

2

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 5

    A.    The Parties ............................................................................................. 5

    B.    Plan Asset Value Plummets ................................................................... 6

    C.    Ferrell Refuses To Act And Rebuffs GreatBanc's Attempts To Help It Right The Ship – All To The Detriment Of Plan Beneficiaries................................................. 8

    D.    Ferrell Purports To Terminate GreatBanc's Trusteeship ...................... 10

    E.    GreatBanc Acts To Save Plan Assets .................................................. 10

PROCEDURAL HISTORY ........................................................................................... 11

ARGUMENT .............................................................................................................. 11

I.    GREATBANC WILL LIKELY SUCCEED ON THE MERITS OF ITS CLAIMS ........ 12

    A.    GreatBanc Is An ERISA Trustee That Acted Pursuant To Its Fiduciary Duties In Issuing The Request, And Ferrell Violated Its Fiduciary Duties By Failing To Comply................................................................................................. 12

    B.    Acting As Ferrell's Sole Shareholder, GreatBanc May Properly And Lawfully Reconstitute Ferrell's Board Of Directors By Written Consent ........................... 17

II.    THE PLAN, OF WHICH GREATBANC IS TRUSTEE, FACES IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF ............................................. 18

III.    THE BALANCE OF EQUITIES TIPS IN GREATBANC'S FAVOR ........................... 19

IV.    INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST ............................... 20

CONCLUSION ........................................................................................................... 21

4837-0232-9771 v1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anthony v. Texaco, Inc.*,
   803 F.2d 593 (10th Cir. 1986) ............................................................18

*Bremer Tr., N.A. v. Quality Ingredients Corp.*,
   No. CV 15-3002, 2015 WL 9412969 (D. Minn. Oct. 30, 2015), *report and*
   *recom. adopted sub nom. Bremer Tr., N.A v. Quality Ingredients Corp.*, No.
   15-3002, 2015 WL 9412526 (D. Minn. Dec. 22, 2015) .........................................12

*Byrne v. Calastro*,
   205 F. App'x 10 (3d Cir. 2006) ...........................................................20

*Central States v. Hester*,
   No. 84-C-3516, 1984 U.S. Dist. LEXIS 15154 (N.D. Ill. July 6, 1984)...........................18, 21

*In re Delphi Corp. Sec., Derivative & ERISA Litig.*,
   602 F. Supp. 2d 810 (E.D. Mich. 2009)........................................................14

*Fechter v. HMW Indus., Inc.*,
   879 F.2d 1111 (3d Cir. 1989)..................................................................20

*FirsTier Bank, N.A. v. Zeller*,
   16 F.3d 907 (8th Cir. 1994) ................................................................13

*Herman v. NationsBank Tr. Co. (Georgia)*,
   126 F.3d 1354 (11th Cir. 1997) ............................................................13

*Hurtado v. Rainbow Disposal Co.*,
   No. 817CV01605JLSDFM, 2018 WL 3372752 (C.D. Cal. July 9, 2018)...................12, 13, 14

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) ..........................................................18, 20

*Moench v. Robertson*,
   62 F.3d 553 (3d Cir. 1995), *abrogated on other grounds by Fifth Third*
   *Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) ..............................................13

*Perez v. Chimes D.C., Inc.*,
   No. CV RDB-15-3315, 2016 WL 6124679 (D. Md. Oct. 20, 2016) ..............................13, 16

*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203 (10th Cir. 2009) .......................................................11, 12, 18

ii

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) ...................................................................................................20

*In re Sprint Corp. ERISA Litig.*,
  388 F. Supp. 2d 1207 (D. Kan. 2004) .....................................................................12

*Trustees of the Pipefitters & Plumbers Local 524 Pension & Annuity Plan v.*
  *Yannuzzi, Inc.*,
  No. CV 3:15-2085, 2016 WL 4479394 (M.D. Pa. Aug. 25, 2016) .........................20

*Trustees of the Plumbers Local Union No. 1 Welfare Fund v. Manhattan*
  *Plumbing Corp.*,
  No. 08-cv-3036 (FB)(RML), 2009 WL 212148 (E.D.N.Y. Jan. 28, 2009) ............18

*In re WorldCom, Inc. ERISA Litig.*,
  354 F. Supp. 2d 423 (S.D.N.Y. 2005)......................................................................14

*In re WorldCom, Inc. ERISA Litig.*,
  263 F. Supp. 2d 745 (S.D.N.Y. 2003)......................................................................13

**Statutes**

29 U.S.C. §1001(a) .........................................................................................................20

K.S.A. §17-6518(a)....................................................................................................17, 18

**Other Authorities**

*2016 Retailer Rankings*, LPGas Magazine (February 2016), *available at*
  https://www.coleoilandpropane.com/wp-content/uploads/2016/02/LP-Gas-
  February-2016-Top-50-Propane-Retailers.pdf ...........................................................1

Allison McNeely, *Lender Spat Could Push Barbecue Fuel Retailer into Debt*
  *Restructuring*, Bloomberg (Oct. 18, 2019), https://www.bloombergquint.com/
  business/tpg-lending-squeezes-company-that-lights-up-backyard-barbecues..........8

*Ferrellgas Partners – 25 Year Stock Price History*, MacroTrends (last visited Oct.
  30, 2019), https://www.macrotrends.net/stocks/charts/FGP/Ferrellgas-
  partners/stock-price-history .............................................................................6, 7, 11

James Dornbrook, *New lawsuit sheds light on power struggle between Ferrellgas*
  *management, ESOP trustee* (Oct. 25, 2019),
  https://www.bizjournals.com/kansascity/news/2019/10/25/new-lawsuit-sheds-
  light-on-power-struggle-between.html ......................................................................11

Defendant/Counterclaim-Plaintiff GreatBanc Trust Company ("GreatBanc") respectfully submits this memorandum of law in support of its motion for a temporary restraining order and preliminary injunction.

## PRELIMINARY STATEMENT

At stake in this litigation – and on this motion – are the long-term benefits of thousands of participants and beneficiaries of the Ferrell Companies, Inc. Employee Stock Ownership Plan (the "Plan"), which Plaintiff/Counterclaim-Defendant Ferrell Companies, Inc. ("Ferrell" or the "Company") – the Plan Administrator under ERISA and its primary fiduciary – has put at imminent risk of permanent and total loss.

The Plan's primary asset is 100% of Ferrell's stock.  Ferrell owns 100% of Ferrellgas Inc. ("FGI"), and Ferrell and FGI together own roughly 25% of Ferrellgas Partners, L.P. ("Ferrellgas"), a publicly-traded master limited partnership run by FGI as general partner that accounts for most of the Company's value.[1]  The Ferrell stock is held in the Ferrell Companies, Inc. Employee Stock Ownership Trust (the "Trust"), which forms a part of the Plan and for which GreatBanc has served as Trustee and ERISA fiduciary for well over a decade.

Over the past two years, under the direction of Jim Ferrell (son of the Company's founder), Ferrell's board of directors (the "Board") has presided over a disastrous decline in the value of Ferrell and Ferrellgas and no viable recovery plan has been forthcoming.  Then, on October 15, 2019, GreatBanc, Plan participants and the world learned for the first time from Ferrellgas's SEC Form 10-K that one of its primary lenders had declared an event of default, accelerating $275

---

[1] FGI's board of directors serves as the board of Ferrellgas.  Ferrellgas is listed on the NYSE and is one of the three largest propane distributors in the country.  *See 2016 Retailer Rankings*, LPGas Magazine (February 2016), *available at* https://www.coleoilandpropane.com/wp-content/uploads/2016/02/LP-Gas-February-2016-Top-50-Propane-Retailers.pdf.

1

million in principal, and the auditors of its operating subsidiary had expressed substantial doubt as to its ability to continue as a going concern.  In other words, Plan participants and beneficiaries are on the cusp of losing their retirement.

Meanwhile, GreatBanc, as Trustee and an ERISA fiduciary of the Plan, has consistently attempted to fulfill its fiduciary duties and preserve and protect the value of the Plan's assets by requesting baseline information from the Company regarding its financial performance and future plans and acting as a conduit for various of the Company's constituencies and outside parties – ranging from employees to investment bankers to potential outside investors – who, anxious to stop the bleeding, have approached GreatBanc unsolicited in the hope that it could penetrate the virtual "star chamber" that the Board has become.  All of those efforts were summarily rebuffed.

Until recently, Ferrell and the Board were content to simply reject or ignore GreatBanc's repeated requests for information (or even a meeting) and to stiff-arm the various suggestions and opportunities for salvaging the Company that GreatBanc dutifully passed along.  Eventually, however, Ferrell realized that GreatBanc – apparently the only fiduciary willing to act to protect the value of the Plan's assets – would not be content to sit idly by and allow the Board to fiddle while Ferrellgas burned.  Sensing that their positions as directors might be at risk, the Board moved preemptively to entrench itself and maintain its death-grip on the Company.

First, the Company failed to hold the required annual election of directors, which, according to Ferrell's bylaws, is to occur in August of every year.[2]  Then, it amended the Plan documents to provide that GreatBanc would now be "directed" by Ferrell with respect to voting the Company's shares in connection with the election of directors, notwithstanding that GreatBanc had never been directed with respect to any director election in the past.  Finally, when it became

---

[2] To this day, there has been no 2019 election of directors.

apparent to Ferrell and the Board that the "jig was up" and Ferrellgas would have to publicly disclose that the creditors of its operating sub had declared a default, the Company, realizing the Board's days might otherwise be numbered, took the precipitous step of terminating GreatBanc as Trustee, just six days before Ferrellgas's damning SEC filing.

Unfortunately for the Board, and luckily for the Plan participants and beneficiaries, the trust agreement expressly provides that termination of a trustee is not effective for 30 days. Ferrell's action, however, put GreatBanc on the horns of a dilemma.  At perhaps the most precarious moment in the Company's corporate existence, GreatBanc would only remain as fiduciary to protect the participants' interests for the next 30 days – until November 8, 2019, to be exact. Could GreatBanc, consistent with its fiduciary duties, simply hand things off to its successor and wash its hands of the situation?  Suspiciously, Ferrell has chosen to replace GreatBanc with a solo practitioner as interim trustee.  Even if an institution with resources comparable to GreatBanc's had been appointed, delaying action long enough to allow for an effective transition and information download to the interim trustee could prove fatal.  On the other hand, particularly with "lame duck" status foisted on it by Ferrell, GreatBanc was loath to go public with its bill of particulars and risk further destabilizing the situation at Ferrellgas.  So, under the untenable circumstances manufactured by Ferrell and the Board, what could GreatBanc do?  With extreme reluctance, it concluded that Ferrell had left it with no choice:  under ERISA, it could – indeed, it must – take precisely the step that Ferrell and the Board had been maneuvering to forestall.

Against the day when such dramatic measures might become unavoidable, GreatBanc had previously identified an impeccably credentialed slate of individuals with extensive industry experience and contacts, as well as knowledge of Ferrell and its business, who were both willing to serve and ready to step in immediately as directors of the Company and begin the process of

trying to right the ship on "Day One."  Accordingly, consistent with the Plan documents and its fiduciary duty of prudence under ERISA, on October 23, 2019, GreatBanc requested a direction from Ferrell, as Plan Administrator (the "Request"), to replace the Board with its proposed slate ("New Board").  Electing a board of directors is an annual requirement each August, as provided in the Company's bylaws – but since Ferrell failed to take this required action, GreatBanc had a duty to do it itself.

Ferrell's response was clear, unmistakable and left little doubt that neither the Plan Administrator nor the Board has any regard for the Plan participants and beneficiaries, preservation of the value of Plan assets, the interests of Ferrellgas's public unitholders or any other constituency apart from themselves.  Without any communication to GreatBanc following the Request, or warning of any kind, Ferrell chose to launch a desperate preemptive strike by publicly filing this lawsuit and asserting baseless allegations that it knew full well would cast a further cloud of uncertainty over the Company at a time when it can least afford it.

For its part, GreatBanc declines to respond in kind.  Ferrell's actions, ERISA, the Company's articles and bylaws and applicable Kansas corporations law permit GreatBanc, as the 100% stockholder of Ferrell, to unilaterally and instantaneously replace the Board via written consent right now.  And what the Plan participants and beneficiaries for whom both GreatBanc and Ferrell are ERISA fiduciaries need most at this moment in order to preserve any value and avoid irreparable harm – and need exigently, before it's too late – is a steady hand on the tiller at Ferrell.  Of almost equal importance, however, and inextricably intertwined with the need for change, is the need for the immediate removal of the uncertainty that the Board's irresponsible leadership and actions (up to and including the filing of this lawsuit) have created.

Accordingly, before replacing the Board (and compounding the confusion over who's in charge created by Ferrell's lawsuit, since the current Board would unquestionably challenge the validity of that action), GreatBanc seeks, by this application, a preliminary injunction maintaining GreatBanc's status as Trustee until such time as the Court has had an opportunity to rule and, to the extent necessary, GreatBanc has had an opportunity to implement any favorable decision. In addition, in order to maintain the status quo and ensure the effectiveness of any relief this Court might award, GreatBanc seeks a temporary restraining order maintaining GreatBanc's status as Trustee until the Court has an opportunity to rule on GreatBanc's request for a preliminary injunction.

## BACKGROUND

### A.   The Parties

Ferrell, through its affiliates, engages in the marketing and sale of propane products. Compl. ¶1.[3]

GreatBanc is a company that specializes in serving as a fiduciary to employee stock ownership plans, or "ESOPs," which are retirement plans authorized under ERISA and the Internal Revenue Code to hold shares of the employer's stock for the benefit of plan participants. Verified Answer, Defenses to Plaintiff's Complaint and Counterclaims of GreatBanc Trust Company, filed concurrently herewith ("Counterclaim") ¶¶7, 13.

For over thirteen years, GreatBanc has served as fiduciary and Trustee of the Plan (an ESOP),[4] the assets of which are held in the Trust for the benefit of Ferrell employees. *Id.* ¶¶2, 13-

---

[3] References to "Compl. __" are to Ferrell's "Complaint for Declaratory Judgement, Injunctive and Other Relief" in this action filed on or about October 24, 2019.

[4] A copy of the Plan is attached as Ex. A to the Complaint.

14.[5]  The Trust is the sole shareholder of Ferrell, owning 100% of its stock.  *Id.* ¶14.  Ferrell serves

as Plan Administrator of the Plan and, on matters as to which GreatBanc is "directed" under the

Trust and the Plan, issues directions to GreatBanc that it generally must follow.  *Id.* ¶15.

GreatBanc nonetheless owes fiduciary obligations, like Ferrell, to act in the Plan's best interests.

*Id.*  Specifically, GreatBanc has a duty of prudence in valuing and preserving Plan assets and,

consequently, in monitoring Ferrell's financial health (including that of the publicly-traded master

limited partnership, Ferrellgas).  *Id.*  Moreover, as Ferrellgas expressly states in its SEC filings,

GreatBanc may, "[i]n all cases, … vote [Ferrell] shares as it determines is necessary to fulfill its

fiduciary duties under ERISA."  Counterclaims Ex. 1 (Ferrellgas Form 10-K, dated Oct. 15, 2019)

at 105; *see* Compl. Ex. A at 35.

### B.    Plan Asset Value Plummets

Ferrell stock is the primary asset in the Plan's portfolio, and the value of Ferrell is, in turn,

driven primarily by the value of the publicly-traded Ferrellgas partnership.  That value has declined

dramatically under the stewardship of the Board.  Counterclaim ¶16.  Ferrellgas's unit price has

been in freefall for the past several years.  *Id.* ¶17.  After hitting a high of $28 per unit in November

2014, Ferrellgas's unit price commenced a steep, steady decline until late 2016, when it nosedived

to the mid-single digits, never to recover.  *Id.*  To the contrary, the units have continued to decline

in market value over the ensuing years, falling to $0.60 by late October of this year, and are at risk

of being delisted, having been valued below $1.00 for several of the past few months.[6]

Counterclaims Ex. 1 at 29.  All in all, the public units have suffered a cataclysmic ***98% decline***.

---

[5] A copy of the Trust document is attached as Ex. B to the Complaint.

[6] *See Ferrellgas Partners – 25 Year Stock Price History*, MacroTrends (last visited Oct. 30, 2019), https://www.macrotrends.net/stocks/charts/FGP/Ferrellgas-partners/stock-price-history.



Source: https://www.macrotrends.net/stocks/charts/FGP/ferrellgas-partners/stock-price-history

Then, on October 15, Ferrellgas publicly disclosed that TPG Specialty Lending, Inc. ("TPG") had taken the position that Ferrellgas's operating partnership had defaulted on a senior secured term loan, immediately accelerating $275 million in principal debt. *Id.* at 52-53. Further, the auditors of Ferrellgas's operating partnership expressed substantial doubt as to the operating partnership's ability to continue as a going concern. *Id.* at 53. More broadly, Ferrell and its related companies are saddled with about $2.2 billion in debt. *Id.* at 24.

The risk factors listed in Ferrellgas's Form 10-K for fiscal year 2019 recognize that Ferrellgas's "substantial indebtedness and other financial obligations could have important consequences to [Ferrellgas's] security holders." *Id.* at 25. Some of these "consequences" include: "mak[ing] it more difficult for us to satisfy our obligations with respect to our securities," "impair[ing] our ability to obtain additional financing in the future for working capital, capital expenditures, acquisitions, general corporate purposes or other purposes," "result[ing] in higher interest expense," "impair[ing] our operating capacity and cash flows," and "plac[ing] us at a competitive disadvantage compared to our competitors that have proportionately less debt." *Id.*

On October 16, 2019, the day after the Ferrellgas 10-K filing, Standard & Poors downgraded Ferrellgas's credit rating to CCC-, recognizing the perilous situation that has been

obvious to GreatBanc for some time and noting that a default on Ferrellgas's debt is a "virtual certainty."[7]  Counterclaim ¶22.

### C.    Ferrell Refuses To Act And Rebuffs GreatBanc's Attempts To Help It Right The Ship – All To The Detriment Of Plan Beneficiaries

Despite Ferrellgas's exceedingly poor performance and the attendant risk to Plan assets and Plan participants and beneficiaries, the Board did absolutely nothing to reverse course.  Worse yet, it actively opposed GreatBanc's repeated proposals, guided by its ERISA duty of prudence, to help salvage the Company (and the Plan's investment in it).  For example, in November 2018, GreatBanc was contacted by members of Ferrell's senior management who expressed concerns about the Board's leadership, believing that Ferrell was being pushed toward bankruptcy and playing a "dangerous game" with bondholders.  Counterclaims Ex. 3 (Letter from GreatBanc to Ferrell, dated Oct. 23, 2019) at 2.  After voicing their concerns, these individuals were removed from Ferrell.  *Id.*

Next, in December 2018, senior officers of GreatBanc met with the Board to discuss management's concerns and Ferrell's future plans.  *Id.*  The Board admitted that Ferrell has too much debt and assured GreatBanc that it was working to address the problem.  *Id.*  But since that meeting, the Board has failed to identify a single solution and Ferrellgas's unit price has virtually flat-lined.  Counterclaim ¶ 26.

In July of this year, GreatBanc notified Ferrell of a potential solution to its financial problems in the form of a recapitalization proposal from an experienced and reputable private equity firm, which had approached GreatBanc unsolicited.  Counterclaims Ex. 3 at 2.  GreatBanc

---

[7] *See* Allison McNeely, *Lender Spat Could Push Barbecue Fuel Retailer into Debt Restructuring*, Bloomberg (Oct. 18, 2019), https://www.bloombergquint.com/business/tpg-lending-squeezes-company-that-lights-up-backyard-barbecues.

suggested that the Board form a special committee to consider the proposal and any other proposals it had received.  *Id.*  Later that month, the Board informed GreatBanc that it would not form a special committee and refused, without explanation, to evaluate the proposal.  *Id.*  In September, after GreatBanc requested further dialogue and collaboration in strategic planning, the Board reiterated that it was not interested and instructed GreatBanc not to take any further steps vis-à-vis the private equity firm that had made the proposal.  *Id.*

Clearly, GreatBanc's efforts to fulfill its fiduciary duties to the Plan did not suit Ferrell.  In late July, GreatBanc received a letter from Ferrell's attorneys providing vague assurances regarding the Company's "long-term strategic objectives" (with no details), reminding GreatBanc that it was a "directed" trustee and notifying it of the adoption of a newly minted amendment to the Plan intended to limit GreatBanc's voting rights with respect to Ferrell stock.[8]  *Id.*; Counterclaim ¶29.  But GreatBanc continued to be contacted by third-parties, including an overture over the summer from certain investment bankers and financial advisors who expressed interest in working with Ferrell to develop solutions to Ferrell's problems.  Counterclaims Ex. 3 at 2.  When GreatBanc asked if they had approached Ferrell directly, it was told that they could "not get past Jim Ferrell."  *Id.*

Throughout the past year, in furtherance of its ERISA duties to protect and preserve the value of Plan assets, GreatBanc has repeatedly requested additional information from Ferrell concerning its long-term objectives, and encouraged expansion of or changes to Ferrell's Board to add independent directors with turnaround or restructuring experience.  *Id.*  The Board has rebuffed GreatBanc's efforts at every turn, informing GreatBanc that no additional independent directors were necessary.  *Id.*

---

[8] A copy of the amendment is appended to Ex. A to the Complaint.

### D.        Ferrell Purports To Terminate GreatBanc's Trusteeship

In September 2019, still working to monitor and preserve Plan assets, GreatBanc requested a meeting with the Board to understand its objectives and why it had concluded that the rejected proposals were not worth pursuing.  *Id.* at 3.  But the Board was finished communicating (to the extent it ever really had).  The next thing GreatBanc heard from Ferrell was that, true to its pattern of mismanagement and breach of its ERISA fiduciary duties, it was terminating GreatBanc as Trustee of the ESOP, effective November 8, 2019.  *Id.*; Compl. Ex. C.

The grim revelations in the Ferrellgas 10-K discussed above became public just a few days later.

### E.        GreatBanc Acts To Save Plan Assets

This left GreatBanc with virtually no choice.  With the Company in extremis, GreatBanc still owing full fiduciary duties for the next 30 days, and no time to sufficiently debrief the incoming interim trustee, GreatBanc wrote to inform Ferrell that it had breached its duties to the Plan by refusing to provide GreatBanc with the information it needed to monitor the value of Ferrell's shares, by refusing to provide GreatBanc with information concerning strategies or plans for addressing the financial peril in which the Company had put the Plan assets, and by refusing even to consider viable strategic alternatives that had been presented to and conveyed by GreatBanc to maximize Plan value.  Counterclaims Ex. 3 at 3.  Finally, compelled by its fiduciary duties as Trustee of the ESOP, GreatBanc made the Request, asking that Ferrell, as Plan Administrator, provide GreatBanc with direction to elect the New Board.  *Id.*

GreatBanc did so notwithstanding that, given the untenable situation Ferrell had created, as Trustee and 100% owner of Ferrell shares, GreatBanc's ERISA fiduciary duties, the Company's constituent documents and applicable Kansas corporations law would have permitted more drastic action.  Out of concern for the potential for additional instability that a public row might cause,

however, GreatBanc refrained.  Counterclaim ¶50.  The next day, heedless of any such concerns, Ferrell filed this lawsuit.[9]

GreatBanc's hand has now been forced.  To protect the Plan participants and fulfill its ERISA fiduciary duties, GreatBanc must act to replace the current Board, which has made no effort to stem (let alone reverse) the decline in value of Plan assets, and has in fact stood as a roadblock to any positive change.  For the reasons set forth below, this Court should keep GreatBanc installed as Trustee.

## PROCEDURAL HISTORY

Ferrell filed the Complaint on or about October 24, 2019.  GreatBanc is filing its Verified Answer and Defenses to Plaintiff's Complaint and Counterclaims ("Counterclaims") concurrently herewith.

## ARGUMENT

A party seeking a preliminary injunction "must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest."  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).  If the injunction sought is mandatory, the movant must "make a heightened showing of the four factors."  *Id.* at 1209.  As demonstrated below, GreatBanc has made the required showing for the injunctions it seeks.

---

[9] This suit has inevitably landed in the headlines, causing Ferrellgas stock price to fall to $0.51 as of October 30, 2019.  *See Ferrellgas Partners – 25 Year Stock Price History*, MacroTrends (last visited Oct. 30, 2019), https://www.macrotrends.net/stocks/charts/FGP/Ferrellgas-partners/stock-price-history; James Dornbrook, *New lawsuit sheds light on power struggle between Ferrellgas management, ESOP trustee* (Oct. 25, 2019), https://www.bizjournals.com/kansascity/news/2019/10/25/new-lawsuit-sheds-light-on-power-struggle-between.html.

## I.   GREATBANC WILL LIKELY SUCCEED ON THE MERITS OF ITS CLAIMS

### A.   GreatBanc Is An ERISA Trustee That Acted Pursuant To Its Fiduciary Duties In Issuing The Request, And Ferrell Violated Its Fiduciary Duties By Failing To Comply

GreatBanc is entitled – indeed, obligated – to act without direction to remove the Board. As Trustee of the ESOP, GreatBanc is a fiduciary under ERISA Section 404 and faces the risk of liability for breach of its fiduciary duties – regardless of whether it is a "directed" trustee – if it fails to act under certain circumstances.   *See Hurtado v. Rainbow Disposal Co.*, No. 817CV01605JLSDFM, 2018 WL 3372752, at *12 (C.D. Cal. July 9, 2018).  Indeed, even where, as here, the Plan prohibits certain action by the trustee without a direction from the plan administrator, "a 'directed trustee' is still subject to a duty of prudence," pursuant to which it "can disobey the named fiduciary's directions when it is plain that they are imprudent."  *Id.* at *12 (citations and quotations omitted); *see also In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207, 1237 (D. Kan. 2004) ("a directed trustee is relieved of liability only if it follows fiduciary directives that are proper and consistent with the plan as well as ERISA").[10]

Moreover, it is no answer to suggest that GreatBanc's fiduciary duties somehow remain dormant until the plan administrator issues an express direction.  GreatBanc's duty of prudence requires it "to attempt to remedy known breaches of duty by other fiduciaries[.]"  *In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 762 (S.D.N.Y. 2003) (quoting *FirsTier Bank, N.A. v. Zeller*,

---

[10] While GreatBanc's duties with respect to the investment of Plan assets are circumscribed, "it is undisputed that [a directed trustee] deals with plan assets.  [It] is responsible for maintaining custody of the assets held in the Trust Fund, for investing those assets as directed by [the Plan Administrator], and for making distributions to payees as directed by the Plan Administrator."  *Bremer Tr., N.A. v. Quality Ingredients Corp.*, No. CV 15-3002 (MJD/BRT), 2015 WL 9412969 (D. Minn. Oct. 30, 2015), *report and recom. adopted sub nom. Bremer Tr., N.A v. Quality Ingredients Corp.*, No. 15-3002 (MJD/BRT), 2015 WL 9412526 (D. Minn. Dec. 22, 2015) (quotations omitted).

16 F.3d 907, 911 (8th Cir. 1994)).  That is precisely what it is seeking to do here.  Ferrell's breaches of its ERISA fiduciary duties here are well-catalogued and must be remedied.

Additionally, it is well-established that where a trustee (i) seeks a direction from the administrator and (ii) announces the consequences of a non-response, "non-responses suffice as guidance, or directions, to the trustee.  Indeed, the black letter law of trusts requires the trustee to follow the [administrator's] silent directions[.]"  *Herman v. NationsBank Tr. Co., (Georgia)*, 126 F.3d 1354, 1370 (11th Cir. 1997).  That is precisely what happened here:  by not responding to GreatBanc's request for direction to replace the Board – and instead filing this suit – Ferrell issued a "silent direction" to GreatBanc ***not*** to remove the Board.  GreatBanc could not abide by both this direction and its duty to "remedy known breaches of duty by other fiduciaries," and is thus compelled to disobey the direction.  *See Perez v. Chimes D.C., Inc.*, No. CV RDB-15-3315, 2016 WL 6124679, at *4 (D. Md. Oct. 20, 2016) ("While a directed trustee should not be expected to second-guess every direction of a plan administrator, it should disobey instructions that are plainly imprudent") (citations and quotations omitted).

Moreover, GreatBanc's fiduciary obligations under ERISA extend beyond – and are not conditioned on – a "direction" from the plan administrator in the first instance.  On the contrary, GreatBanc's duty of prudence compels it to act ***without*** direction if it believes that inaction would constitute a breach of duty.  *Hurtado*, 2018 WL 3372752, at *12 (fiduciary duty violation plausibly alleged "by ***failing to act*** in the face of a self-dealing transaction") (emphasis added); *see Moench v. Robertson*, 62 F.3d 553, 567 (3d Cir. 1995), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) ("the common law of trusts … mandates that the [ESOP directed] trustee in certain narrow instances must take actions at odds with how it is ***generally directed to act***") (emphasis added).

Of particular note here, this Court (and others) have held that sufficiently dire financial circumstances devaluing and threatening the viability of plan assets warrant a trustee taking unilateral action to discontinue plan investment in company stock.  In *In re YRC Worldwide, Inc. ERISA Litig.*, for example, this Court observed that "the Tenth Circuit permits a claim of imprudence [against a trustee] based on investment in employer securities even if such investment is required by the terms of the plan[.]"  No. 09-2593-JWL, 2010 WL 4386903, at *2 (D. Kan. Oct. 29, 2010).  Thus, where plaintiffs alleged that "the stock became practically worthless," declining from $25.96 per share in 2007 to $0.45 per share in 2010, and risked being "delisted from the stock exchange," the trustee "should have overridden the Plan's terms and refused to offer the Company stock fund as an investment option[.]"  *Id.* at *2, 6; *see also* Dep't of Labor Field Assistance Bulletin No. 2004-03 ("where there are clear and compelling public indicators, as evidenced by an 8-K filing with the [SEC], a bankruptcy filing or similar public indicator, that call into serious question a company's viability as a going concern, the directed trustee may have a duty not to follow the named fiduciary's instruction without further inquiry."); *In re Delphi Corp. Sec., Derivative & ERISA Litig.*, 602 F. Supp. 2d 810, 825 (E.D. Mich. 2009) (same); *In re WorldCom, Inc. ERISA Litig.*, 354 F. Supp. 2d 423, 447 (S.D.N.Y. 2005) (same).  Ferrell's performance fits that bill precisely.

It is indisputable that Ferrell, its affiliates and thus the Plan, are in a dire situation.  From the outset, GreatBanc "had a duty to investigate the relevant facts and to explore alternative courses of action[.]"  *Hurtado*, 2018 WL 3372752, at *12 (citations and quotations omitted).  It did exactly that.  As the Company steadily and precipitously declined, GreatBanc sought to monitor the Plan's assets – repeatedly requesting information from Ferrell about its strategy to turn the Company around.  Having been approached by several Ferrell and Plan constituencies – from Ferrell

employees and management deeply concerned with the Company's performance and strategic plan to private equity firms interested in providing financing and/or restructuring assistance to the Company – GreatBanc continually passed these communications on to Ferrell and requested meetings to determine how it intended to proceed. Ferrell rebuffed each request and every overture. Initially content to brush GreatBanc aside with vague assurances of a sound strategy, Ferrell quickly shifted to outright rebuke – shrouding itself in a cone of silence and staunchly refusing to even consider strategic opportunities and other potential solutions despite ever-deteriorating financial conditions.

Eventually, Ferrell set in motion a plan to entrench the Board and rid itself of GreatBanc, whose continued requests for information, meetings, and explanations had apparently grown at best tedious, and perhaps threating, to those mismanaging the Company. Ferrell abruptly amended the Plan in late July 2019 to provide that GreatBanc would be directed in connection with voting Ferrell stock. Meanwhile, the Company has simply failed ever to propose a slate of directors for election in 2019, despite having done so each year prior, providing the slate to GreatBanc, who in turn would vote the Trust's shares by written consent without a specific direction. This failure to hold a director election not only breaks from past precedent, it violates the Company's Bylaws, which require it to hold an annual meeting for the election of directors once a year on August 4. *See* Bylaws §§4, 7(a). That date, too, came and went. To this day, there has been no annual meeting or slate of directors proposed – other than the slate for the New Board proposed by GreatBanc.

When, in late September, GreatBanc sent yet another letter imploring the Company to provide information about its financial health and strategic plan, Ferrell simply terminated GreatBanc on 30 days' notice. The timing cannot have been coincidental. Just one week later,

Ferrellgas filed its 10-K revealing, as GreatBanc had feared, an even more precarious set of financial circumstances: a creditor of the Ferrellgas operating partnership had taken the position that the operating partnership was in default on a $275 million senior secured term loan and that its:

> consolidated financial statements … for the fiscal year ended July 31, 2019 … ***do not satisfy the requirements set forth in the financing agreement*** for delivery of annual audited financial statements because ***the report of our independent registered public accounting firm on such financial statements includes an "explanatory paragraph" regarding substantial doubt as to the operating partnership's ability to continue as a going concern.***

Counterclaims Ex. 1 at 52-53 (emphasis added).  Unsurprisingly, S&P downgraded them to CCC-the next day.

Ferrell's pattern of imprudent decisions, mismanagement and nondisclosure had come to a head, and GreatBanc could "not simply close its eyes and ignore what was there to be seen." *Perez*, 2016 WL 6124679, at *4.  Nor, given that its purported removal becomes effective on November 8, is it feasible to bring the interim trustee up to speed in time for him to take the necessary action to stave off irreparable harm to the Plan and its participants and beneficiaries.  Accordingly, Ferrell's systematic stonewalling and entrenchment maneuvers have caused GreatBanc to conclude that it must take the action available to it under ERISA and as the Company's sole shareholder[11] "to remedy known breaches of duty by other fiduciaries":  electing the New Board. At this point, permitting the current Board to continue to run the Company would be imprudent.

---

[11] Counterclaims Ex. 1 at 105 ("In all cases, the Trustee may vote [company] shares as it determines is necessary to fulfill its fiduciary duties under ERISA.")

### B.    Acting As Ferrell's Sole Shareholder, GreatBanc May Properly And Lawfully Reconstitute Ferrell's Board Of Directors By Written Consent

As Ferrell's sole shareholder, exercising its fiduciary duty to act without/contrary to imprudent direction, GreatBanc clearly has the power to elect the New Board to replace the existing Board by action on written consent.

Section 5 of the Company's Bylaws provides that "[s]pecial meetings of the stockholders may be held for any purpose or purposes and may be called by … the holders of … not less than one-fifth of all outstanding shares entitled to vote at any such meeting …."  Counterclaims Ex. 2 (Ferrell Bylaws) §5.  Moreover, Section 19 of the Bylaws specifically provides that directors may be removed at a special meeting by a majority of shareholders entitled to vote, and Section 18 provides that vacancies created by removal of directors are to be filled by successors "duly elected at a stockholders meeting."  *Id.* §§ 18, 19.

Under Kansas corporations law, unless a company's articles of incorporation state otherwise, "any action which may be taken at any annual or special meeting of [a corporation's] stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, are signed by the holders of outstanding stock."  K.S.A. §17-6518(a).  Ferrell's articles of incorporation do not provide otherwise.

Accordingly, because GreatBanc, in its capacity as 100% shareholder of Ferrell, could clearly call a special meeting at which it could remove the current Board and elect the New Board, under §17-6518(a), it may do so on written consent.[12]

---

[12] For the Court's convenience, a draft written consent that would replace the Board with the New Board is attached at Counterclaims Ex. 3 at 5.

## II.     THE PLAN, OF WHICH GREATBANC IS TRUSTEE, FACES IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

A movant can demonstrate irreparable harm by showing "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages" that "is likely to occur before the district court rules on the merits." *RoDa Drilling Co.*, 552 F.3d at 1210 (internal quotations omitted).  Courts have held that a depletion of assets from an ERISA plan is an example of just such a risk.  *See, e.g.*, *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) (affirming preliminary injunction where plaintiff demonstrated that defendants would likely be unable to reimburse the plan if its legal costs were advanced from the plan, thereby establishing irreparable harm); *Anthony v. Texaco, Inc.*, 803 F.2d 593, 596 (10th Cir. 1986) (affirming preliminary injunction where district court found that plaintiffs "would be irreparably harmed if the defendants were not financially able to meet their obligations" under an ERISA plan); *Trustees of the Plumbers Local Union No. 1 Welfare Fund v. Manhattan Plumbing Corp.*, No. 08-cv-3036 (FB)(RML), 2009 WL 212148, at *2 (E.D.N.Y. Jan. 28, 2009) (preliminarily enjoining the disposition of employer's assets where plaintiffs alleged employer failed to contribute to ERISA fund and finding that depletion of employer's assets constituted irreparable harm); *Central States v. Hester*, No. 84-C-3516, 1984 U.S. Dist. LEXIS 15154, at *6 (N.D. Ill. July 6, 1984) ("[I]n the context of ERISA, when contributing employers fail to make monthly contributions, a pension fund suffers irreparable injury.").

Under the Board's stewardship, the value of Plan assets has cratered.  The unit value of Ferrellgas, on which the Plan heavily depends for its value, has declined over 98% since late 2014, and the units are now at risk of delisting.  *See supra* p. 6.  Compounding the problems, outsized leverage – to the tune of $2.2 billion – has, inevitably, led to creditors declaring and threatening to declare events of default with respect to loans at the Ferrellgas operating partnership level

18

(including the acceleration of $275 million in principal), auditors expressing substantial doubt as to the operating partnership's ability to continue as a going concern and ratings downgrades. *See supra* pp. 7-8.

The Company's only response has been to seek to limit GreatBanc's authority, terminate it as Trustee, refuse to issue the directions necessary for it to comply with its ERISA duties and elect the New Board (who represent the last best chance for the Plan's regrowth), and finally to sue it. Judging from past actions (and inaction), there can be little doubt that the Board will continue to preside over the deterioration of Plan assets. Absent the preliminary relief GreatBanc seeks, the Plan will face imminent irreparable harm. The Plan's assets are retirement benefits for Ferrell's employees, many of whom are at or approaching retirement age. Eroding the retirement benefits these participants have earned, in some cases since the Plan was established in 1997, will cause irreparable harm to these participants, their beneficiaries and their families.

## III.   THE BALANCE OF EQUITIES TIPS IN GREATBANC'S FAVOR

In issuing the Request, GreatBanc acted in its capacity as an ESOP trustee and ERISA fiduciary. Its only interest is (as it should be) for welfare of the Plan's participants and beneficiaries, and all of its actions are meant to improve the returns that they may receive in the future. Ferrell, on the other hand, has attempted to entrench the Board, which has mismanaged the Company to the severe detriment of Plan assets. It has alleged harm only in the most speculative and conclusory fashion (unspecified risks of "destabilizing the business, interfering with customer relationships [and] events of default" that "represent[] a direct, imminent and existential threat to Ferrell and the Plan Participants" (Compl. ¶14)), when, in fact, any harm posed to Plan assets, whether by "destabilization," "events of default" or otherwise, is, as discussed at length above, entirely of Ferrell's making. The harm posed to the Plan, however, is real and imminent.

On balance, the risk to the Plan and its participants and beneficiaries absent an injunction outweighs any risk to Ferrell in its capacity as Plan Administrator or the Board.  *See Trustees of the Pipefitters & Plumbers Local 524 Pension & Annuity Plan v. Yannuzzi, Inc.*, No. CV 3:15-2085, 2016 WL 4479394, at *5 (M.D. Pa. Aug. 25, 2016) (enjoining defendant's violations of ERISA fund agreements and refusing to "speculate as to the burdens the defendant will face if required to comply with an order simply enforcing its pre-existing contractual obligations.").

## IV.    INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST

In much the same way that the balance of equities favors GreatBanc as the Plan's trustee, the requested injunctive relief will serve the public interest.  A TRO keeping GreatBanc in place as Trustee until it can elect and seat the New Board is the best (and, if history is any guide, the only) hope for the growth of Plan assets, which is the overriding public interest at issue in this litigation.  *See* 29 U.S.C. §1001(a) ("The Congress finds that … employee benefit plans … are affected with a national public interest …."); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983) ("ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."); *Johnson*, 572 F.3d at 1083 ("Defendants invoke the public interest in ensuring that talented individuals remain willing to serve as corporate directors and officers.  But this concern, while significant, is far outweighed by the interests that ERISA protects."); *Byrne v. Calastro*, 205 F. App'x 10, 16-17 (3d Cir. 2006) (affirming preliminary injunction and concurring with the District Court that "ERISA evinced a congressional determination that employee benefit plans are in the national public interest and that there is a public interest in ensuring honest management of [ERISA funds]."); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1121 (3d Cir. 1989) ("public policy favors a preservation of the employee's right to benefits"); *Central States*, 1984 U.S. Dist. LEXIS 15154, at *7 ("It does not disserve the public

interest to enforce the principles endorsed by Congress of promoting fiscal integrity of employee benefit plans such as the Pension Fund involved in this litigation.").

## CONCLUSION

For the foregoing reasons, GreatBanc respectfully requests that the Court issue: (1) a temporary restraining order, in the form submitted to the Court, maintaining GreatBanc's status as Trustee beyond November 8, 2019 until such time as the Court has had an opportunity to rule on GreatBanc's request for a preliminary injunction and (2) a preliminary injunction maintaining GreatBanc's status as Trustee until such time as the Court has had an opportunity to rule and, to the extent necessary, GreatBanc has had an opportunity to implement any favorable decision.

Dated: November 1, 2019

*Of Counsel:*

WINSTON & STRAWN LLP
James P. Smith III (*pro hac vice* to be filed)
(NY # 2634491)
Matthew L. DiRisio (*pro hac vice* to be filed)
(NY # 4228995)
200 Park Avenue
New York, NY 10166
Telephone: 212-294-6700
Facsimile:  212-294-4700
jpsmith@winston.com
mdirisio@winston.com

Respectfully submitted,

SHOOK, HARDY & BACON

By:  */s/ Todd W. Ruskamp*
      Todd W. Ruskamp, D.Kan #70412
      Jessica A. E. McKinney, D.Kan #78649

2555 Grand Boulevard
Kansas City, Missouri  64108
Telephone: 816.474.6550
Facsimile: 816.421.5547
truskamp@shb.com
jamckinney@shb.com

*Attorneys for Defendant/Counterclaim-Plaintiff GreatBanc Trust Company*

## CERTIFICATE OF SERVICE

I certify that on November 1, 2019, the foregoing paper was served upon Counsel for Plaintiff via the Court's ECF system.

      */s/ Todd W. Ruskamp*
      Todd W. Ruskamp
      Attorney for Defendant/Counterclaim-Plaintiff
      GreatBanc Trust Company

4837-0232-9771 v1