**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | | |
|---|---|---|
| FERRELL COMPANIES, INC, as Plan Sponsor and Plan Administrator of the Ferrell Companies, Inc., Employee Stock Ownership Plan, | ) ) ) ) | CASE NO. 2:19-CV-2656-JAR-ADM |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| GREATBANC TRUST COMPANY, Trustee of the Ferrell Companies, Inc. Employee Stock Ownership Trust | ) ) ) ) | |
| Defendant. | ) ) ) | |
| GREATBANC TRUST COMPANY, Trustee of the Ferrell Companies, Inc. Employee Stock Ownership Trust, | ) ) ) ) | |
| Counterclaim-Plaintiff, | ) ) | |
| v. | ) ) | |
| FERRELL COMPANIES, INC., as Plan Sponsor and Plan Administrator of the Ferrell Companies, Inc., Employee Stock Ownership Plan, | ) ) ) ) ) | |
| Counterclaim-Defendant. | ) ) | |

**FERRELL COMPANIES, INC.'S OPPOSITION TO GREATBANC TRUST**
**COMPANY'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ................................................................................................... 3

I.     THE PARTIES, THE PLAN, AND THE TRUST ........................................... 3

II.    THE BRIDGER ACQUISITION ................................................................... 5

III.   THE BOARDS OF FCI AND GENERAL PARTNER RESPOND TO THE
       FINANCIAL DIFFICULTIES ...................................................................... 6

IV.    THE NOTICE OF REMOVAL AND GREATBANC'S RESPONSE ............. 8

ARGUMENT ...................................................................................................... 10

I.     GREATBANC IS NOT ENTITLED TO A TRO OR PRELIMINARY
       INJUNCTION ............................................................................................ 10

       A.     There Is No Likelihood That GreatBanc Will Prevail On The Merits ............... 11

              1.     GreatBanc's Rights are Purely Contractual and GreatBanc Has No
                     Right to Remain as Trustee Beyond November 8, 2019 ........................ 11

              2.     The Actions of the Companies' Boards Were at All Times
                     Consistent With Their Fiduciary Obligations, And Are Protected
                     By the Business Judgment Rule.............................................................. 16

       B.     GreatBanc Cannot Demonstrate Irreparable Harm In The Absence Of
              Injunctive Relief.......................................................................................... 19

       C.     The Supposed Harm To GreatBanc Does Not Outweigh The Harm To
              FCI, The Plan, And The Plan Participants That A TRO Or Preliminary
              Injunction Would Cause ............................................................................ 21

       D.     Injunctive Relief, If Issued, Would Be Adverse To The Public Interest ............. 22

II.    GREATBANC'S MOTION SHOULD BE DENIED IN ITS ENTIRETY, BUT IF
       GRANTED, GREATBANC SHOULD BE REQUIRED TO POST A
       SIGNIFICANT BOND ................................................................................ 23

CONCLUSION................................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................ 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adrian v. Westar Energy, Inc*.,
  2011 U.S. Dist. LEXIS 139989 (D. Kan. Dec. 5, 2011)..........................................................13

*Beddow v. Rhodes*,
  2018 U.S. Dist. LEXIS 209417 (D. Kan. Dec. 12, 2018).................................................13, 26

*Christeson v. Amazon.com.ksdc, LLC*,
  2019 U.S. Dist. LEXIS 82718 (D. Kan. May 16, 2019).........................................................25

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig*.,
  602 F. Supp. 2d 810 (E.D. Mich. 2009)................................................................................17

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp*.,
  269 F.3d 1149 (10th Cir. 2001) ...........................................................................................26

*Flake v. Hoskins*,
  55 F. Supp. 2d 1196 (D. Kan. 1999)......................................................................................21

*GTE Corp. v. Williams*,
  731 F.2d 676 (10th Cir. 1984) ..............................................................................................24

*Holdeman v. Devine*,
  474 F.3d 770 (10th Cir. 2007) ..............................................................................................20

*Hurtado v. Rainbow Disposal Co.*,
  2018 U.S. Dist. LEXIS 118128 (C.D. Cal. July 9, 2018).......................................................18

*Kansas Heart Hospital, L.L.C. v. Idbeis*,
  286 Kan. 183 (Kan. 2008)...............................................................................................18, 19

*In re Lear Corp. Shareholder Litig*.,
  967 A.2d 640 (Del. Ch. 2008)...............................................................................................19

*Mead Johnson & Co. v. Abbott Lab.*,
  201 F.3d 883 (7th Cir. 2000) ................................................................................................26

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
  906 F.2d 884 (2d Cir. 1990)..................................................................................................15

*Navarre v. Luna (In re Luna)*,
  406 F.3d 1192 (10th Cir. 2005) ............................................................................................21

*Paramount Communications v. Time Inc*.,
1989 Del. Ch. LEXIS 77 (Del. Ch. July 14, 1989), *aff'd in pertinent part*, 571
A.2d 1140 (Del. 1989) ....................................................................................................19

*Pegram v. Herdrich*,
530 U.S. 211 (2000)........................................................................................................20

*People for the Ethical Treatment of Animals, Inc. v. Kan. State Fair Bd*.,
891 F. Supp. 2d 1212 (D. Kan. Sept. 4, 2012)..........................................................23

*Perez v. Chimes D.C., Inc.*,
2016 U.S. Dist. LEXIS 145272 (D. Md. Oct. 20, 2016)..........................................17

*Radioshack Corp. v. Ruffin*,
2012 U.S. Dist. LEXIS 22209 (D. Kan. Feb. 22, 2012) .................................13, 22

*Smart Commun. Sys., LLC v. Region Constr., Inc*.,
2017 U.S. Dist. LEXIS 139599 (D. Kan. Aug. 30, 2017) .......................................22

*St. Mary of Plains College v. Higher Education Loan Program, Inc*.,
1989 U.S. Dist. LEXIS 15721 (D. Kan. Dec. 15, 1989)..........................................26

*Three Ten Enters. v. Berrenberg Enters.*,
1994 U.S. Dist. LEXIS 7363 (D. Kan. May 13, 1994)............................................27

*TMFS Holdings, LLC v. Capace*,
2017 U.S. Dist. LEXIS 17372 (D. Kan. Feb. 7, 2017) ...........................................22

*Waterman v. Bd. of Comm'rs*,
2018 U.S. Dist. LEXIS 107466 (D. Kan. June 27, 2018)........................................22

*Welch v. Via Christi Health Ptnrs*.,
281 Kan. 732 (Kan. 2006)..............................................................................................19

*In re WorldCom, Inc. ERISA Litig*.,
354 F. Supp. 2d 423 (S.D.N.Y. 2005)...................................................16, 17, 18

**Statutes**

ERISA Section 403(a), 29 U.S.C. § 1103....................................................4, 16, 17

K.S.A. 17-6501(c)................................................................................................................10

**Other Authorities**

Fed R. Civ. P. 65(c) ...........................................................................................................26

https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-
assistance-bulletins/2004-03 .......................................................................................17

## PRELIMINARY STATEMENT

The drastic and extraordinary relief that GreatBanc Trust Company ("GreatBanc") seeks is unprecedented.  GreatBanc is simply the directed trustee of the trust for the employee stock ownership plan ("ESOP") that invests in and owns the stock of Ferrell Companies, Inc. ("FCI").  As a directed trustee, its role is bounded by the specific, limited tasks delegated to it in the FCI Employee Stock Ownership Trust agreement (the "Trust Agreement"), and the responsibility to direct its decisions lies with FCI itself.  FCI has, as is its absolute right under the Trust Agreement, properly acted to replace GreatBanc—with a different trustee, who will have exactly the same powers and fiduciary responsibilities as GreatBanc.  The Trust Agreement specifically authorizes FCI to replace GreatBanc *without cause*, although there is ample cause as well.  This cause includes the fact that the U.S. Department of Labor has mandated that GreatBanc be replaced as Trustee.

GreatBanc has not challenged the sufficiency of FCI's notice removing it as Trustee.  And GreatBanc cannot sincerely criticize the qualifications of the incoming trustee or point to any conflict that would preclude the trustee from acting faithfully in the ESOP participants' interests.  Yet GreatBanc maintains that the Court should erase the contractual limitations on GreatBanc's authority, override the appointment mechanism that is the sole source of its status, and place a cloud of uncertainty over who exactly is in control of FCI and its affiliates—all to prevent the replacement of GreatBanc with a trustee who would be both empowered and obligated to do the same things GreatBanc says it must.  No court has ever abrogated an employee stock ownership plan trust agreement as GreatBanc asks this Court to do.

GreatBanc suggests that the Employee Retirement Income Security Act ("ERISA") overrides the Trust Agreement and empowers both GreatBanc and the Court to take actions that the Trust Agreement, by its plain terms, does not permit.  But not one of the cases GreatBanc cites

supports the relief it seeks, and not a single authority remotely resembles the facts here, where the FCI Board exercised its sound business judgment and clear legal right to terminate GreatBanc's trusteeship. Moreover, GreatBanc's purported reason for ousting the FCI Board is that GreatBanc disagrees about how FCI is restructuring the debts of Ferrellgas Partners, L.P. ("FGP") and Ferrellgas L.P. ("OpCo")—companies in which plan participants have no direct interests. As GreatBanc itself has previously conceded, "The ESOP owns shares of FCI, but the entity involved in the restructuring was Ferrellgas Partners, L.P. ("FGP"). . . .  The ESOP . . . does not own a direct stake in FGP and could not directly control its restructuring."[1]  Disagreement about how management carries out business affairs at an entity the ESOP does not own is plainly not a legitimate basis for GreatBanc to take any action as trustee—much less an act that would need the Court to assist by ordering equitable relief beyond GreatBanc's own authority.

GreatBanc's request also would do great harm to ESOP participants.  The FCI Board, the Board of Ferrellgas, Inc. (the "General Partner"), and the management of FGP and OpCo[2] are engaged in a thorough, thoughtful, and appropriate process to restructure FGP's and OpCo's debt.  While that debt, which has long been known to GreatBanc and the general public, generated a dispute over a non-existent default on some technical credit facility covenants, the course of action GreatBanc demands would cause an immediate and actual default, allowing OpCo's lenders to accelerate in excess of $350 million in loans and risking the genuine collapse of the Ferrellgas companies (not just the possible decline in fortunes that GreatBanc purports to fear).  Ferrellgas is entering perhaps the most delicate period in its history:  negotiations to restructure roughly $2 billion in debt, $357 million of which will come due in June 2020.  A court-ordered replacement

---

[1] May 31, 2013 Letter from Susan Peters, Esq. to Susan Jack, Investigator, U.S. Department of Labor (attached as Exhibit 1).

[2] An organization chart is attached as Exhibit 2.

of the FCI Board that, together with the General Partner Board, has been leading the restructuring process with management and advisors, would be catastrophic and contrary to the interests of employees and ESOP participants.

GreatBanc's willingness to expose ESOP participants to such risk, and the circularity of its arguments about its role, should give the Court great pause. GreatBanc's motives are not pure. FGP and OpCo unquestionably are companies with heavy debt, and publicly traded units in FGP have dropped in value. GreatBanc bears as much blame for the FGP's woes as anybody. The company's losses are largely the result of its disastrous 2015 acquisition of Bridger Logistics. In connection with that transaction, FCI asked GreatBanc to serve not as a directed trustee, but as a discretionary trustee, specifically so that the ESOP participants would have the benefit of a fiduciary review. In approving the Bridger transaction, GreatBanc undertook its own independent review and consideration of the proposed acquisition, a job for which GreatBanc received a substantial fee.

In the aftermath of the Bridger transaction, the management of the company changed; and Jim Ferrell had to return from retirement to rehabilitate the company (for zero compensation). It is time for the Trustee to change as well.

## BACKGROUND

## I.    THE PARTIES, THE PLAN, AND THE TRUST.

FCI is a Kansas corporation headquartered in Overland Park. *See* Declaration of James Ferrell ("Ferrell Decl.") at ¶ 4 (attached as Exhibit 3).[3] FCI is the 100% owner of Ferrellgas, Inc. ("General Partner"). *Id.* General Partner is the general partner of both Ferrellgas Partners, L.P.

---

[3] The Declaration of James Ferrell, and accompanying exhibits, are incorporated herein by reference.

("FGP"), a publicly traded limited partnership, and Ferrellgas, L.P. ("OpCo"). *Id.* FCI is also the owner of approximately 23% of the limited partnership units of FGP. *Id.* FGP is the 99% owner of OpCo. *Id.* Collectively, these entities are referred to as the "Companies." *Id.*

FCI established the Ferrell Companies, Inc. Employee Stock Ownership Plan (the "Plan") as the Plan's Sponsor on or about August 1, 1997. Ferrell Decl. ¶ 5; Ex. A to Ferrell Decl. On the same date, FCI, as Plan Sponsor, and LaSalle National Bank, the predecessor to GreatBanc, as directed Trustee, entered into the Ferrell Companies, Inc. Employee Stock Ownership Trust (the "Trust"). Ferrell Decl. ¶ 5; Ex. B to Ferrell Decl.

In addition to their service as directed trustee, LaSalle National Bank and GreatBanc have also served, when specifically asked by the Plan Administrator, as discretionary trustee for specific transactions involving the Plan and Trust. Ferrell Decl. ¶ 6. When they have acted as discretionary trustee, LaSalle National Bank and GreatBanc have received additional compensation for their independent review and judgment of the matters they are requested to evaluate. *Id.* The Plan and Trust collectively are referred to as the "ESOP." *Id.*

As a directed Trustee of the Trust, GreatBanc is obligated to take directions from FCI in its capacity as Plan Administrator.[4] *See generally* Trust Agreement § 2.3 (General Powers) (Ex. B to Ferrell Decl.). The Trust Agreement further provides that "the powers, duties and responsibilities of the Trustee shall be limited to those set forth in this Trust Agreement, and

---

[4] ERISA Section 403(a), 29 U.S.C. § 1103(a), the directed trustee provision, states in pertinent part that "[t]he trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan, except to the extent that – (1) the plan expressly provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee, in which case the trustees shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to this Act . . . ." 29 U.S.C. § 1103(a) (emphasis added).

nothing contained in the Plan, either expressly or by implication, shall be deemed to impose any additional powers, duties or responsibilities on the Trustee." *Id*. § 2.2.  On many matters affecting the ESOP, the Trust Agreement does not authorize GreatBanc to exercise its own discretion.  *Id.* at § 2.3.   Naming or replacing members of the FCI Board are certainly among the steps that GreatBanc cannot take on its own decision, because the Trust Agreement and the Plan authorize GreatBanc to vote stocks only "as directed by the Plan Administrator" and say specifically that FCI "shall have the power to direct" GreatBanc's voting of FCI stock.  *Id.*  at § 2.3(d) ("as directed by the Plan Administrator, to vote any stocks (including Company Stock, . . .)"); *see also* Plan § 11(h) ("[t]he Company (as Plan Administrator) shall have the power to direct the Trustee as to voting of Company Stock. . .") (Ex. A to Ferrell Decl.).

## II.     THE BRIDGER ACQUISITION.

In May 2015, the then company management pursued a strategy to diversify the business by investing in mid-stream operations.  Ferrell Decl. ¶ 9.

Bridger Logistics, LLC ("Bridger") was a mid-stream transportation company, primarily engaged in shipping oil from the Bakken Formation in North Dakota to refineries on the East Coast.  *Id.* at ¶ 10.  The Companies, assessing that Bridger was a good opportunity to diversity, negotiated an acquisition for Bridger for approximately $822 million.  *Id.*  GreatBanc, acting as discretionary Trustee for this transaction, specifically approved the acquisition and was paid $500,000 for its role in doing so.  *Id.*; May 4, 2015 letter from K. Kolb to A. Heitman (Ex. C to Ferrell Decl.)

To finance the acquisition of the mid-stream operations, of which Bridger was the most significant, FGP and OpCo together issued over $500 million in debt.  Ferrell Decl. ¶ 11.  The Bridger and related midstream acquisitions turned out to be a financial disaster.  *Id.*  FGP and OpCo were saddled substantial debt and the midstream operations did not generate sufficient

cashflow to service the debt. *Id.* This is what created the current problems with respect to the companies' capital structure. *Id.*

## III.   THE BOARDS OF FCI AND GENERAL PARTNER RESPOND TO THE FINANCIAL DIFFICULTIES.

The Bridger acquisition had such terrible consequences for FGP and OpCo that Jim Ferrell came out of retirement in September 2016 to help guide the company through its rehabilitation. Ferrell Decl. ¶ 12. The debt incurred to finance the Bridger and related midstream acquisitions has necessitated that FGP and OpCo craft a process and strategy for restructuring their debt. *Id.*

The mid-stream operations were divested. *Id.* at ¶ 13. Moelis & Company, a highly regarded investment bank and financial advisory firm, was engaged as a strategic financial advisor. *Id.* at ¶ 14. Moelis made recommendations to the Boards of FCI and the General Partner regarding long-term strategic objectives for addressing the FGP and OpCo capital structure. *Id.* The Boards approved those recommendations. *Id.*; July 27, 2019 Board Resolution (Ex. D to Ferrell Decl.).

Ferrellgas, as a direct result of the Bridger disaster, had to replace its commercial bank line with a loan from TPG, a distressed debt fund. Ferrell Dec. ¶ 15; Credit Agreement (Ex. E to Ferrell Decl.). Jim Ferrell made a substantial effort to develop a strong "partner" relationship with TPG, over and above the contractual terms of the loan. *Id.* at ¶ 16. That did not materialize, however, and in September TPG indicated that it was anticipating that the upcoming 10-K and audit would violate the requirement that the audit not be qualified. *Id.*

TPG demanded a commercially unreasonable amount of money in order to waive the anticipated default. *Id.* at ¶ 17. TPG also claimed a technical default on September 25 to further their demand for a substantial sum to cure the alleged foot-fault. *Id.*

Ferrellgas disagrees with TPG's position regarding such alleged defaults and has worked with TPG to resolve the dispute. *Id.* at ¶ 18. Importantly, TPG has not exercised any remedies

and continues to provide financing in accordance with the loan terms. *Id.* This is nothing more than a commercial dispute that Ferrellgas continues to attempt to resolve consensually with TPG and it has no bearing whatsoever on GreatBanc or this case. *Id.* Indeed, on September 12, 2019, two weeks before the alleged default, Jim Ferrell, the two Plan Administrators, and counsel interviewed James Urbach. Declaration of Cathy Brown at ¶ 3 (attached as Exhibit 4). At the conclusion of the meeting, it was agreed amongst the company representatives that Mr. Urbach should replace GreatBanc. *Id.*

In the meantime, the Boards and management have worked hard to preserve relations with investors and creditors, and maintain operating revenue. Ferrell Decl. ¶ 19. The necessary tactics have sometimes been sharp and not without debate. *Id.*

In November 2018, members of senior management raised concerns that a Chapter 11 bankruptcy was being given serious consideration and was imminent. *Id.* at ¶ 20. They made demands and announced their intention to resign. *Id.* Their demands were not met. *Id.* They then contacted GreatBanc to express concerns about the supposed, imminent, pre-packaged Chapter 11 bankruptcy filing. *Id.* This was not true, and the former executives ultimately acknowledged under oath this was not true. *Id.* There were no plans for an imminent bankruptcy filing. *Id.* After the employees' voluntary separation from General Partner, the FCI Board met with GreatBanc in December 2018 and explained how GreatBanc had been used as a pawn. *Id.* Since that December 2018 meeting, GreatBanc did not voice further concern about these events until October 23, 2019, two weeks after it was notified that it was being removed as Trustee. *Id.*

Jim Ferrell made three trips to see GreatBanc in Chicago earlier in 2019 to ensure that GreatBanc understood that the former executives' allegations that he planned to take the company

into bankruptcy were concocted out of thin air and that the executives ultimately acknowledged that Jim Ferrell had actually done nothing wrong.  *Id.* at ¶ 21.

The decisions of the Ferrellgas entities as they related to the skirmish with TPG were (and are) totally separate from those relating to FCI's decisions regarding the replacement of GreatBanc as trustee.  *Id.* at ¶ 22.  The timing is entirely coincidental.  *Id.*

GreatBanc represents that it was contacted by a number of third parties, including "certain investment bankers and financial advisors who expressed interest in working with Ferrell to develop solutions to Ferrell's problems."  GreatBanc TRO Brief at 9.  The FCI Board requested information concerning these bankers and advisors.  Ferrell Decl. ¶ 23.  To date, GreatBanc has not provided this information.  *Id.*

The FCI Board met on October 8, 2019, voted to replace GreatBanc as Trustee, and provided formal notice to the Trustee of its removal the next day.  Ferrell Decl. ¶ 24.  GreatBanc complains that the FCI Board did not form a special committee as requested by GreatBanc. GreatBanc TRO Brief at 8-9.   The FCI Board advised GreatBanc that doing so under the current circumstances was not warranted and not appropriate corporate governance.  Ferrell Decl. ¶ 25. The FCI Board reasonably determined to have the full board consider the proposals in conjunction with its outside counsel and Moelis.  *Id.*

## IV.    THE NOTICE OF REMOVAL AND GREATBANC'S RESPONSE.

FCI notified GreatBanc on October 9, 2019 that it was terminating GreatBanc's trusteeship thirty days thereafter (November 8, 2019).  Ferrell Decl. ¶ 26; Notice of Removal (Ex. H to Ferrell Decl.).  That same day, FCI entered into an agreement with James Urbach for him to serve as successor trustee.  Ferrell Decl. ¶ 26; Urbach Agreement (Ex. H to Ferrell Decl.).

Two weeks later, GreatBanc demanded that FCI's Board, as Plan Administrator, direct GreatBanc as Trustee to replace FCI's entire Board with new directors.  Ferrell Decl. ¶ 27; October

23, 2019 Demand Letter to the Board of Directors of FCI and OpCo (redacted per ECF 7-3) (Ex. I to Ferrell Decl.).

GreatBanc's demand presents a clear and existential threat to the Companies, and potentially irredeemable harm to their employees and the ESOP Participants. Ferrell Decl. ¶ 28. GreatBanc's proposed ouster of the Board would significantly destabilize the business, interfere with customer relationships, and trigger events of default under loan covenants made by OpCo to its lenders, all of which would significantly, negatively impact the financial performance of the ESOP. *Id.* Even a short extension of GreatBanc's Trusteeship would cause market uncertainty and enhance risk, including impairing the company's ability to credibly negotiate with its bondholders. *Id.* To the extent that GreatBanc is successful in its efforts to replace the FCI Board, then a cascading domino effect will cause irreparable harm to the Companies. *Id.* at ¶ 29.

The FCI Board, in consultation with the General Partner's board of directors and their advisors, appropriately has focused on long-term strategic objectives with respect to Ferrellgas that the FCI Board believes will enhance the value of the stock. *Id.* at ¶ 31. The FCI and General Partner are taking prudent and reasonable steps to appropriately address the overleveraged balance sheets of FGP and OpCo, in the best interests of the employees and the ESOP. *Id.*

Under the Credit Agreement, a "Change of Control" will occur if a "majority of the seats . . . on the Board of Directors (or similar governing body) of the General Partner (or its direct or indirect parent holding company) cease to be occupied by Persons who either (i) were members of the Board of Directors of General Partner (or its direct or indirect parent holding company) on the Closing Date . . . ." Credit Agreement § 1.1 (Ex. E to Ferrell Decl.). What GreatBanc is demanding – replacing the FCI Board, the direct parent of General Partner under the Credit Facility – is a Change of Control. As a result, an Event of Default under Section 8.1(k) of the Credit Facility

will occur and TPG will be positioned to pursue all remedies, including acceleration.  If the amounts due under the Credit Facility are accelerated, Events of Default with respect to the unsecured notes issued by both FGP and OpCo also would occur and such notes would then become due and owing.  GreatBanc's requested mandatory injunction would destroy the Companies by creating a default that would accelerate the massive debt that looms.  No one, especially not the beneficiaries of the ESOP, would benefit from GreatBanc's demand.

## ARGUMENT

As the preceding pages reveal, FCI strongly disputes GreatBanc's self-serving narrative. As it happens, though, these facts – the truth and GreatBanc's spin on it—are largely irrelevant. Neither under the Plan and Trust Agreement nor under ERISA does GreatBanc have any right to the relief it demands.  The law does not permit the unprecedented judicial intervention that GreatBanc urges upon the Court.

## I.  GREATBANC IS NOT ENTITLED TO A TRO OR PRELIMINARY INJUNCTION.

Temporary restraining orders and preliminary injunctions are "drastic" remedies, and "the exception rather than the rule." *Adrian v. Westar Energy, Inc*., 2011 U.S. Dist. LEXIS 139989, at *9 (D. Kan. Dec. 5, 2011) (citing *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)).  To obtain a TRO or preliminary injunction, the moving party must show "a clear and unequivocal right to relief."  *Beddow v. Rhodes*, 2018 U.S. Dist. LEXIS 209417, at *2 (D. Kan. Dec. 12, 2018) (Robinson, J.) (denying motion for TRO and preliminary injunction).

To obtain such drastic and extraordinary relief, the moving party must show:

(1)     a likelihood of success on the merits;

(2)     a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief;

(3)     that the balance of equities tips in the movant's favor; and

(4)     that the injunction is in the public interest.

*Id.*; *see also Radioshack Corp. v. Ruffin*, 2012 U.S. Dist. LEXIS 22209, at *18 (D. Kan. Feb. 22, 2012)).

In addition, the moving party must meet a "heightened standard" when requesting one of three types of disfavored injunctions, including: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Beddow*, 2018 U.S. Dist. LEXIS 209417, at *2-3 (citation omitted). When an injunction falls into one of these categories, it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* at *3 (citation omitted).

GreatBanc's motion for TRO and preliminary injunction should be denied because GreatBanc cannot demonstrate any of the requirements for extraordinary relief.

**A.     There Is No Likelihood That GreatBanc Will Prevail On The Merits.**

GreatBanc fails to cite a single case in which a court has granted injunctive relief to extend the trusteeship of a trustee who has received a facially compliant and legally valid notice of removal.

**1.     GreatBanc's Rights are Purely Contractual and GreatBanc Has No Right to Remain as Trustee Beyond November 8, 2019.**

GreatBanc has no right to remain as Trustee beyond November 8, 2019. GreatBanc's rights as a Trustee are purely contractual, and pursuant to Section 6.2 of the Trust Agreement, it has received a self-effectuating Notice of Removal. Trust Agreement § 6.2 (Ex. B to Ferrell Decl.) GreatBanc has effectively conceded as much. *See* GreatBanc's October 23, 2019 Letter at 1

("GreatBanc . . . will continue to take action to preserve Trust *assets until the removal becomes effective on November 8, 2019*.") (emphasis added) (Exhibit C to GreatBanc's TRO brief).

Section 6.2 of the Trust Agreement provides no mechanism for GreatBanc to challenge its removal, or extend its Trusteeship beyond November 8, 2019.  FCI's right to remove GreatBanc under this Section is absolute, subject only to FCI's obligation to provide advance notice and evidence of the successor Trustee's acceptance of the Trusteeship.  *See* Trust Agreement § 6.2 ("The Company may remove the Trustee by giving thirty (30) days' advance written notice to the Trustee, subject to providing the removed Trustee with satisfactory written evidence of the appointment of a successor Trustee and of the successor Trustee's acceptance of the trusteeship.").[5]

The Trust does not provide a right to appeal because the interests of the Plan and Plan Participants are fully protected by the appointment of successor Trustee, who is subject to the same fiduciary obligations as its predecessor.  A fully qualified and experienced successor trustee has been appointed to assume the role of Trustee.  *See* Declaration of James Urbach ("Urbach Decl.") at ¶¶ 4-6, 8 (attached as Exhibit 5).  The new Trustee will be subject to the same fiduciary obligations as GreatBanc.  And unlike GreatBanc, there is no risk that the new Trustee will be motivated by a desire to insulate himself against claims for breach of fiduciary duty by the Plan Participants for past conduct.

The injunction GreatBanc seeks is unprecedented.  "[C]ontract provisions specifying [30]-day periods mean [30] days rather than [30] days plus an additional period calculated by the length of the chancellor's foot."  *See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 891 (2d Cir. 1990) (reversing a preliminary injunction extending 60-day contractual cure period under

---

[5] It is undisputed that FCI's notice to GreatBanc complied with all the requirements of Section 6.2 of the Trust Agreement.

indentures).  GreatBanc does not (and cannot) cite a single case in which a court rewrote the plain terms of a trust agreement to even temporarily extend the trusteeship of an employee stock ownership plan trustee after it received valid notification of removal, but before the effective date of its termination.

As a directed Trustee, GreatBanc is obligated to take directions from the Plan Administrator, as provided for in the Trust.  *See* Trust Agreement § 2.3 (enumerating and proscribing the General Powers of the Trustee) (Ex. B to Ferrell Decl.”); *id.* § 2.2 (“The powers, duties and responsibilities of the Trustee shall be limited to those set forth in this Trust Agreement, and nothing contained in the Plan, either expressly or by implication, shall be deemed to impose any additional powers, duties or responsibilities on the Trustee.”).

Significantly, Section 2.3(d) of the Trust Agreement provides that the Trustee can vote the shares of Company Stock only “as directed by the Plan Administrator . . . .”  Trust Agreement § 2.3(d) (Ex. B to Ferrell Decl.); *see also* Plan § 11(h) (“The Company (as Plan Administrator) shall have the power to direct the Trustee as to voting of Company Stock under Section 8 . . . .”) (Ex. A to Ferrell Decl.).  GreatBanc’s TRO and its eventual preliminary injunction—mandating the removal and replacement of the entire FCI Board—would require the Court to abrogate the plain terms of these documents.  Clearly, GreatBanc cannot succeed on the merits of any claim under the Plan or the Trust Agreement that would involve such relief.

GreatBanc asserts that under ERISA, it may – indeed, it says it must – flout the Plan Administrator’s instructions and take its own initiative.  Instead of the Plan Administrator’s replacing the Trustee as the Trust Agreement specifies, GreatBanc believes the Trustee can, in effect, replace the Plan Administrator.  This theory is directly contrary to the text of ERISA, which says a trustee has authority and discretion to control plan assets “***except to the extent*** that the plan

expressly provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee, ***in which case the trustees shall be subject to proper directions of such fiduciary***." 29 U.S.C. § 1103(a).[6]  "[T]he fiduciary obligations of directed trustees are circumscribed by the parameters of their duties pursuant of Section 403(a)."  *In re WorldCom, Inc. ERISA Litig.*, 354 F. Supp. 2d 423, 445 (S.D.N.Y. 2005).

This provision provides the sole possible bases for a directed trustee to depart from directions provided by a plan administrator; the directions much "made in accordance with the terms of the plan and which are not contrary to [ERISA]." 29 U.S.C. § 1103(a).  FCI's replacement of GreatBanc as trustee is manifestly in accord with the terms of the Plan.  And GreatBanc has made no argument (nor could it) that those instructions are contrary to ERISA.  The Department of Labor has explained that with respect this element, "the scope of a directed trustees [sic] responsibility is significantly limited," and a directed trustee is not supposed to "second-guess the work of the plan fiduciaries that have discretionary authority over the management of plan assets and [the] direct obligation to determine the prudence of a transaction."  U.S. Dep't of Labor, Field Assistance Bulletin No. 2004-03 (Dec. 17, 2004), at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2004-03 (attached as Exhibit 6).  In particular, "a directed trustee's knowledge that a company's 'stock price and profits were declining and that the company was undergoing a restructuring' is not sufficient" to trigger the trustee to depart from instructions.  *WorldCom*, 354 F. Supp. 2d at 449 (granting summary judgment to trustee because continued investment in

---

[6] This provision limits that obligation to instructions that are "made in accordance with the terms of the plan and which are not contrary to [ERISA]." 29 U.S.C. § 1103(a).  FCI's replacement of GreatBanc as trustee is obviously in accordance with the terms of the Plan and Trust Agreement.  And GreatBanc has made no argument (nor could it) that those instructions are contrary to ERISA.

company's declining stock was not a breach of duty); *In re Delphi Corp. Sec., Derivative &* *"ERISA" Litig.*, 602 F. Supp. 2d 810, 826 (E.D. Mich. 2009) (similar).

By contrast, none of GreatBanc's purported authorities supports its theory.  They show only that, in *some* circumstances, a trustee has a duty to investigate the operations of the plan.  For example, in *Perez v. Chimes D.C., Inc.*, 2016 U.S. Dist. LEXIS 145272 (D. Md. Oct. 20, 2016), the court denied a directed trustee's motion to dismiss because she allegedly paid plan service providers excessive fees that differed from the agreed upon fee schedule, despite knowing that the benefits administrator was not providing adequate services to the Plan and its participants.  *Id.* at *12-14.   The directed trustee was not immunized from ERISA liability by virtue of her position.  *Id.*  But that shows nothing about whether GreatBanc has the obligation or the authority to disregard its instructions in this case.  *WorldCom, Inc.*, which GreatBanc cites, actually cuts the opposite direction.  That court held that the *WorldCom* collapse, famously catastrophic as it was, was still not "one of those rare cases in which a directed trustee had a duty under ERISA to investigate whether the continued investment of Plan assets in company stock was imprudent." 354 F. Supp. 2d at 451.  Likewise, in *Hurtado v. Rainbow Disposal Co.*, 2018 U.S. Dist. LEXIS 118128 (C.D. Cal. July 9, 2018), the plaintiffs alleged plausible allegations that GreatBanc violated its fiduciary duties by failing to investigate self-dealing by two executive officers.  *Id.* at *32.  They alleged that GreatBanc was aware that the officers were investing company assets into entities in which they personally held ownership interests but did nothing to investigate.  *Id.*  Even if a directed trustee could ignore certain directions as a matter of prudence, that is a far cry from taking unilateral action to remove the plan sponsor's Board – which no court has ever allowed.

2.      **The Actions of the Companies' Boards Were at All Times Consistent With Their Fiduciary Obligations, And Are Protected By the Business Judgment Rule.**

GreatBanc asserts the right to make basic business decisions at FCI.  GreatBanc disagrees with how FCI, the General Partner, and FGP are working to restructure FGP's and OpCo's debts, and GreatBanc disagrees even more strenuously with FCI's decision to replace GreatBanc as trustee.  But the Court cannot second-guess the business decisions made by FCI's and the General Partner's management and board of directors.  Under the protections of the business judgment rule, the Court must "presume[] a corporate board's decision was made by disinterested directors who acted on an informed basis, in good faith, and in the honest belief the decision was in the corporation's best interest." *Kansas Heart Hospital, L.L.C. v. Idbeis,* 286 Kan. 183, 211 (Kan. 2008).  GreatBanc does not even attempt to show any of those presumptions is false.  Instead, GreatBanc tries to override the business judgment rule on the strength of a novel ERISA argument.

Certainly nothing in state law permits GreatBanc's actions.  GreatBanc believes it can, as trustee holding the majority of shares in FCI, instruct the FCI Board to replace itself.  But Kansas corporation law, which follows Delaware law, allocates all corporate managerial authority to the Board, and it has long been held that this allocation empowers the board to oppose the entreaties of shareholders or those who purport to act for them.[7]  Boards of directors "are not thermometers, existing to register the ever-changing sentiments of stockholders.  [D]irectors may take good faith

---

[7] Kansas corporation law was patterned after Delaware law, and thus it is appropriate to look to Delaware cases for guidance. *See Welch v. Via Christi Health Ptnrs*., 281 Kan. 732, 765 (Kan. 2006) ("Kansas courts have a long history . . . of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware code.'").  Kansas courts routinely cite Delaware law on the business judgement rule. *See, e.g.*, *Kansas Heart Hospital*, 286 Kan. at 209 (quoting *Aronson v. Lewis* for its articulation of the rebuttable presumption and burden shifting aspect of the business judgement rule).

actions that they believe will benefit stockholders, even if they realize that the stockholders do not agree with them." *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 655 (Del. Ch. 2008).

Courts long have recognized the fundamental invalidity of any assertion that directors are shareholder agents: "The corporation law does not operate on the theory that directors, in exercising their powers to manage the firm, are obligated to follow the wishes of a majority of shares.  In fact, directors, not shareholders, are charged with the duty to manage the firm." *Paramount Communications v. Time Inc.*, 1989 Del. Ch. LEXIS 77, at *89 (Del. Ch. July 14, 1989), *aff'd in pertinent part*, 571 A.2d 1140 (Del. 1989).  The corporate governance framework, in other words, is board-centric, not shareholder-centric.

The FCI Board, in consultation with the General Partner's board of directors and their advisors, appropriately has focused on long-term strategic objectives with respect to Ferrellgas that the FCI Board believes will enhance the value of the stock.  Ferrell Decl. ¶ 31.  They have undertaken an aggressive but prudent strategy to address the balance sheet issues.  *Id.*  They are entitled – indeed obligated – to exercise their independent business judgment without being supplanted by a directed Trustee that is only interested in insulating itself from claims of breach of fiduciary duty.

This does not change because the FCI Board also is the Plan Administrator.  Both the Supreme Court and Tenth Circuit have held that an ERISA fiduciary can "wear different hats" and make business decisions that are not subject to a heightened ERISA fiduciary duty.  *See Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000) ("[T]he [ERISA] statute does not describe fiduciaries simply as administrators of the plan, or managers or advisers.  Instead it defines an administrator, for example, as a fiduciary only 'to the extent' he acts in such a capacity in relation to a plan.  In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether

the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.").

In *Holdeman v. Devine*, 474 F.3d 770 (10th Cir. 2007), plaintiffs challenged the district court's conclusion that a CEO's decisions regarding funding for a plan were business judgments that fell outside the scope of ERISA's fiduciary duty requirements. *Id*. at 776. The plaintiffs argued that the business judgement rule should not have been applied and that instead ERISA's prudent person test under Section 1104(a)(1)(B) should have been applied. *Id*. at 779. The Tenth Circuit applied the law as described by the Supreme Court in *Pegram v. Herdrich* and affirmed the district court's holding that "Devine was 'wearing his CEO hat' in making those allocation-of-funding decisions, and in turn did not breach any fiduciary duties to the Plan in doing so." *Id*. at 779-80.

Likewise, in *Navarre v. Luna (In re Luna)*, 406 F.3d 1192 (10th Cir. 2005), the court held that the employers' decision to use funds to pay business expenses rather than make contributions to the fund was a business decision, not a breach of fiduciary duty. *Id*. at 1207. The court observed that "[b]ecause virtually every business decision an employer makes can have an adverse impact on an employee benefit plan, courts must examine the conduct at issue to determine whether it constitutes management or administration of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary duties." *Id*. (citation and internal quotations omitted).

Similarly, in *Flake v. Hoskins*, 55 F. Supp. 2d 1196 (D. Kan. 1999), the court stated that an "employer often will act as both an employer and plan fiduciary, and not all of an employer's business activities implicate fiduciary duties under ERISA." *Id*. at 1219. Thus, because the plan

gave defendants the power to "administer" or "manage" the trust, but did not give them control over the investment or sale of employee stock ownership plan shares, the court sustained defendants' motion to dismiss with respect to plaintiff's claim that the defendants owed fiduciary duties regarding the disposition of ESOP assets.  *Id*. at 1220-21.

The FCI and General Partner Boards are taking prudent and reasonable steps to appropriately address the overleveraged balance sheets of FGP and OpCo, in the best interests of the employees and the ESOP.  Ferrell Decl. ¶ 31.  Under the legally unsupported guise of suggesting that the FCI Board is breaching its ERISA fiduciary duties, GreatBanc, as Trustee, is attempting to essentially hijack the decisions of the Boards of all the Companies, which are subject to the business judgment rule.  GreatBanc is not likely to succeed on the merits of its claims.

**B.      GreatBanc Cannot Demonstrate Irreparable Harm In The Absence Of Injunctive Relief.**

Courts consistently have recognized that irreparable harm "is the most important prerequisite to obtain a preliminary injunction or temporary restraining order."  *Waterman v. Bd. of Comm'rs*, 2018 U.S. Dist. LEXIS 107466, at *3 (D. Kan. June 27, 2018) (citing *New Mexico Dept. of Game and Fish v. U.S. Dept. of Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017)).

"To constitute irreparable harm, the injury must be both certain and great," and "is often suffered when the injury can[not] be adequately atoned for in money, or when the district court cannot remedy [the injury] following a final determination on the merits."  *Smart Commun. Sys., LLC v. Region Constr., Inc*., 2017 U.S. Dist. LEXIS 139599, at *3-4 (D. Kan. Aug. 30, 2017) (citations and internal quotations omitted) (Robinson, J.); *see also TMFS Holdings, LLC v. Capace*, 2017 U.S. Dist. LEXIS 17372, at *6-7 (D. Kan. Feb. 7, 2017) (same); *Radioshack Corp*., 2012 U.S. Dist. LEXIS 22209, at *19 ("To constitute irreparable harm, an injury must be *certain, great, actual and not theoretical*.") (quoting *Universal Engraving, Inc. v. Duarte*, 519 F. Supp.2d

1140, 1148 (D. Kan. 2007)) (emphasis added).   In other words, ""[t]he harm must not be speculative." *Waterman*, 2018 U.S. Dist. LEXIS 107466, at *3.

GreatBanc bears the heavy burden to show that "the injury complained of is of such *imminence* that there is a clear and present need for equitable relief." *Radioshack Corp*., 2012 U.S. Dist. LEXIS 22209, at *19 (quoting *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)) (italics in original).

GreatBanc cannot satisfy these stringent requirements for injunctive relief.   First, GreatBanc does not claim that it will be irreparably harmed if it is removed as Trustee.  This is not surprising because GreatBanc has no right to remain as Trustee after November 8, 2019.

Second, while GreatBanc argues that the Plan, of which GreatBanc is Trustee, faces irreparable harm in the absence of injunctive relief, GreatBanc ignores that a well-qualified successor Trustee will immediately step into GreatBanc's shoes, assume the same fiduciary duties as Trustee that GreatBanc held, and exercise his duty to ESOP participants.  *See* Urbach Decl. ¶¶ 7-8, 11-12.   Unlike GreatBanc, the new Trustee does not face exposure for breach of fiduciary duty claims by the ESOP participants for its past conduct.  The probability of irreparable harm is simply not there.  The Plan, however, *will* be harmed if GreatBanc is allowed to stay on as Trustee in violation of the governing contracts.

Even if GreatBanc's claims of harm had any merit (and they do not), the successor Trustee is the proper party to deal with them.  An injunction extending or otherwise modifying the 30-day notice period in Section 6.2 of the Trust Agreement would substantially alter, and decidedly not preserve, the status quo, not to mention the parties' expectations under the Trust Agreement, and thus it should be disfavored.  *See People for the Ethical Treatment of Animals, Inc. v. Kan. State Fair Bd*., 891 F. Supp. 2d 1212, 1220 (D. Kan. Sept. 4, 2012) ("An injunction which has the effect

of altering the status quo is specifically disfavored, and the movant must demonstrate that the elements of injunctive relief weigh heavily and compellingly in its favor.") (citing *SCFC ILC, Inc. v. Visa USA*, 936 F.2d 1096, 1098-99 (10th Cir. 1991)).

In addition, GreatBanc merely speculates as to the bleak future of the Company. *See* GreatBanc TRO Brief 18-19. First, there is no dispute that FCI remains a profitable company. It produces a healthy profit, and FCI and its affiliated entities have adopted long-term strategic goals and are working with their advisors to achieve those goals and complete a balance sheet restructuring. *Id.* The alleged "deterioration of Plan assets" (i.e., FCI stock) is hardly certain, and it certainly is not imminent such that there is a clear and present need for equitable relief.

Finally, GreatBanc's delay in this case only further cuts against granting injunctive relief. GreatBanc delayed until a week before its termination to file its motion. Many of the acts GreatBanc criticizes, and much of the alleged deterioration of Plan assets (i.e., the FCI stock), occurred years ago under different management and with GreatBanc's participation and approval of the Bridger acquisition. Ferrell Decl. ¶¶ 9-10. While GreatBanc claims to be acting on behalf of the Plan, its decision not to do anything until the eve of its termination suggests a different motivation for its acts, and only further weighs against the issuance of injunctive relief. *See GTE Corp. v. Williams*, 731 F.2d 676, 687 (10th Cir. 1984) (delay in seeking relief cuts against finding irreparable injury).

### C.   The Supposed Harm To GreatBanc Does Not Outweigh The Harm To FCI, The Plan, And The Plan Participants That A TRO Or Preliminary Injunction Would Cause.

As demonstrated above, GreatBanc has failed to show probable irreparable harm if injunctive relief is not granted.

By contrast, maintaining a properly removed Trustee beyond the 30-day notice period, particularly when replacing GreatBanc has been mandated by the U.S. Department of Labor and

GreatBanc stands credibly accused of breaching its contractual and fiduciary duties to FCI, the Plan, and ESOP participants, is unprecedented and would cause affirmative harm to FCI and the Plan Participants.  The ability of FCI's Board to conduct FCI's affairs during this period would be significantly impaired, to the detriment of all constituents, including the Plan and ESOP participants.  Even a short extension of GreatBanc's Trusteeship would cause market uncertainty and enhance risk, including impairing the company's ability to credibly negotiate with its bondholders. Ferrell Decl. ¶ 28.

And matters would only become worse—crossing over to critical—if as threatened, an entrenched GreatBanc could make good on its threat to sack the existing FCI Board and replace it with a new board of its own choosing.  The impact to FCI's stock value would be immediate and the harm irreparable.  GreatBanc's proposed ouster of the FCI Board would destabilize the FGP and OpCo business, harm the relationships with customers and potential customers, and trigger events of default under debt documents, all of which will drop to the bottom line and hurt the employee ESOP participants' financial interests by further decreasing the value of FCI owned by the Trust.  *Id.*  For these reasons as well, GreatBanc's motion should be denied.

## D.   Injunctive Relief, If Issued, Would Be Adverse To The Public Interest.

GreatBanc's motion should be denied for the separate and independent reason that GreatBanc has failed to satisfy its burden of demonstrating that a TRO, if issued, would not be adverse to the public interest.

First, after a comprehensive audit, GreatBanc's replacement has been deemed necessary and in the public interest by the U.S. Department of Labor.

Second, upending the parties' agreement, which is self-effectuating and requires GreatBanc's automatic removal effective November 8, 2019, would undercut basic principles of contract law.  *See Christeson v. Amazon.com.ksdc, LLC*, 2019 U.S. Dist. LEXIS 82718, at *13 (D.

Kan. May 16, 2019) ("The Court will not re-write the parties' agreement, and it will not go hunting like a pig, searching for truffles, inventing arguments to satisfy its concerns.") (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Third, but no less significant, entrenching GreatBanc in its position as Trustee beyond November 8, 2019, while it defends itself against FCI's claims, would inevitably lead to conflicts of interest as between GreatBanc, the Plan, and ESOP participants, as GreatBanc and its management would owe fiduciary duties to each.  For each of these reasons, GreatBanc's Motion should be denied.

Even briefly extending GreatBanc's term as Trustee would alter the status quo.  The status quo is GreatBanc's imminent replacement as Trustee, which should be allowed to take effect. GreatBanc has failed to satisfy its heightened burden to show entitlement to such relief.  *See Beddow*, 2018 U.S. Dist. LEXIS 209417, at *2-3.

## II.   GREATBANC'S MOTION SHOULD BE DENIED IN ITS ENTIRETY, BUT IF GRANTED, GREATBANC SHOULD BE REQUIRED TO POST A SIGNIFICANT BOND.

GreatBanc has not satisfied the strict mandatory requirements for injunctive relief.  If this Court, however, were to decide to enter a temporary restraining order or an injunction, then GreatBanc should be required to post a significant bond, given the devastating effects an injunction would have on the Companies, its employees, and the Plan and the Plan Participants.  *See* Fed R. Civ. P. 65(c) ("The Court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to be wrongfully enjoined or restrained.").

The purpose of the bond is to compensate the injured party if the TRO is later found to have been wrongfully issued.  If it is later decided that a preliminary injunction was wrongfully entered, the enjoined party is limited in its damages to the amount of the bond.  *See Dominion*

*Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1158 (10th Cir. 2001); *St. Mary of Plains College v. Higher Education Loan Program, Inc*., 1989 U.S. Dist. LEXIS 15721, at *5-6 (D. Kan. Dec. 15, 1989).  Thus, "[w]hen setting the amount of security, [trial] courts should err on the high side."  *Mead Johnson & Co. v. Abbott Lab.*, 201 F.3d 883, 888 (7th Cir. 2000).

Here, requiring only a nominal bond would be inappropriate.  The threatened harm to FCI, in terms of, among other things, disruption of FCI's business and business relationships, in addition to defaults on loan covenants, is immense.  Accordingly, this Court should require GreatBanc to post a significant bond because the risk of harm to FCI, the Plan and Plan Participants is great.  This Court should consider a substantial bond to protect FCI, the Plan and Plan Participants from the damages that they would suffer quickly as a result of the temporary injunctive relief GreatBanc seeks.

## CONCLUSION

Because GreatBanc fails to establish the four requirements for issuance of a TRO, this Court should deny its motion.  *See Three Ten Enters. v. Berrenberg Enters.*, 1994 U.S. Dist. LEXIS 7363, at *8 (D. Kan. May 13, 1994) (denying request for TRO that would have enjoined party from terminating agreement for 45 days).  In the alternative, should this Court determine that GreatBanc is entitled to a TRO, GreatBanc should be required to post a significant bond, in an amount no less than $350,000,000, as security for any costs and damages FCI may incur if it is subsequently determined that FCI was wrongfully enjoined or restrained.

Dated:  November 6, 2019

Respectfully submitted,

_s/James D. Griffin_

John A. Burlingame (DC # 455876)
(*pro hac vice* admitted)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
Tel:  (202) 457-6000
Fax:  **(**202) 457-6315
Email:  john.burlingame@squirepb.com

Joseph C. Weinstein (OH #0023504)
(*pro hac vice* pending)
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH  44114
Tel:  (216) 479-8500
Fax:  (216) 479-8780
Email:  joe.weinstein@squirepb.com

James D. Griffin (KS # 12545)
Brent N. Coverdale (KS # 18798)
SCHARNHORST AST KENNARD GRIFFIN PC
1100 Walnut Street, Suite 1950
Kansas City, MO  64106
Tel: (816) 268-9400
Fax: (816) 268-9409
E-mail:  jgriffin@sakg.com
        bcoverdale@sakg.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 6th day of November, 2019, a copy of the above notice was filed electronically with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all persons registered to receive such notice.

<u><em>s/James D. Griffin</em></u><br>One of the Attorneys for Ferrell Companies,<br>Inc.