# EXHIBIT 1

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Susan Peters Schaefer
Attorney at Law
sschaefer@mwe.com
+1 312 984 2009

May 31, 2013

Susan Jack
Investigator
U.S. Department of Labor
Employee Benefits Security Administration
2300 Main Street, Suite 1100
Kansas City, MO 64108-2415

Re:     Ferrell Companies, Inc. Employee Stock Ownership Plan
        EIN/PN:  43-1688741/003
        EBSA Case No. 60-104982

Dear Ms. Jack:

We are writing on behalf of GreatBanc Trust Company ("GreatBanc"), in its capacity as trustee of the Ferrell Companies, Inc. Employee Stock Ownership Plan (the "ESOP") in response to your letter dated April 29, 2013 (a copy of which is attached as Exhibit A) on behalf of the Department of Labor ("DOL"). In a conversation on May 8, 2013 with Arlene Westbrook of GreatBanc, you confirmed that the DOL would accept a response to the letter until May 31, 2013.

As a preliminary matter we would like to provide some background information regarding the 2001 restructuring which included the distribution deferral addressed in your letter. As you may be aware, in 2002 the DOL reviewed the 2001 restructuring in detail. Ferrell Companies, Inc. ("FCI") provided the DOL with extensive information regarding the refinancing, including the information provided in a letter dated July 31, 2002, which we have attached for your reference as Exhibit B. The DOL closed its investigation in 2002 without taking any further action in a letter dated September 3, 2002, which we have also enclosed as Exhibit C.

For ease of response, we have included the questions from your letter with our responses.

*1.      In a response to a question by the Department regarding the Distribution Deferral mechanism that was requested of the Plan Sponsor by Ferrellgas Partners, L.P. (FGP) and implemented with the consent of the Trustee, GreatBanc Trust Company (GreatBanc) in 2001, FCI stated that it was their understanding that GreatBanc had consulted with Wall Street*

Susan Jack
May 31, 2013
Page 2

*equity analysts concerning the Distribution Deferral mechanism and its impact on the value of the FGP common units.*

FCI did notify the ESOP trustee of the possible restructuring, although the ESOP trustee was not a party to the restructuring and could not directly approve or disapprove of the restructuring. The restructuring did not involve plan assets. The ESOP owns shares of FCI, but the entity involved in the restructuring was Ferrellgas Partners, L.P. ("FGP"). FCI is 100% owner of Ferrellgas, Inc. ("FGI"), and FGI owns a controlling 1% general partnership interest in FGP. The ESOP, however, does not own a direct stake in FGP and could not directly control its restructuring. Nonetheless, FCI notified the ESOP, as its majority shareholder, to permit the ESOP trustee to engage in discussions, ask questions and raise any possible objections to the restructuring.

To assist with its assessment, the ESOP trustee, LaSalle Bank N.A. ("LaSalle"), GreatBanc's predecessor, engaged its independent financial advisor, Willamette Management Associates ("Willamette"), to prepare an analysis of the proposed restructuring and to determine "whether the restructuring would be fair to the ESOP from a financial point of view." Willamette prepared a report of its assessment of the refinancing proposal, which is attached as Exhibit D, and discussed the report with LaSalle and its fiduciary committee. The presentation included in-depth discussion of the corporate organization of the involved entities, the characteristics and proposed changes to the outstanding units, the mechanics of the proposed restructuring and the associated benefits and risks. Willamette announced its conclusion that the proposed restructuring was fair to the ESOP from a financial point of view. On March 2, 2001, LaSalle and Willamette met with the Boards of Directors of FCI and FGI to discuss their assessment. During this meeting, LaSalle expressed its comfort with the analysis and conclusion that had been reached to the Boards of Directors in favor of the restructuring.

*1.a.    Please confirm if GreatBanc consulted with Wall Street analysts regarding the implementation of the Distribution Deferral mechanism in 2001.*

GreatBanc believes, although it does not have specific knowledge, that it's predecessor, LaSalle, through its financial advisor Willamette, consulted with analysts at Banc of America Securities regarding the implementation of the distribution deferral mechanism in 2001 in the course of preparing the March 2, 2001 report.

*1.b.    If Wall Street analysts were consulted, please identify the Wall Street analysts who were consulted and when they were consulted regarding the implementation of the Distribution Deferral.  Please provide any and all analysis or documentation provided to GreatBanc by any Wall Street analysts regarding the Distribution Deferral mechanism.*

Susan Jack
May 31, 2013
Page 3

As noted above, GreatBanc believes Willamette consulted with Banc of America Securities regarding the implementation of the restructuring in February, 2001 before issuing its report, although we do not know the exact date. GreatBanc does not have any written analysis or documentation that was provided to Willamette by Banc of America Securities, and is not aware that any was provided.

      *1.c.    Please provide any record or documentation concerning discussions with any outside analysts or advisors of the impact of the Distribution Deferral mechanism on the value of the FGP common units in 2001 or when it was renewed in 2005.*

As noted above, Willamette prepared the March 2, 2001 report, which is Exhibit D, for the 2001 refinancing. In 2005, Stout Risius Ross ("SRR") was engaged to assess the extension of the distribution deferral on behalf of LaSalle. Attached as Exhibit E is SRR's report dated February 17, 2005, and as Exhibit F is SRR's opinion dated March 1, 2005. The LaSalle fiduciary committee met with SRR on March 1, 2005 (the meeting minutes are attached as Exhibit G) to discuss the report, and on that date SRR issued LaSalle an opinion that the extension of the distribution deferral was fair to the ESOP from a financial point of view.

      *2.    What benefit and/or consideration did the Plan and/or the Plan's participants and beneficiaries receive by implementing the Distribution Deferral mechanism in 2001?*

To understand the ESOP's analysis of the 2001 refinancing, it is essential to understand FCI, FGI and FGP's underlying financial structure. On December 17, 1999, FGP purchased Thermogas L.P. ("Thermogas"), a subsidiary of Williams Natural Gas Liquids, Inc. ("Williams"), in part in exchange for approximately $175 million worth of newly issued FGP senior units. The senior units, newly created for the Thermogas transaction, had special rights with respect to the FGP common units. The senior units could be converted to FGP common units beginning on February 1, 2002, or upon the occurrence of certain other events. In connection with the conversion, the unit holders would receive a 25% conversion premium (i.e., 1.25 common units would be granted for each senior unit converted). In addition, beginning on February 1, 2002, the senior unit holders had the right to cause FGP to register and help to sell the senior units (or, if the senior units had been converted, the resulting common units). The senior units also had priority ahead of the common units with respect to quarterly distributions.

With the senior lenders holding FGP common units as collateral, towards the end of 2000 it became apparent to FCI that a restructuring of FGP was necessary. The publicly traded units price of FGP was depressed based in large part on a public perception that Williams would convert its senior units (with the 25% conversion premium) on or shortly after February 1, 2002. Public markets were concerned that approximately $200 million of FGP equity would be offered on or shortly after the February 1, 2002 conversion date to replace the units owned by Williams (again, with the senior units expected to be converted into common units with a 25% conversion premium). The imminent issuance of equity to honor the Williams' senior unit

Susan Jack
May 31, 2013
Page 4

conversion and its 25% conversion premium was seen as posing a significant dilution threat to the common units. This market perception, FCI believed, had a corresponding effect of depressing the value of FCI shares owned by the ESOP.

Despite the fact that the FCI-owned common units of FGP could possibly have distributions deferred, Willamette determined (and the ESOP concurred with the determination) that the overall transaction would be beneficial to the ESOP. Willamette's analysis discussed the potential benefits for the ESOP. First, the restructuring replaced a short-term owner, Williams, with a long-term owner, JEF Capital Management ("JEF"), a privately held company controlled by FCI board member and founder James E. Ferrell, and extended for three years the window for FGP to refinance the senior units before the conversion could take place. This course of action alleviated the near-term pressure for FGP to pursue an equity offering during a period when the unit price was at an all-time low (which, in turn, would have caused a significant dilution to all common unit holder including FCI). In addition, since senior unit conversion feature no longer provided for an additional 25% premium, the dilution to FCI which would have occurred based on the premium was eliminated.

Willamette found it likely that the public market unit holders and investment analysts would favorably view the infusion of cash from JEF. Also, Willamette's report stated that restructuring would enhance the units' distribution coverage ratio, giving public unit holders and investment analysts a higher degree of confidence in the stock, thereby resulting in a higher unit price. A higher unit price, in turn, would result in less dilution when new equity is issued to permanently refinance the senior units.

The distribution deferral on FCI-owned common units was limited to $36 million in the aggregate, i.e. approximately only one year's worth of distribution. Moreover, FCI would have rights to all deferred distributions before additional distributions could be paid. Willamette's analysis highlighted these features among the benefits of the proposed transaction since they limited the impact of the distribution deferral feature on the value of the FCI-owned common units.

In all other respects the value of FCI's stake in the partnership was unchanged. FCI would continue to hold its controlling interest in FGP, and it would continue to have the same voting and liquidation rights held by all public common unit holders. The only change in value of FCI's stake would result from the limited distribution deferral feature. Having said this, Willamette's analysis went so far as to note that even under alternating warm weather scenarios, FCI's projections did not anticipate the need for any deferrals on FCI-owned units.

       *2.a.    What benefit and/or consideration did the Plan and/or the Plan's participants and beneficiaries receive by extending the Distribution Deferral mechanism from December 31, 2005 to April 30, 2010?*

Susan Jack
May 31, 2013
Page 5

SRR fully analyzed the benefits and risks to the ESOP of extending the
distribution deferral, as discussed in detail in the February 17, 2005 report attached as Exhibit E.
In particular, SRR noted that the effect of the April, 2001 distribution deferral was to increase the
trading price of FGP units. Although SRR noted in its analysis that it did not expect that the
FGP unit price would increase in 2005 if the extension were granted, the extension was expected
to prevent the FGP price from declining. SRR also noted that the distribution deferral is only an
option, FGP had never used the deferral feature and management did not expect it would.
Balancing these considerations, SRR was of the opinion that the extension of the distribution
deferral in 2005 was fair to the ESOP.

*2.b.    Please provide any documents and/or correspondence provided by FCI to
GreatBanc regarding the implementation and/or extension of the Distribution Deferral.*

GreatBanc does not have any documents and/or correspondence provided by FCI
regarding the implementation and/or extension of the distribution deferral.

*2.c.    Please provide any documents, correspondence, or record of
correspondence regarding GreatBanc's analysis and/or the exercise of GreatBanc's fiduciary
judgment in regard to the implementation and/or extension of the Distribution Deferral
mechanism including, but not limited to, any analysis as to the consideration due or not due to
the Plan and the Plan's participants and beneficiaries should the Distribution Deferral
mechanism be approved.*

Please see the Willamette report dated March 2, 2002 attached as Exhibit D with
its complete analysis of the ESOP considerations of the 2001 restructuring. Please also see the
SRR report dated February 17, 2005 attached as Exhibit E with its complete analysis of the
ESOP considerations of the 2005 extension.

*3.    Please provide a copy of any invoice for payment regarding the exercise
of GreatBanc's fiduciary judgment in regarding to the implementation and/or extension of the
Distribution Deferral mechanism.*

Enclosed as Exhibit H is the First Amendment to the LaSalle Bank N.A. Trustee
Agreement, dated February 20, 2001 (the "Trust Agreement") providing an agreement as to the
fees for LaSalle's review of the proposed restructuring. Attached as Exhibit I is a copy of FCI's
$30,000 check in payment for LaSalle's 2001 review.

In early 2005 when FCI was considering the extension of the distribution deferral,
FCI again specifically engaged LaSalle to exercise its fiduciary duty to assess the proposal.
Attached as Exhibit J is the Second Amendment to the Trust Agreement pursuant to which
LaSalle was paid $35,000 to review the proposed distribution deferral extension.

*4.    In 2010 there was a two million share increase in the number of shares
available to be issued as part of the Incentive Compensation Plan sponsored by FCI. In July*

Susan Jack
May 31, 2013
Page 6

*2012 we were provided with very brief notes of phone conservations [sic] involving Arlene
Westbrook and Vaughn Gordy with FCI management and Susan Gould.*

        The FCI Incentive Compensation Plan was adopted in 1998 in conjunction with
the original ESOP stock purchase and operated successfully thereafter as a method to incentivize
management and reward performance. During that period FCI and its related companies had
increased fivefold in size, experienced a significant increase in the number of employees and
generally became a more complex and sophisticated company. Due to the desire to continue to
retain and incentivize management in the increasingly large and complex company, FCI, SRR
and GreatBanc discussed increasing the number of shares available under the Incentive
Compensation Plan. On March 9, 2010, GreatBanc and SRR discussed the prudence of
approving the authorization of two million more shares under the Incentive Compensation Plan.
The increase would have some dilutive impact on the ESOP's ownership value, but it was
deemed prudent in light of the benefits of incentivizing management performance.

        *4.a.    Please provide any invoices for payment regarding of the exercise of
GreatBanc's exercise of its fiduciary judgment in regard to the increase in the number of shares
available for FCI's Incentive Compensation Plan.*

        Pursuant to the terms of its engagement letter with FCI, GreatBanc did not
separately charge FCI for the exercise of its fiduciary judgment with respect to the increase in the
number of shares available for FCI's Incentive Compensation Plan.

        *4.b.    Please provide any and all documentation from FCI to GreatBanc
regarding the increase in the number of shares available to be issued under the Incentive
Compensation Plan.*

        GreatBanc did not receive any written documentation from FCI regarding the
increase in the number of shares available under FCI's Incentive Compensation Plan, other than
the First Amendment to the Incentive Compensation Plan (attached to this letter as Exhibit K) to
which LaSalle indicated its consent.

        *4.c.    Please provide any and all documentation from Stout Resius Ross (SRR)
to GreatBanc regarding the increase in the number of shares available for FCI's Incentive
Compensation Program.*

        GreatBanc did not receive any written documentation from SRR regarding the
increase in the number of shares available under FCI's Incentive Compensation Plan.

        *4.d.    Please provide any other documentation showing any studies or analysis
by GreatBanc of the impact of the increase in the number of shares available for FCI's Incentive
Compensation Plan on the value of FCI shares held by the Plan.*

Susan Jack
May 31, 2013
Page 7

Other than the notes of the telephone conversations between SRR and GreatBanc, GreatBanc does not have any other written documentation analyzing the increase in the number of shares available under FCI's Incentive Compensation Plan.

*4.e. Please provide any documents, correspondence, or record of correspondence regarding GreatBanc's analysis and/or exercise of GreatBanc's fiduciary judgment in regard to the increase in the number of shares available for FCI's Incentive Compensation Plan, including, but not limited to, any analysis as to the consideration due or not due to the Plan and Plan participants and beneficiaries.*

GreatBanc does not have any written documentation or correspondence with respect to the increase in the number of shares available under FCI's Incentive Compensation Plan, other than the First Amendment attached as Exhibit K.

*5. In 2008 when the Plan's ESOP Loan was reamortized what, if any, analysis was completed to determine if the reamortization of the ESOP Loan complied with the Department of Labor's Field Assistance Bulletin 2002-01 and/or was in the best interest of the participants and beneficiaries of the Plan for FCI to approve?*

Enclosed as Exhibit L is the ESOP Loan and Pledge Agreement (the "Loan Agreement") between FCI and the ESOP, dated July 17, 1998. Section 2.02(d) specifically provides for reamortizing the loan over the original term at FCI's option, if prepayments are made prior to June 16, 2008. The last three sentences of Section 2.02(d) of the Loan Agreement specifically provides as follows:

> "If any prepayment prepays less than the entire outstanding principal balance of the Loan, any such prepayments shall be applied against the unpaid installments of principal in the inverse order of their maturity, and Borrower shall continue to make payments pursuant to this Section 2.02 until the entire principal balance of, and all accrued but unpaid interest on, the ESOP Loan has been paid in full. Notwithstanding the prior sentence, immediately following the payment on June 16, 2008, if directed by the Corporation the amortization schedule provided on Exhibit 1 shall be reset by amortizing the principal amount outstanding as of such date over the remaining term of this Agreement. At such time Exhibit 1 will be replaced with an updated amortization table."

This provision of the Loan Agreement was negotiated by LaSalle prior to the July 18, 1998 closing in conjunction with the negotiation of all of the other terms of the Loan Agreement and the terms of the ESOP's stock purchase in general. The reamortization was not a refinancing and the terms of the Department of Labor's Field Assistance Bulletin 2002-11 were

Susan Jack
May 31, 2013
Page 8

not applicable. The Field Assistance Bulletin specifically defines a refinancing as: "an ESOP
refinancing involves entering into a new loan that extends the repayment schedule and, therefore,
the period over which stock will be allocated from the suspense account to individual
participants." The reamortization of the ESOP Loan pursuant to Section 2.02(d) is not a new
loan and does not extend the original maturity date of the ESOP Loan.

GreatBanc was not the trustee of the ESOP at the time the Loan Agreement was
entered, and therefore does not know all of the factors which were considered and balanced when
Section 2.02(d) was negotiated. However, it is possible that LaSalle considered that it believed
that the original maturity date of the loan, June 16, 2048, was prudent, then retaining that
maturity date if prepayments were made would also be prudent. All of the shares purchased
would be allocated to participants by the same date, and allowing prepayments without affecting
the maturity date would not be detrimental to the ESOP participants. ESOPs sometimes
negotiate for the prepayments to be applied to the end of the loan term, and other times for
prepayments to be applied in the order of maturity. The language of Section 2.02(d) is merely a
hybrid of each.

     *5.a.   Please provide any supporting documentation of analysis not already
provided regarding the reamortization of the ESOP Loan.*

GreatBanc does not have any documentation regarding the reamortization of the
ESOP Loan.

     *5.b.   What, if any, communication took place with the participants and
beneficiaries of the Plan regarding the reamortization of the Plan's loan? Please provide copies
of any communications.*

No communications were made to the ESOP participants or beneficiaries
regarding the reamortization. Participants and beneficiaries do not have any specific knowledge
of the payment terms of the ESOP Loan.

     *5.c.   What, if any, consideration did the Plan receive for allowing the
reamortization of the ESOP loan to occur?*

As previously discussed, the reamortization of the ESOP Loan was not a
refinancing and the terms of the Department of Labor's Field Assistance Bulletin 2002-11 did
not apply. The negotiation of Section 2.02(d) of the Loan Agreement was done by LaSalle in
conjunction with the negotiation of all of the terms of the ESOP's purchase of shares on July 18,
1998. GreatBanc does not know what, if any, consideration was received by the ESOP which
specifically related to this reamortization provision.

DM_US 42893597-3.050625.0012

Susan Jack
May 31, 2013
Page 9

>        5.d.    How was GreatBanc notified of the reamortization by FCI?

GreatBanc received a telephone call from FCI on September 25, 2008 informing it that FCI would be exercising its option to reamortize the payments over the remaining term of the loan. Thereafter, FCI sent a revised Exhibit 1 to the Loan Agreement, which GreatBanc reviewed and approved.

>        5.e.    What communication took place between FCI and GreatBanc regarding the reamortization of the ESOP Loan? What information was provided to GreatBanc regarding the reamortization by FCI? When was information regarding the reamortization provided to GreatBanc and/or SRR?

Please see the answer to question 5.d. above.

>        5.f.    Please provide an explanation and any documentation of analysis for allowing the reamortization provision to be included in the original loan agreement.

As noted above, GreatBanc was not the trustee of the ESOP at the time Section 2.02(d) of the Loan Agreement was negotiated, so it does not have any documentation of the analysis which may have been conducted in 1998. Many terms and conditions of the ESOP's purchase were negotiated at that time, any of which may have supported the reamortization provision of the Loan Agreement.

>        6.    What due diligence is undertaken by GreatBanc regarding the retention of SRR to perform valuations of FCI stock held by the Plan?

GreatBanc serves as trustee of numerous privately held ESOPs, and in that capacity has the opportunity to review the work of many appraisers annually. Each year GreatBanc reviews the work of the appraisers as they prepare the annual valuations, and compares them with the work of other appraisers it sees. SRR is recognized in the ESOP community as one of the premier appraisers. SRR is an active member of a number of the ESOP-related trade associations by speaking at their conferences and participation on committees.

>        6.a.    What information does GreatBanc provide FCI regarding SRR and SRR's retention to perform the valuations of the FCI stock held by the Plan?

GreatBanc does not consult with FCI regarding the retention of SRR.

>        6.b.    Please provide any documentation, not previously provided, documenting any review of the appropriateness of the retention of SRR to perform the valuations of the FCI stock held by the Plan.

DM_US 42893597-3.050625.0012

Susan Jack
May 31, 2013
Page 10

        GreatBanc does not have any documentation to provide regarding its review of SRR to perform valuations of FCI.

        We believe this information should help you review the operation of the ESOP. Please do not hesitate to contact us if we can provide any other information.

                        Sincerely,

                        Susan Peters Schaefer

Enclosures

CHI99 3957960-1.050625.0014