# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| FERRELL COMPANIES, INC, as Plan Sponsor and Plan Administrator of the Ferrell Companies, Inc., Employee Stock Ownership Plan,<br><br>   Plaintiff,<br><br>v.<br><br>GREATBANC TRUST COMPANY, Trustee of the Ferrell Companies, Inc. Employee Stock Ownership Trust<br><br>   Defendant.<br><br>GREATBANC TRUST COMPANY, Trustee of the Ferrell Companies, Inc. Employee Stock Ownership Trust,<br><br>   Counterclaim-Plaintiff,<br><br>v.<br><br>FERRELL COMPANIES, INC., as Plan Sponsor and Plan Administrator of the Ferrell Companies, Inc., Employee Stock Ownership Plan,<br><br>   Counterclaim-Defendant | CASE NO. 2:19-CV-2656-JAR-ADM |

## DECLARATION OF JAMES E. FERRELL

Pursuant to 28 U.S.C. § 1746, I, James E. Ferrell, declare:

1.   My name is James E. Ferrell, I am over eighteen (18) years of age and have never been convicted of a felony or crime of moral turpitude.

2. I am the current Chairman and interim Chief Executive Officer of Ferrell Companies, Inc. ("FCI"). I am "interim" CEO because I voluntarily came out of retirement in September 2016 to help rehabilitate FCI and its subsidiaries after a misguided acquisition created staggering debt for FCI's subsidiaries. I do not receive financial compensation for my services.

3. I earned a Bachelor's Degree from the University of Kansas School of Business in 1963. After graduation, I attended U.S Army infantry school at Fort Benning, Georgia and was later stationed in Korea. I returned home to help my father with his company, the A.C. Ferrell Butane Company, which was financially struggling. At the time, A.C. Ferrell Butane Company was a local propane company with a single store, in Atchison, Kansas. I grew the A.C. Ferrell Butane Company from a single, struggling store in Atchison, Kansas into a leading propane company in the nation. For example, Blue Rhino, our propane cylinder exchange business, is the leading and most recognized propane brand in the nation with more than 55,000 locations. Today we are making strategic acquisitions and capital investments to position the company for long-term growth and success.

4. Today, FCI is a Kansas corporation headquartered in Overland Park. FCI is the 100% owner of Ferrellgas, Inc. ("General Partner"). General Partner is the general partner of both Ferrellgas Partners, L.P. ("FGP"), a publicly traded master limited partnership, and Ferrellgas, L.P. ("OpCo"). FCI is also the owner of approximately 23% of the limited partnership units of FGP. FGP is the 99% owner of OpCo. Collectively, these entities are referred to as the "Companies."

5. FCI established the Ferrell Companies, Inc. Employee Stock Ownership Plan (the "Plan") as the Plan's Sponsor on or about August 1, 1997. On the same date, FCI, as Plan Sponsor, and LaSalle National Bank, the predecessor to GreatBanc Trust Company ("GreatBanc"), as directed Trustee, entered into the Ferrell Companies, Inc. Employee Stock Ownership Trust (the

"Trust Agreement"). True and accurate copies of the Plan and the Trust Agreement are attached as Exhibits A and B to this Declaration, respectively.

6. In addition to their service as directed trustee, LaSalle National Bank and GreatBanc have also served, when specifically asked by the Plan Administrator, as discretionary trustee for specific transactions involving the Plan and Trust. When they have acted as discretionary trustee, LaSalle National Bank and GreatBanc have received additional compensation for their independent review and judgment of the matters they are requested to evaluate. The Plan and Trust collectively are referred to as the "ESOP."

7. In 2006, I stepped down as CEO and retired from the day-to-day business affairs of the Companies.

8. OpCo distributes and sells propane and related equipment and supplies. The company transports propane to distribution locations, tanks on customers' premises, or to portable propane tanks delivered to retailers. It conducts its portable tank exchange operations under the Blue Rhino brand name through a network of independent and partnership-owned distribution outlets.

9. In May 2015, the then company management pursued a strategy to diversify the business by investing in mid-stream operations.

10. Bridger Logistics, LLC ("Bridger") was a midstream transportation company, primarily engaged in shipping oil from the Bakken Formation in North Dakota to refineries on the East Coast. The Companies, assessing that Bridger was a good opportunity to diversify, negotiated an acquisition for Bridger for approximately $822 million. GreatBanc, acting as discretionary Trustee for this transaction, specifically approved the acquisition and was paid $500,000 for its role in doing so. *See* May 4, 2015 letter from K. Kolb to A. Heitman, a true and accurate copy of which is attached as Exhibit C.

11. To finance the acquisition of the mid-stream operations, of which Bridger was the most significant, FGP and OpCo together issued over $500 million in debt. The Bridger and related midstream acquisitions turned out to be a financial disaster. FGP and OpCo were saddled with substantial debt and the midstream operations did not generate sufficient cashflow to service the debt. This is what created our current problems with respect to the companies' capital structure.

12. The Bridger acquisition had such terrible consequences for FGP and OpCo that I had to come out of retirement in September 2016 to help guide the company through its rehabilitation. The debt incurred to finance the Bridger and related midstream acquisitions has necessitated that FGP and OpCo craft a process and strategy for restructuring their debt.

13. The midstream operations were divested.

14. Moelis & Company, a highly regarded investment bank and financial advisory firm, was engaged as a strategic financial advisor. Moelis made recommendations to the Boards of FCI and the General Partner regarding long-term strategic objectives for addressing the FGP and OpCo capital structure. The Boards approved those recommendations. *See* July 27, 2019 Board Resolution, attached as Exhibit D to this Declaration.

15. Ferrellgas, as a direct result of the Bridger disaster, had to replace its commercial bank line with a loan from TPG, a distressed debt fund. A true and accurate copy of the Credit Agreement is attached as Exhibit E to this Declaration.

16. I made a substantial effort to develop a strong "partner" relationship with TPG, over and above the contractual terms of the loan. That did not materialize, however, and in September TPG indicated that it was anticipating that the upcoming 10-K and audit would violate the requirement that the audit not be qualified.

17. TPG demanded a commercially unreasonable amount of money in order to waive the anticipated default. TPG also claimed a technical default on September 25th to further their demand for a substantial sum to cure the alleged foot-fault.

18. Ferrellgas disagrees with TPG's position regarding such alleged defaults and has worked with TPG to resolve the dispute. Importantly, TPG has not exercised any remedies and continues to provide financing in accordance with the loan terms. This is nothing more than a commercial dispute that Ferrellgas continues to attempt to resolve consensually with TPG and it has no bearing whatsoever on GreatBanc or this case.

19. In the meantime, the Boards and management have worked hard to preserve relations with investors and creditors, and maintain operating revenue. The necessary tactics have sometimes been sharp and not without debate. In my experience, tough negotiations are common in the world of finance.

20. In November 2018, members of senior management raised concerns that a Chapter 11 bankruptcy was being given serious consideration and was imminent. They made demands and announced their intention to resign. Their demands were not met. They then contacted GreatBanc to express concerns about the supposed, imminent, pre-packaged Chapter 11 bankruptcy filing. This was not true and the former executives ultimately acknowledged under oath this was not true. *See* Affidavits attached as Exhibits F and G to this Declaration, respectively. There were no plans for an imminent bankruptcy filing. After the employees' voluntary separation from General Partner, the FCI Board met with GreatBanc in December 2018 and explained how GreatBanc had been used as a pawn. Since that December 2018 meeting, GreatBanc did not voice further concern about these events until October 23, 2019, two weeks after it was notified that it was being removed as Trustee.

21. I made three trips to see GreatBanc in Chicago earlier this year to first, ensure that GreatBanc understood that the former executives' allegations that I planned to take the company into bankruptcy was concocted out of thin air and that the executives ultimately acknowledged that I had actually done nothing wrong, and second to keep GreatBanc updated as to the status of the restructuring including the engagement of advisors.

22. The decisions of the Ferrellgas entities as they related to the skirmish with TPG were (and are) totally separate from those relating to the FCI Board's decisions regarding the replacement of GreatBanc as trustee. The timing is entirely coincidental.

23. GreatBanc represents that it was contacted by a number of third parties, including "certain investment bankers and financial advisors who expressed interest in working with Ferrell to develop solutions to Ferrell's problems." The FCI Board requested information concerning these bankers and advisors. To date, GreatBanc has not provided this information.

24. The FCI Board met on October 8, 2019, voted to replace GreatBanc as Trustee, and provided the required formal notice to the Trustee of its removal the next day.

25. GreatBanc complains that the FCI Board did not form a special committee as requested by GreatBanc. The FCI Board advised GreatBanc that doing so under the current circumstances was not warranted and not appropriate corporate governance. The FCI Board reasonably determined to have the full board consider the proposals in conjunction with its outside counsel and Moelis.

26. FCI notified GreatBanc on October 9, 2019 that it was terminating GreatBanc's trusteeship thirty days thereafter (November 8, 2019). *See* Notice of Removal of GreatBanc Trust Company as Trustee of the Ferrell Company as Trustee of the Ferrell Companies, Inc. Employee Stock Ownership Plan Pursuant to Section 6.2 of the Ferrell Companies, Inc. Employee Stock

Ownership Trust; and Successor Trustee's Acceptance of Trusteeship, a true and accurate copy of which is attached as Exhibit H to this Declaration. That same day, FCI entered into an agreement with James Urbach for him to serve as successor trustee. *See* Urbach Agreement, a true and accurate copy of which is attached as part of Exhibit H to this Declaration.

27.     Two weeks later, GreatBanc demanded that FCI's Board, as Plan Administrator, direct GreatBanc as Trustee to replace FCI's entire Board with new directors. *See* October 23, 2019 Demand Letter to the Board of Directors of FCI and OpCo (redacted per the Court's November 4, 2019 Order (ECF 7-3)), a true and correct copy of which is attached as Exhibit I to this Declaration.

28.     GreatBanc's demand presents a clear and existential threat to the Companies, and potentially irredeemable harm to their employees and the ESOP Participants. GreatBanc's proposed ouster of the Board would significantly destabilize the business, interfere with customer relationships, and trigger events of default under loan covenants made by OpCo to its lenders, all of which would significantly, negatively impact the financial performance of the ESOP. Even a short extension of GreatBanc's Trusteeship would cause market uncertainty and enhance risk, including impairing the company's ability to credibly negotiate with its bondholders.

29.     To the extent that GreatBanc is successful in its efforts to replace the FCI Board, then a cascading domino effect will cause irreparable harm to the Companies.

30.     Exhibit J contains true and accurate copies of certain relevant provisions of various unsecured bonds issued by both FGP and OpCo.

31.     The FCI Board, in consultation with the General Partner's board of directors and their advisors, appropriately has focused on long-term strategic objectives with respect to Ferrellgas that the FCI Board believes will enhance the value of the stock. The FCI and General Partner

- 8 -

Boards are taking prudent and reasonable steps to appropriately address the overleveraged balance sheets of FGP and OpCo, in the best interests of the employees and the ESOP.

32. I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 6, 2019

_____
James E. Ferrell