1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
2

3    FERRELL COMPANIES, INC., as
     Plan Sponsor and Plan
4    Administrator of the Ferrell
     Companies, Inc., Employee
5    Stock Ownership Plan,

6        Plaintiff,

7    v.                           Docket No. 19-2656-JAR

8    GREATBANC TRUST COMPANY,      Kansas City, Kansas
     Directed Trustee of the      Date:   11/07/2019
9    Ferrell Companies, Inc.,
     Employee Stock Ownership
10   Trust,

11       Defendant.
     .....................
12
                          TRANSCRIPT OF
13     MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
                          INJUNCTION
14         BEFORE THE HONORABLE JULIE A. ROBINSON
               UNITED STATES DISTRICT JUDGE
15
     APPEARANCES:
16   For the Plaintiff:      Mr. James D. Griffin
                             Scharnhorst, Ast, Kennard, Griffin, PC
17                           1100 Walnut Street
                             Suite 1950
18                           Kansas City, MO 64106

19                           Mr. John A. Burlingame
                             Squire, Patton, Boggs, LLP
20                           2550 M Street, NW
                             Washington, DC 20037
21
     For the Defendant:      Mr. Todd W. Ruskamp
22                           Shook, Hardy & Bacon
                             2555 Grand Boulevard
23                           Kansas City, MO 64108

24                           Mr. James P. Smith, III
                             Winston & Strawn, LLP
25                           200 Park Avenue
                             New York, NY 10166

```
 1              (10:12 a.m., proceedings commenced).

 2         THE COURT:  All right.  You can be seated.

 3         All right.  We are on the record in Ferrell Companies,

 4    Inc., versus GreatBanc Trust Company.  The case number is

 5    19-2656.  We have some folks on the phone that are listening.

 6    Can you all hear us?  We've muted them--

 7         COURTROOM DEPUTY:  Go ahead.

 8         THE COURT:  Muted them.  Can you hear us on the phone?

 9         UNIDENTIFIED SPEAKER:  Yes, Your Honor.

10         THE COURT:  Okay.  We're going to put you on mute.

11    Hopefully we'll all be speaking in the microphone and you can

12    hear as well.

13         All right.  State your appearances, please.

14         MR. GRIFFIN:  Your Honor, for Ferrell Companies, Inc.,

15    James Griffin.  Good morning.

16         THE COURT:  Good morning.

17         MR. GRIFFIN:  And with me is Mr. John Burlingame,

18    who's going to be making the argument.  He's admitted pro hac.

19    And here as the company representative is Mr. Jim Ferrell.

20         MR. BURLINGAME:  Good morning, Your Honor.

21         THE COURT:  All right.  Good morning.

22         MR. RUSKAMP:  Good morning, Your Honor.  Todd Ruskamp

23    with the Shook, Hardy firm on behalf of GreatBanc Trust

24    Company.  And I'm joined by James Smith.  He's a partner with

25    Winston & Strawn in their New York office.  He is also-- Mr.
```

1   Smith will be making the argument today.

2           We have filed motions to admit Mr. Smith pro hac.  I'm

3   not sure that the court has had an opportunity to look at those

4   at this point.

5           And also, Your Honor, thank you to the court for

6   accommodating us on such short notice with respect to this

7   motion.

8           THE COURT:  All right.  Those motions, everyone's

9   motions for pro hac have been referred to Judge Birzer.  And we

10  spoke with her office this morning, they're going to rule on

11  those as soon as possible.  So we'll just proceed.  We know

12  that they're going to be granted.

13          And I'll echo what you said, thank you all for being

14  so cooperative and collegial.  And I know you wanted to hear

15  this on short notice.  I'm glad we could accommodate you, but

16  we're also glad that you were willing to work with the court's

17  schedule as well.

18          So all right.  So we're here on motion for temporary

19  restraining order and preliminary injunction that's been filed

20  by defendant/counterclaim plaintiff GreatBanc.

21          So Mr. Smith.

22          MR. SMITH:  Thank you, Your Honor, and good morning.

23  Let me reiterate the thanks going around for being so

24  accommodating and hearing us on such short notice.

25          I'm going to address my remarks today, Your Honor, to

1    the TRO that we have requested and I'll try to frame for Your

2    Honor what we think is fairly narrow relief that's before you

3    today.

4           But what this case is about and what this application

5    is ultimately about is the long-term benefits for thousands of

6    participants in the employee stock ownership plan of the

7    Ferrell group of companies which are at imminent risk of total

8    loss.  So there can be no doubt that Ferrell and its related

9    companies are *in extremis*.

10          Over the last five years, the trading price of its

11   publicly-traded master limited partnership has seen a

12   98 percent decline from $28 down to the mid-single digits in

13   2016.  And since 2016 down to about $0.60, which is where I

14   believe it closed yesterday.

15          They're at risk of being delisted from the New York

16   Stock Exchange because the stock price has been below a dollar

17   for a significant period of time.  The net leverage of the

18   company, the ratio of its debt to earnings, is double the

19   industry average at about $2.2 billion.  The creditors are

20   circling.

21          As recently as October 15th in the 10-K filed by the

22   publicly-traded master limited partnership, it was disclosed

23   that the lender on a senior secured term loan, TPG, had

24   declared an event of default, accelerating $275 million in

25   principal.  It was disclosed that the auditors of the operating

1   partnership had expressed substantial doubt about the operating

2   partnership's ability to continue as a going-concern.  TPG had

3   expressed the opinion that the audited financial statements of

4   the operating partnership did not meet the requirements of its

5   financing agreement.  And October 16th, the following day,

6   Standard & Poore's downgraded the company to a triple C-minus

7   rating.

8        Now, my client, GreatBanc has been the trustee for

9   Ferrell's ESOP for a little over 13 years.  Under ERISA-- as

10   the trustee of the ESOP, under ERISA 403(a)(1), a directed

11   trustee is required to follow the proper directions of the plan

12   administrator.  Here the plan administrator, a co-fiduciary

13   with GreatBanc, is Ferrell.

14        Proper directions that are made in accordance with the

15   plan documents and not contrary to ERISA must be followed by a

16   directed trustee.  Under 404(a)(1)(B) of ERISA, GreatBanc

17   remains subject to the prudent person standard.  And under 405

18   of ERISA, GreatBanc remains potentially liable for breaches of

19   fiduciary duty by co-fiduciaries where it has knowledge of the

20   breach unless you make-- GreatBanc makes reasonable efforts

21   under the circumstances to remedy the breach.

22        It's for these reasons, Your Honor, that Judge

23   Lungstrum in the *YRC Worldwide* case, which is cited at Page 14

24   of my brief - although not mentioned in Ferrell's opposition -

25   there, the judge noted that the Tenth Circuit permits a claim

1  of imprudence against an ESOP trustee like GreatBanc based on

2  investment in employer securities, even if such investment is

3  required by the terms of the plan.

4        So under what circumstances is that potential

5  liability for an ESOP trustee like GreatBanc present?  Well,

6  the court went on in that case, citing to the *Quan* case, to

7  frame the question as follows:

8        How bad do things have to be before no reasonable

9  fiduciary in similar circumstances would have continued

10  investing in a company's stock?  And in answering that

11  question, again, citing from the *Quan*-- or quoting from the

12  *Quan* case, the court noted, "Allegations that clearly implicate

13  the company's viability as an ongoing concern," and here we can

14  harken back to what Ferrell's auditors have recently announced,

15  "or show precipitous decline in the employer's stock," again a

16  98 percent decline here, "with evidence that the company is on

17  the brink of collapse or undergoing serious mismanagement,

18  publicly known facts that would trigger the kind of careful and

19  impartial investigation by a reasonable fiduciary that the--

20  the plan's fiduciary failed to perform."  The court goes on.

21  "Facts indicating dire financial-- a dire financial situation."

22        Now, in that case, I'll just note for Your Honor that

23  the stock over a three-year period had declined from 25.96 per

24  share down to $0.45 per share.  And, as here, there was a risk

25  that the company's stock would be delisted, thereby effectively

1  making the security untradeable and potentially worthless.  And

2  apropos of irreparable harm, which is obviously an issue before

3  Your Honor today that I'll get to in a bit, the court

4  concluded, "Allowing the plan's holdings of company stock to

5  become essentially worthless could clearly defeat the purpose

6  of the plan."

7        So those are the circumstances where an ERISA

8  fiduciary like GreatBanc in the position of an ESOP trustee has

9  an obligation to act.

10        I want to focus on 405 of ERISA where a co-fiduciary

11  is in breach and, therefore, there is an obligation to try to

12  remedy the breach.

13        The circumstances here by Ferrell as plan participant

14  are fairly severe.  Now, in Ferrell's opposition brief, it

15  focuses on the board's protection under the business judgment

16  rule for managing the day-to-day affairs of the company.  What

17  I want to focus on is-- and as you'll recall, Your Honor, from

18  the quote I read from *YRC* case, mismanagement is clearly

19  something that needs to be considered.  But I want to focus on

20  the breaches by Ferrell as a plan administrator wearing its

21  ERISA hat.

22        When, as plan administrator for the last five years,

23  it has failed to investigate or even consider the continued

24  prudence of investing in and holding the company's stock,

25  notwithstanding a 98 percent deterioration in the unit price of

1   the publicly-traded master limited partnership, that was

2   wearing its ERISA hat.

3          When, over the course of that period of time as my

4   client, GreatBanc, repeatedly requested information about the

5   company's plans and strategy for turning things around, the

6   plan administrator refused to provide the information, it was

7   wearing its ERISA hat.

8          When in July Ferrell acted to amend the plan in an

9   effort to restrict GreatBanc's ability to vote the stock of

10  which it holds 100 percent of Ferrell, notwithstanding that

11  under different circumstances a sponsor's decision to amend a

12  plan is not necessarily an ERISA act, under the circumstances

13  here where that attempted amendment, in fact, violated the plan

14  documents, they were wearing their ERISA hat.

15         When the company this year failed to hold any election

16  of directors or an annual meeting, notwithstanding that that's

17  required by the company's bylaws, under the circumstances they

18  were wearing their ERISA hat.

19         And while we don't challenge the company's right under

20  the plan documents to change trustees, here, under all of the

21  circumstances when they terminated GreatBanc, they were wearing

22  their ERISA hat.

23         And, yes, the mismanagement of the company over that

24  period of time also goes into the hopper in assessing whether a

25  co-fiduciary is breaching its-- its fiduciary duties.

1          So under those circumstances, GreatBanc had an

2     obligation to act.  It had a decision point in terms of what

3     was in the realm of the possible to do in response to all of

4     these facts and circumstances.  And I'll get to that in a

5     minute.  But the point I'm making here is that under ERISA, as

6     the trustee, given all of those circumstances, GreatBanc had a

7     duty and a power to take action.

8          But before we even get to the action that GreatBanc

9     attempted to take, I want to focus on the plan documents

10    themselves and what's permitted and what's necessary under the

11    plan documents.

12         So I don't know if Your Honor has in front of you the

13    various submissions in the case.  But-- in the complaint filed

14    by Ferrell that commenced this action, attached to the

15    complaint is Exhibit B, the trust document.

16         THE COURT:  I have it.

17         MR. SMITH:  The trust document and the plan documents

18    collectively are the-- and the plan are the plan documents.

19         If Your Honor goes to Page 2 of Exhibit B and take a

20    look at Section 2.2, about halfway down in Section 2.2-- I'm

21    sorry, Section 2.3.  It indicates that, "The trustee shall have

22    the following powers, rights, and duties in addition to those

23    provided elsewhere in this trust agreement or by law."

24         And if you flip over to Page 3 and go down to sub (d),

25    it reads, "As directed by the plan administrator to vote any

1    stocks," and then in a parenthetical it says, "including

2    company stock, which shall be voted as provided in Section 8 of

3    the plan as that section may be amended from time to time."

4         Okay.  If you then go to Page 8 of the trust document

5    and look at Section 3.3 entitled "Voting Of Shares and Tender

6    Or Exchange of Shares," it reads, "Company stock held in the

7    trust fund shall be voted by the trustee in the manner set

8    forth in Section 8 of the plan."

9         And if Your Honor goes now to Page 10 of the trust

10   document and take a look at Section 4.10, you'll see in the

11   second sentence, "To the extent that the provisions of the plan

12   and this agreement conflict, the provisions of the plan shall

13   govern, provided, however, that the trustee's duties and

14   obligations shall be determined solely under the trust

15   document."

16        Okay.  So that's what's in the trust document.

17   Obviously cross-referencial in a couple of places to Section 8

18   of the plan.  The plan is Exhibit A to the complaint.  So let's

19   turn to the plan.

20        Section 8, which was referred to in the trust, is on

21   Page 35 of the plan document, Your Honor.

22        THE COURT:  Do you have an extra copy of that, by the

23   way, the plan?

24        MR. SMITH:  Unfortunately, I don't have one handy.

25   I'll look to my colleague and see if we're able to hand one up

1   to you, Your Honor.   May I approach, Your Honor?

2         THE COURT:   Yes.   And this is Exhibit A attached to

3   the complaint.   Correct?

4         MR. SMITH:   Correct, Your Honor.   It's Exhibit A to

5   the complaint.

6         THE COURT:   Okay.

7         MR. SMITH:   So I-- I had directed Your Honor to

8   Page 35 if you've got it in front of you.

9         THE COURT:   Okay.

10        MR. SMITH:   And this is Section 8, which is referred

11   to in the-- in the couple of sections of the trust document

12   that we looked at earlier.

13        And I just want to look at the very first sentence of

14   Section 8, which says, "Subject to the provisions of this

15   Section 8, all company stock held in the trust shall be voted

16   by the trustee."

17        Now, before we continue on through this walk through

18   the documents, Your Honor, I want to also note that in the 10-K

19   I referred to earlier that was filed by the publicly-traded

20   master limited partnership on October the 15th, there was also

21   the following statement that GreatBanc may, quote, "in all

22   cases vote Ferrell shares as it determines is necessary to

23   fulfill its fiduciary duties under ERISA."   And I

24   bullet-pointed for Your Honor a few moments ago what those

25   fiduciary duties are.

1          Now let's take a look at what Ferrell did in July of

2    this year against the backdrop of those provisions that we just

3    looked at.  So the very last page, Your Honor, of that Exhibit

4    A that I just put in front of you is that amendment of

5    July 29th of 2019 to the plan.  And if you look at enumerated

6    Paragraph 1, this is amending Section 8 that we just looked at

7    a moment ago.  And it now says, "Subject to the provisions of

8    this Section 8, all company stock held in the trust shall be

9    voted by the trustee," which is what it said before.  But

10   what's been added is "as directed by the plan administrator."

11   Well, that's brand-new.  And that's a recognition that before

12   the amendment it wasn't as directed by the plan administrator.

13   They felt that there was a need to add that language.

14        If Your Honor then looks at the amendment in

15   enumerated Paragraph 2 here, it's amending Section 11.1 of the

16   plan, which is a provision that enumerates the plan

17   administrator's powers.  And if Your Honor turns the page over

18   and looks at enumerated Paragraph H, it says, "For the

19   avoidance of doubt, the company as plan administrator shall

20   have the power to direct the trustee as to voting of company

21   stock under Section 8."  That's brand-new.  That was not in the

22   plan until it was amended in July of this year.

23        Now, why do I belabor those amendments if, as they

24   appear to do, they make clear that GreatBanc does not have the

25   ability to vote the shares without direction?  In addition to

1   the ERISA fiduciary duties that I enumerated before, which are

2   an overlay to all of this, I want to take Your Honor back to

3   Page 40 of the plan document and focus you on Section 12.1A.

4         12.1A is an amendment, and it says, "The circumstances

5   under which the plan can be effectively amended."  And there's

6   an exception, there's a number of enumerated exceptions, but

7   the very first one is, "Except the duties and liabilities of

8   the trustee may not be changed without its consent."  Well,

9   GreatBanc never consented to have its duties and

10  responsibilities with respect to voting the 100 percent of

11  Ferrell stock that it holds amended under these circumstances

12  here.  So the amendment was effectively inoperative *ultra*

13  *vires*.

14        Notwithstanding that, I took Your Honor before to the

15  point where GreatBanc had a decision to make; what to do to

16  fulfill its fiduciary duties to plan beneficiaries under all of

17  the parade of horribles that were going on at the company that

18  I enumerated before.

19        What GreatBanc decided to do, even though this

20  amendment to the plan was ineffective, even though its

21  fiduciary duties given this-- the condition that the company

22  was in would've allowed it to take immediate action under its

23  ability to vote 100 percent of the company's stock , it didn't

24  unilaterally change the board of directors, which it had

25  concluded with reluctance was the only fix to this situation.

 1    It didn't do that.

 2         Instead it asked for direction from the plan

 3    administrator.  Again that, for general purposes, GreatBanc is

 4    a directed trustee and, other than in the circumstances that I

 5    just walked through with Your Honor, it follows plan direction.

 6         Here, as a belt and suspenders approach, GreatBanc

 7    before taking any precipitous action went and asked for

 8    direction from the plan administrator to replace the current

 9    board of directors on whose watch all of this parade of

10    horribles had unfolded with a new slate.

11         The direction somewhat unsurprisingly was not

12    forthcoming.  In fact, no response was forthcoming.  The

13    response was this lawsuit, Your Honor.  The request for

14    direction was on October 23rd of this year.  And without any

15    further communication, a lawsuit was filed by Ferrell against

16    GreatBanc.

17         Now, with Your Honor's indulgence, if we can go back

18    to the trust document that was Exhibit B to the complaint.  And

19    if you go to Page 7 of the trust document, Section 2.6, which

20    is in the middle of the page, is "Plan Administration."  Go

21    down to the very last sentence.

22         The last sentence says, "If the trustee requests any

23    direction hereunder and does not receive them, the trustee

24    shall act or refrain from acting as it may determine and shall

25    be indemnified by the company for such action or inaction

1    pursuant to Section 4.11."

2          So under all of these circumstances, under our ERISA

3    fiduciary duties, under the plan documents, the failed

4    amendment, and this section that I've just pointed to Your

5    Honor, GreatBanc had the ability to take the action that it had

6    concluded was necessary to remedy the breach of fiduciary

7    duties by the plan administrator and replace the board.  But it

8    didn't do that.  We could've done it after this lawsuit was

9    filed, Your Honor, but we didn't.

10          We're today asking for very narrow relief.  I want to

11   be very clear that today before Your Honor we're not asking for

12   a ruling that declares us entitled to take the steps that for

13   the reasons I just mentioned I think we're going to-- we're

14   clearly likely to succeed on the merits and be permitted to

15   take; that is, removing the current board and replacing them

16   with a new slate of directors.  That's not for today.

17          For today what we are seeking from Your Honor is only

18   to maintain the status quo.  Currently while terminated by

19   GreatBanc [sic]-- and we're not-- as I said before, we're not

20   arguing that Ferrell does not have the ability to terminate the

21   trustee, they do.  And they can do it on 30 days' notice and

22   they did that here.

23          What we're asking for given the timeline-- remember

24   that 10-K came out on October 15th.  On October 16th, the

25   company is downgraded.  We thereafter on October 23rd asked for

1   the direction that we think we're entitled to and is necessary

2   to preserve plan assets and replace the board.

3              So what we're trying to do is maintain our standing to

4   get to the point where Your Honor can rule on the merits of the

5   claim before it's too late.  Thirty days from the termination

6   of GreatBanc is tomorrow.  Now, we came in to Your Honor--

7   again, on that timeline, hoping on October 23rd that we would

8   get the direction that we had asked for and not getting it and,

9   rather, being met with a lawsuit, we came in to Your Honor

10  within a week of the lawsuit being filed.  We were able to put

11  our papers together and make this request.

12             But absent the TRO that we're seeking today, come

13  tomorrow our termination as trustee will become effective.

14  Now, we're still going to be defendants in this lawsuit because

15  we got sued.  For what, I'm not entirely clear.  But we were

16  sued.

17             But to maintain standing as the trustee to take the

18  necessary step here, as we believe we're entitled to do, and

19  remove the board and re-elect the new slate, we're asking Your

20  Honor just keep us in our chair long enough for Your Honor to

21  rule on that.

22             Now, I want to be clear about the relief that's been

23  requested here again, because I think in the opposition

24  participation papers it's a bit confused.  That's the TRO we're

25  asking for, and we're asking for a preliminary injunction

1    hearing as soon as Your Honor is able to do to continue that

2    relief.

3          But what we're ultimately asking for, the relief on

4    the merits, not on the preliminary injunction and TRO, but on

5    the merits is a declaration from Your Honor that GreatBanc is,

6    in fact, entitled to take the step of removing and replacing

7    the board of directors, and that's a request for declaratory

8    relief.  We would request that Your Honor give us a speedy

9    hearing on that under Rule 57 of the Federal Rules of Civil

10   Procedure and that that issue be heard by Your Honor as quickly

11   as possible.  Because one thing we agree with Ferrell on is

12   that-- that this is an important issue and there ought not be

13   uncertainty hanging over the company in this way.

14         Taking a step back and-- well, I should say maybe

15   jumping ahead to the balance of the equities here, the

16   uncertainty that's hanging over the company right now is one

17   completely of-- of Ferrell's manufacture because on

18   October 23rd, when we made our request for direction, Ferrell

19   could have responded to us, could've told us no, they could've

20   told us yes.  And then if we had so chosen, as we believe we

21   have the power to do, we, GreatBanc, could've removed the board

22   of directors.  None of that would've been aired out in the

23   public forum, Your Honor.

24         To be clear, Ferrell Company, where we own 100 percent

25   of the stock, is the ultimate holding company on top of the

1    Ferrell group of companies.  And it, as our holding 100 percent

2    of the stock suggests, is a privately-held company.  That's the

3    board that we're looking to change.  And we could've done that

4    without being here in court in front of Your Honor.  There was

5    a preemptive strike, that Ferrell made a decision to drop this

6    court-- to drop this dispute into the public forum.  So we

7    agree that now that it's here, Your Honor, it ought to be

8    decided quickly.

9        But the other thing in the balance of the equities was

10    our forbearance.  We still have not taken a step that we

11    believe as we sit here today we're entitled to take right now.

12    In order to avoid any further uncertainty in the market, we're

13    asking Your Honor first to decide the question are we right?

14    We believe we're likely to succeed on the merits here, but are

15    we right?  Do we have the ability to remove the board?

16        That's what we want to get to quickly.  And all we're

17    asking Your Honor to do today, as I said before, is keep us in

18    our chair as trustee with standing.

19        Now, in terms of the irreparable harm that could occur

20    here, again, I think it's a fairly narrow issue.  As I quoted

21    before from the *YCR* case, yes, there's a serious risk to the

22    plan assets, and that's irreparable harm.

23        Now, why you might ask when the company has already

24    designated an interim trustee is removing GreatBanc going to

25    create irreparable harm?  And the answer is we've been the

1    trustee of this company for 13 years.  There is a long history

2    of efforts that we have made to engage with the company, to get

3    the necessary information, to help the company find a solution

4    to its problems, and a long history of being rebuffed at every

5    turn.  We know where this has landed and why, which is leaving

6    an ESOP trustee with no choice but to remove the board.

7              Now, we do not in any way challenge Mr. Urbach, that's

8    the interim trustee, Mr. Urbach's qualifications, his

9    independence, his good faith.  He has indicated in Paragraph 11

10   of the affidavit that he submitted to Your Honor that he's

11   prepared to meet with GreatBanc for purposes of the tradition--

12   transition.  And-- and we take that as in good faith, of

13   course, as well.  But the fact of the matter is, there is just

14   no time.  This company is in big trouble, Your Honor.  I

15   enumerated it at the outset of my presentation.

16             There is no time to get an interim trustee fully up to

17   speed on 13 years of history.  Most of the stuff that's acute

18   now is over the last five to three years or so.  But there's no

19   time to get an interim trustee who's doing his homework up to

20   speed and prepared to take this step.  And we-- we concede this

21   is a dramatic step.  It's one we've concluded has to be taken.

22             But to hand this off to the interim trustee and think

23   that it's going to be taken by him, in fairness to him, with

24   enough time to save the company, we don't think that's going to

25   happen.  And that's the only reason that we're asking that

1   GreatBanc be kept in its seat.

2         That, by the way, keeping us on as trustee is not the

3   ultimate relief we're seeking.  That's the interim relief for

4   purposes of allowing Your Honor to decide these issues and for

5   us to have standing if Your Honor finds in our favor, which we

6   believe you're going to do, to then effectuate the action of

7   removing and replacing the board with our slate.

8         So on Mr. Urbach, it's purely a question of timing and

9   bandwidth for effectively a solo practitioner to get to a point

10  where in his fiduciary duty he's comfortable taking the step

11  that we have reluctantly concluded is necessary to save the

12  company.

13        I'll just spend another couple of minutes on the

14  balance of the equities here, Your Honor, and then I'm happy to

15  take Your Honor's questions.

16        On the balance of the equities, as I mentioned a

17  moment ago, we have an affidavit from Mr. Urbach who's the

18  interim trustee.  One of the things that he says in his

19  affidavit in Paragraphs 11 and 12 is that the actual transition

20  here is not complicated.  And that's correct.  To-- to hand off

21  the ministerial functions that the trustee serves on a

22  day-to-day basis, apart from this issue that's now in front of

23  you Your Honor, that's easy.  It's easily done, it can be

24  quickly done.  And so there's no harm to Ferrell, to the plan,

25  to anyone for delaying that process for whatever it is for Your

1   Honor to decide, two weeks, three weeks, whatever schedule Your

2   Honor is willing to give us.  There's no harm there in terms of

3   the transition.  Zero.  And that's in Mr. Urbach's affidavit.

4          I mentioned the uncertainty, which is another thing

5   that has been raised by the other side in opposition as-- as

6   balancing the equities in favor of denying the TRO.  We see it

7   the other way around, and we believe that to remove the

8   uncertainty, the TRO ought to be granted and we ought to get to

9   the merits as quickly as possible.

10          There's a suggestion that granting the TRO that we're

11  requesting here would somehow create an event of default.

12  That's clearly not the case.  Keeping GreatBanc on long enough

13  for Your Honor to decide the ultimate merits of this case is

14  not going to do that.

15          Even with respect to the ultimate merits, which is us

16  asking Your Honor to declare that under ERISA and the plan

17  documents we have the power to replace the board, replacing the

18  board respectfully will only create an event of default under

19  the documents that Your Honor has been pointed to if Ferrell

20  wants it.  There's a-- there's what's known as a change of

21  control provision in their credit agreements.  This is Exhibit

22  E to Mr. Ferrell's affidavit that he submitted to Your Honor.

23  It's their financing agreement with TPG.

24          And in that document on Pages 130 and 134, you've got

25  to go from the beginning of a long provision to the operative

1    paragraph, that's Section 8.1.  It basically indicates that a

2    change of control at the Ferrell level could-- or would create

3    an event of default.

4          But if you look at that document and at the definition

5    of what is a change of control-- with Your Honor's indulgence

6    I'm just going to turn to that.  A change of control.  I'll

7    read it for Your Honor, I don't want to leave you with a

8    paraphrase.  But the gist of it is that where there is a

9    changeover at the board of directors level, that's only going

10   to be a change of control that precipitates an event of default

11   if the current board hasn't approved the new slate.

12         So to play out the thread.  If Your Honor were, after

13   a speedy hearing on our declaratory judgment action, to declare

14   that we, as ESOP trustee, are entitled to replace the board, at

15   that point it would be up to Ferrell to determine are they

16   going to approve the slate of directors that we're proposing,

17   which Your Honor will have held we're entitled to do, and

18   thereby avoid an event of default, or are they not going to

19   approve the new slate, which Your Honor will have held we're

20   entitled to do, and cause an event of default.

21         So this is, while I hesitate to use the hackneyed

22   phrase, a red-herring, and I just wanted to allay any concerns

23   Your Honor may have had there.

24         I've addressed one of the other issues that was

25   raised, which is our supposed delay.  If you go through the

1    timeline, between October 9th, when we got the notice out of

2    the clear blue sky that we were being terminated.  We then had

3    October 15th, just a few days later, the public disclosure of

4    the declarative event of default by TPG, the auditors

5    expressing doubt about a going-concern at the operating company

6    level.  October 16th, Standard & Poore's downgrade.  Our letter

7    asking for direction on October 23rd and October 24th this

8    lawsuit.  So there's no delay on our part.

9          The last issue that I just wanted to briefly address

10   for Your Honor, because if I were in your shoes I may be

11   wondering about it, is this suggestion throughout Ferrell's

12   papers that the DOL, the Department of Labor, has mandated the

13   removal of GreatBanc.

14         I'll tell you what I know about that, Your Honor.

15   And-- and before I do that, I'll point out that there is no

16   evidence in any of the papers that have been submitted by

17   Ferrell of that.  There's no letter from the-- the DOL, which

18   typically they would send a closing letter if they had reached

19   such a determination, a copy of which would've gone to

20   GreatBanc.  There's nothing.

21         So my understanding of that - and counsel for Ferrell

22   can obviously address this when they're up here - is that there

23   was an audit done by the DOL of Ferrell sometime I think in

24   late 2017 or early 2018 and some suggestion to GreatBanc after

25   that audit by Ferrell that there was going to be an RFP process

1   to determine the trustee and that GreatBanc would be a part of

2   that process.  That's really the last anyone heard.

3          And the sequence of events thereafter, which is laid

4   out in great detail both in our counterclaims and in our brief,

5   is that in November of 2018, so toward the end of that year

6   rather than the beginning of that year when the audit happened,

7   GreatBanc is meeting with members of senior management at the

8   company talking about the condition that it's in.

9          In December of that year, senior officers of GreatBanc

10  are meeting with the current board of directors of the company

11  talking about the condition that it's in and what can be done.

12         In January of 2019, Mr. Ferrell himself on at least

13  two occasions is meeting with GreatBanc as trustee to talk

14  about what can be done.  And it goes on from there.

15         I had mentioned to Your Honor in July there's an

16  amendment to the plan documents continuing to contemplate

17  GreatBanc as trustee.

18         You know, there's nothing that occurs until

19  September 10th, as we're getting increasingly frustrated and

20  repeatedly stiff-armed, GreatBanc sends a letter requesting a

21  meeting to Ferrell.  And within a couple of days of that

22  letter, we now know they interviewed Mr. Urbach to take over as

23  trustee.  Okay?  And just to be clear, that's September of this

24  year, just a month-and-a-half or so ago.  That was when they

25  interviewed the replacement trustee.

1          It strikes me as passing strange if the Department of
2    Labor at the end of 2018 had mandated GreatBanc's removal that
3    all of that interaction, unsatisfactory as it was because it
4    never gave us answers to our questions, but all of that
5    interaction and engagement would've occurred if we had been
6    mandated to be removed as the trustee.  And that no meeting
7    with Mr. Urbach to take over would've occurred until September
8    of this year.

9          So I just wanted to address that issue so as not to
10   leave Your Honor with a misimpression about your ability or the
11   wisdom of granting the TRO that's before you today.  And again,
12   limited to leaving us in place until Your Honor can rule on the
13   merits.  And with that, I'll answer any questions that Your
14   Honor has.

15             THE COURT:  No questions at this point from me.
16             MR. SMITH:  Thank you, Your Honor.
17             THE COURT:  I'll hear from the other party.
18             MR. BURLINGAME:  Good morning, Your Honor.
19             THE COURT:  Good morning.  And you are Mr. Burlingame?
20             MR. BURLINGAME:  John Burlingame, Your Honor, and I
21   have the pleasure of representing Ferrell Companies, Inc.

22         In terms of the relief sought, Your Honor, they say
23   that they're-- want to maintain the status quo so that they can
24   get a declaratory judgment.  They also in their prayer for
25   relief ask for a mandatory injunction, this court ordering the

1   board of directors of Ferrellgas to instruct the trustee to

2   oust the current board and replace it with a new board.

3          You heard Mr. Smith say that, well, it wouldn't be a

4   change of control if the current board directed the trustee or

5   approved the slate of-- of the new board of directors.  That is

6   a classic mandatory injunction that they're seeking.  Your

7   Honor knows the standards for injunctions a lot better than I

8   do and so I won't-- I won't belabor the very high standards of

9   granting the drastic and extraordinary relief of a preliminary

10  injunction.

11         I want to focus on the status quo, Your Honor.  The

12  status quo is that the trustee will be out tomorrow by the

13  plain terms of its at-will contractual relationship with

14  Ferrell Companies.

15         We cited the *Metropolitan Life* case, Your Honor, out

16  of the Second Circuit Court of Appeals.  In that case the

17  district court had granted a preliminary injunction that

18  effectively tolled a cure period under an indenture.  The

19  Second Circuit overturned that preliminary injunction.  It

20  explicitly said, "An extension such as that granted here is not

21  a preliminary injunction preserving the status quo but rather

22  one that radically alters the status by permanently changing

23  the cure provisions."

24         They've not cited, Your Honor, to a single case where

25  any court in this country has ever granted the type of relief

1    that GreatBanc is seeking here.  It is to the best of our

2    knowledge totally unprecedented.

3           I'm glad that Mr. Smith walked the court through some

4    of the contractual language here, the plan and the trustee

5    agreement.  And with the court's permission I'd like to do the

6    same and-- and address some of the points.

7           The one provision that he didn't show Your Honor-- if

8    I may use the ELMO?

9           THE COURT:  Yes.

10          MR. BURLINGAME:  This is a classic reciprocal at-will

11   relationship.  This is the trustee agreement, it controls the

12   relationship between Ferrell Companies, Inc., and GreatBanc.

13   It's mutual.  "The trustee may resign at any time by giving 30

14   days' notice.  The company may remove the trustee by giving 30

15   days' advance written notice only subject to providing the

16   removed trustee with satisfactory written evidence of an

17   appointment of a successor trustee."  They don't dispute the

18   effectiveness of the notice, they don't contest it in the

19   least.

20          In connection with the transition there's a 30-day

21   period, and GreatBanc is obligated to cooperate.

22          He said it's so urgent that GreatBanc, because it's

23   been a trustee for 16 years, needs to stay involved as trustee

24   because they know so much about the history of these companies.

25   They've had 29 days to ramp up the successor trustee, who

1    unquestionably has the same duties and fiduciary

2    responsibilities as GreatBanc.

3            As well, Your Honor, there's nothing that prevents

4    GreatBanc from communicating with the new trustee even after

5    the new trustee takes over.  They're saying we need to remain

6    in place notwithstanding the clear at-will nature of our

7    directed trustee status because we're the only ones capable of

8    protecting this company.

9            Your Honor, GreatBanc is hopelessly conflicted.  You

10   heard Mr. Smith talk about their concerns about liability for

11   breaches of fiduciary duty.  You heard him talk about under

12   ERISA potential liability as a co-fiduciary for breaches of

13   another fiduciary's duties.  This is a prophylactic measure

14   designed to give GreatBanc as much protection as it can.

15           Your Honor, now I'd like to talk about the powers and

16   duties of GreatBanc.  Mr. Smith talked-- did refer Your Honor -

17   again using the ELMO - to the responsibility of the trustee and

18   the powers of the trustee.  The contractual relationship,

19   Section 2.2, "The powers, duties, and responsibility of the

20   trustee shall be limited to those set forth in the trust

21   agreement and nothing contained in the plan, either expressly

22   or by implication, shall be deemed to impose any additional

23   powers, duties, or responsibilities on the trustee."

24           We then go to Section 2.3, the general powers.  "As

25   directed by the plan administrator to vote any stocks,

1   including company stocks."  It has the power to vote the stock

2   pursuant to the direction of the plan administrator.

3          They point to the recent-- relatively recent amendment

4   to the plan, not to the trust agreement.  Section 11.1(h).  And

5   what does that say?  "For the avoidance of doubt, the company

6   as plan administrator shall have the power to direct the

7   trustee to the voting stock of the company under Section 8."

8          This was to clarify, Your Honor, that it was the

9   company that would direct the trustee.  That was done to ensure

10  that two employees acting as plan administrator weren't going

11  to be able to direct the company-- to direct the trustee to

12  vote in connection with the change in control.  It was going to

13  be the entire board.  That was a clarification that the board,

14  not just the two plan administrators, would do that.

15         Your Honor, they talk a lot about ERISA.  ERISA

16  obligates the trustee to follow direction so long as that

17  direction does not violate the plan.  They don't point to

18  anything in the plan documents that-- that they would be

19  violating or that it would be a violation of its ERISA

20  fiduciary duties.

21         When you look at their complaint, their counterclaim,

22  when you look at their request, their brief in support of a

23  TRO, they haven't identified a breach of an ERISA fiduciary

24  duty that would occur.  In fact, Your Honor, they haven't

25  identified a direction by the board that would constitute a

1  breach.  This is a self-executing notice of termination of the

2  at-will relationship.  There's no direction.  Your time is up,

3  a new trustee with the same duties and responsibility is going

4  to step in.

5          At the very best, Your Honor, what they've alleged are

6  corporate fiduciary duties.  ERISA doesn't grant a roving

7  license to an at-will directed trustee to inject itself into

8  the management affairs of the company's day-to-day business.

9  It's just not that broad.  And, again, they've not cited a

10 single case that comes anywhere close to that proposition.

11         This board has been exercising its business judgment

12 in directing the affairs of Ferrell Companies, Inc.  What the

13 trustee is concerned about, what they really focus on are two

14 and three steps below Ferrell Companies, Inc.  We have the hold

15 co, Ferrellgas Partners, and we have the operating company.

16 Two steps down.

17         GreatBanc itself in Exhibit 1 to Mr. Ferrell's

18 declaration in 2013 noted that its responsibilities were with

19 respect to FCI and that they didn't have any direct control

20 over the subsidiaries, Ferrellgas Partners and the operating

21 company.  What they're trying to do here, Your Honor, is get a

22 mandatory injunction to flip the board of Ferrell Companies,

23 Inc., so that they can ultimately direct the affairs of two of

24 its subsidiaries.

25         Your Honor, both sides have cited the DOJ bulletin.

 1   And again, that makes clear what ERISA does.  The only way a

 2   directed trustee is in violation-- should not follow the

 3   direction of a company, of the board - and again, there's no

 4   direction that we're asking them to follow here - is with

 5   respect to a violation of the plan or a breach of fiduciary

 6   duty of ERISA.

 7        Both sides cited the *WorldCom* case.  That court held

 8   that, "A directed trustee's knowledge that the company's stock

 9   price and profits were declining and that the company was

10   undergoing a restructuring is not sufficient to find a breach

11   of fiduciary duty when the trustee continued to invest in plan

12   funds in the company's stock."

13        All the cases they cite, or at least most of them,

14   Your Honor, deal with directions to invest in the assets or the

15   interests.  And that's not what is happening here.  All that's

16   happening here is a notice of termination of this at-will

17   relationship.

18        Your Honor, this board-- there's no question that the

19   company is at perhaps the most precipitous point in its

20   history.  And, frankly, it's not surprising that we have note

21   holders and lenders listening in on this hearing.  They're very

22   interested in picking up as much information about the company

23   and this dispute as they possibly can.

24        Ferrell Companies, Inc., has been working with a very

25   highly-regarded financial advisory firm to address what

1    everybody knows has been looming out there for some time.

2    These hundreds of millions of dollars in debt.  The first

3    tranche of which, 500 million, comes due in June of 2020.

4    That's what's been causing the-- the drop in stock price.

5        The company itself has plenty of cash flow.  It's

6    operating well.  It continues to invest.  This is a board of

7    directors committed to the employees of the company and the

8    plan participants.  They have been working tirelessly to

9    address this looming debt crisis that was created by some

10    pretty bad decisions to invest in the midstream operations,

11    most particularly the Bridger transaction in 2015.  That's what

12    saddled the company with virtually all of its debt.

13        Now, GreatBanc, acting as a discretionary trustee in

14    connection with that transaction, was paid a substantial fee to

15    evaluate it, and they approved it.  It didn't take folks long

16    to realize that that transaction was a disaster.  The

17    management of the company from that time is no longer around.

18    Mr. Ferrell came back from retirement, not taking any financial

19    compensation whatsoever, to work tirelessly to address the

20    problems the company was facing.

21        The board has continued to have turnover, Your Honor.

22    Every two, three years there's been new board members coming

23    in, people turning around.

24        What this comes down to is negotiating strategy.

25    Great-- GreatBanc-- and they haven't been alone, there have

1    been others who have been running around like Chicken Little,

2    frankly, Your Honor, the sky is falling.  We've got to do

3    something.  We've got to-- we've got to go to these note

4    holders and renegotiate the notes.  This is high stakes,

5    sophisticated, tough negotiations between very, very

6    sophisticated business people.

7         If GreatBanc got its way a year ago, we would've gone

8    to the note holders hand-in-glove and lost considerable

9    leverage.  I'm not going to reveal the specifics of the

10   strategy, Your Honor.  But as we've told you, we've been

11   working with a financial advisor.  There is a plan in place,

12   and this has been in the works for some time.

13        GreatBanc has come to us and said, "Well, you've got

14   to consider this proposal, you should consider that proposal."

15   One of the real ironies here, Your Honor, is that this internal

16   ruckus that they pointed to at the company about a year ago

17   with some now former company executives, that was because of

18   this fiction that the board of directors had been scheming to

19   put the company then into a pre-packaged Chapter 11 bankruptcy.

20        These executives approached independent directors of

21   the board with their concern.  The board met with them.  The

22   board investigated.  These executives threatened to resign from

23   the company if they didn't get their way.  The board didn't

24   give them their way.  There was ultimately a voluntary

25   separation.  But before the voluntary separation, do you know

1   what happened?  These executives went off and met with

2   GreatBanc, laid out the same concerns.

3          After the voluntary separation, GreatBanc came here to

4   Kansas City, met with the entire board of directors.  The board

5   explained fully what had happened.  There was no pre-packaged

6   Chapter 11 in the works.

7          Mr. Ferrell, the next month, took three trips to

8   Chicago to further try to make sure that GreatBanc was

9   understood, and then we didn't hear a peep about this from

10  GreatBanc until they sent their letter in October telling the

11  board, "We want you to direct us that you guys are out and

12  we're-- we're in."  And then they try to resurrect this-- this

13  stuff from December, November and December of 2018.

14         Now, why do I go there, Your Honor?  Well, it's very

15  ironic that one of the proposals that they wanted the board to

16  consider, and in fact that the board did consider, included--

17  and Your Honor has sealed the names of the entities, and I will

18  respect that of course.  It included, "Give us equity in the

19  company, let us negotiate with the note holders and we'll put

20  the company into a pre-packaged Chapter 11 bankruptcy."  That

21  wasn't going to happen, Your Honor.  Not at all.

22         But what does that also tell you?  That there are very

23  sophisticated people out there who realize the enormous value

24  of this company.  They believe that they can come to a deal

25  with the note holders that's going to, if not totally solve,

1   solve, dramatically reduce the one looming problem of this

2   company, and that's these hundreds of billions of dollars in

3   notes that are coming due.  They want to be able to have the

4   reigns of the company so they can profit from that.

5           This board is committed to the employees of the

6   company and the ESOP plan participants.  Their business

7   judgment should not be upset.  GreatBanc has come nowhere close

8   to showing that this court should not give a presumption that

9   this board, acting to protect the interests of its employees,

10  acting to protect the interests of the plan participants, is

11  not exercising its sound, good-faith, and reasonable business

12  judgment.

13          Your Honor, the harm that would befall the employees

14  and the plan participants by allowing the issue of who's in

15  charge, this board or a directed at-will trustee, is already

16  harming the company.  GreatBanc has pointed to the skirmish

17  with TPG.  The board and TPG-- one of-- one of Ferrell

18  Companies, Inc.'s lenders, TPG has asserted a default.  The

19  board has said it's not in default.

20          Your Honor, one of the reasons we got our papers in a

21  little bit later yesterday than-- than we had hoped was because

22  the board was deflected with negotiations with TPG.  Those

23  negotiations remain ongoing.  But now you have lenders

24  wondering, well, who's in charge?  GreatBanc's own brief time

25  and again points to the devastating impact of this cloud of

1    uncertainty at this dramatic moment in the company's history,

2    Your Honor.  And the harm that will surely befall the

3    employees, the plan participants would be devastating.

4         At this moment when this board, with all the planning

5    and evaluation that it's done with its very, very sophisticated

6    advisors, about to commence negotiations with note holders who

7    hold about $2.2 billion in notes, so that a brand-new board,

8    fresh faces, come in, immediately take over?

9         The balance of the hardships here for the employees,

10   the employees and the plan participants that Mr. Ferrell and

11   this board have been fighting to protect and are committed to

12   protecting in the exercise-- not just their sound-- these are

13   really smart, sophisticated people, Your Honor.  And yes,

14   they-- they have considered proposals, but these proposals that

15   GreatBanc has been-- floated are totally inconsistent, totally

16   inconsistent, with the recommendations from the company's

17   strategic advisors and the resolution that the board adopted

18   last summer.

19        Your Honor, GreatBanc has come nowhere close to

20   showing by clear and convincing evidence that it's likely to

21   succeed on the merits of its claim.  Nowhere close.  No

22   violation of the plan.  No violation of ERISA.  Not even being

23   directed to do anything.  "GreatBanc, you've been part of the

24   problem.  We're looking forward to the solution.  We've got a

25   well-qualified, unquestionably well-qualified replacement

1    trustee who's been waiting in the wings.  No transition."  We

2    even-- we got a phone call yesterday finally from GreatBanc,

3    "Well, let's just see how this hearing turns out tomorrow and

4    then we'll go from there."

5          The harm to GreatBanc itself, nil.  If this court

6    doesn't grant the injunction, there is no harm to GreatBanc

7    except for the fact that it's-- it's not going to have its

8    cherry-picked board perhaps and continue forward-- continuing

9    to try to insulate itself from potential liability.

10          The irreparable harm that would befall if this court

11   didn't allow the clock to tick on the at-will relationship,

12   that irreparable harm falls to the employees and plan

13   participants.  That's what this is really about, Your Honor.

14   It's what it's always been about for Mr. Ferrell.  It's what

15   it's been about for this board.

16          Your Honor, I-- I respect the position that you're in

17   and that you need to make.  The plan documents, the trust

18   agreement, I want to go back to that.  That's-- that's what

19   controls this at-will relationship.  Thirty days, you're out.

20          What if-- what if GreatBanc had offered its

21   resignation and said, "We're out in 30 days," are we're going

22   to run in and get a mandatory injunction to keep an at-will

23   trustee in place?  I mean, what at-will employee, Your Honor,

24   is-- is able to say, "Well, I know I'm an at-will employee, but

25   gee, I'm so important to this company, I've got to stay in

1   place for a little bit longer"?  It's not happened.  They

2   haven't cited a single case.  Not a single case, Your Honor.

3           Your Honor, I respectfully ask that you deny their TRO

4   and keep the status quo in place.  Again, the *Metropolitan Life*

5   case, Your Honor, out of the Second Circuit, the status quo is

6   not entering-- is not this court ordering a tolling agreement

7   in a contract that doesn't have a tolling agreement.  The

8   status quo is not allowing GreatBanc to remain as trustee as

9   long as it wants to remain trustee just because it's been an

10  at-will directed trustee for 16 years.

11          The status quo is that as of tomorrow morning by the

12  plain terms of the contract, GreatBanc is out.  A new trustee

13  is in.  A new trustee with the same duties and responsibilities

14  as GreatBanc.

15          Your Honor, on behalf of Ferrell Companies, Inc., I

16  urge you to deny the TRO.  Thank you, Your Honor.

17          THE COURT:  Let me ask you one question.  I-- I just

18  would like your interpretation of Section 403 of ERISA in light

19  of the fact I think that Ferrell is both a trustee and a plan

20  administrator.

21          MR. BURLINGAME:  Well, that's-- so when Ferrell is--

22  is acting with respect to the plan, then it is an ERISA

23  fiduciary trustee.  But the case law is very, very clear, Your

24  Honor, that when-- when Ferrell is acting in connection with--

25  with its business affairs, yes, that might have some impact

1    on-- on the plan, and it-- most oftentimes it does.  But in--

2    in that capacity, in their capacity as making business

3    decisions for the company, they're not acting as ERISA

4    fiduciaries, Your Honor, they're acting as fiduciaries to the

5    company, not in connection with their fiduciary duties towards

6    the plan.

7         THE COURT:  Well, I understand there's a body of law

8    over there because sometimes it's hard to draw a line between

9    what hat someone is wearing.

10        MR. BURLINGAME:  Uh-huh.

11        THE COURT:  But the particular language I'm focusing

12   on says, "The trustee or trustees shall have exclusive

13   authority and discretion to manage and control the assets of

14   the plan except to the extent that the plan expressly provides

15   that the trustee or trustees are subject to the direction of a

16   named fiduciary."  This plan and-- I mean, as I read it--

17        MR. BURLINGAME:  Uh-huh.

18        THE COURT:   -- Ferrell is a named-- named fiduciary.

19   GreatBanc is their-- at least there are provisions that have

20   the directive-- direction language.  There are other provisions

21   in terms of its powers that do not.  But-- but this section,

22   403, says, "Except to the extent that the plan expressly

23   provides that the trustee or trustees are subject to the

24   direction of a named fiduciary who is not a trustee, in which

25   case the trustee shall be subject to proper directions of such

```
1    fiduciary which are made in accordance with the terms of the
2    plan and not contrary to ERISA."
3         MR. BURLINGAME:  Right.  And that's the language, Your
4    Honor, that we quoted and bolded at the top of Page 14 of our
5    opposition brief.  And-- and so that, "The trustee shall be
6    subject to the proper directions of such fiduciaries."  And
7    that would be the company.
8         When the company is directing the trustee, they're
9    subject to the directions of the company.  It's by definition a
10   directed trustee, in this case a directed at-will trustee.  But
11   that's-- I'm glad Your Honor has picked up on that because it's
12   a point that we-- we have emphasized in our-- in our brief.
13        THE COURT:  Well, so respond to GreatBanc's argument
14   that they asked for direction, that they're empowered to ask
15   for certain direction, they did so in this case and you didn't
16   respond, which then I think they're relying on language in-- I
17   don't know if it's the trust or the plan, I'll have to look at
18   it, which then empowers them to-- to act or not act along-- so
19   long as I guess they're acting within their-- their powers.
20        MR. BURLINGAME:  Yeah, but this goes back to the point
21   that the direction they're asking for is precipitated by the
22   corporate business judgment.  They don't like the operational
23   strategy or decisions that the company is making and so they
24   want to-- to oust the board.  This is not with respect to-- and
25   most of these cases, Your Honor, deal with how the-- the assets
```

1   of the trust are going to be invested.  Not one of them that

2   I'm aware of, Your Honor, deals with-- comes close to dealing

3   with this situation where--

4           THE COURT:  I haven't found one yet, but I haven't

5   looked that much either, but-- but yet they're empowered to

6   vote the stock and, thus, empowered to vote on directors.

7           MR. BURLINGAME:  They're empowered to vote the stock

8   pursuant to the direction of the company.

9           THE COURT:  Yeah.  There is that specific language in

10  whatever provision of the agreement, "As directed to vote the

11  stock"-- let me find that language.

12          "As directed by the plan administrator to vote any

13  stocks, including company stock, which shall be voted as

14  provided for in Section 8 of the plan."

15          MR. BURLINGAME:  Uh-huh.

16          THE COURT:  Yeah, to vote any stocks.

17          So, I mean, incumbent in that is the ability to vote

18  on new directors.  I don't know about ousting an entire or

19  changing an entire-- I assume the bylaws provide for some

20  staggering of classes of directors, and maybe it-- they provide

21  for ousting a whole-- I don't know, I haven't seen the bylaws,

22  but...

23          MR. BURLINGAME:  But, Your Honor, it's the directed

24  trustee.  They vote the stock as they're told.  They-- yeah,

25  they vote as they're directed to vote by the company.  They

1   don't get to tell the company how to vote.  They are-- they are

2   a directed trustee.  And-- and, Your Honor--

3        THE COURT:  It does-- it definitely says, "As directed

4   by the plan administrator."

5        MR. BURLINGAME:  I mean, there's-- the contractual

6   language couldn't be clearer.  Your Honor, just to-- to

7   illustrate, so-- and this wasn't-- wasn't in the briefs, but

8   I-- you know, so here's just an example.

9        "Kevin and Arlene, I hope you're doing well."  This

10  was from the then COO of the company.  "I hope you're doing

11  well.  Please find unanimous consent for the re-appointment of

12  existing directors of Ferrell Company, Inc."  And this was late

13  September two years ago.  And there's-- there's so many of

14  these, Your Honor.

15       And then here's what Ferrell sends over and here's

16  what GreatBanc does.  And it-- it happens very quickly, very

17  routinely.  This e-mail was sent September 29 at 9:56 a.m.  And

18  unlike what they've done with respect to the transition of the

19  new trustee, they responded very promptly here, September 29 at

20  4:42 p.m.

21       There are-- this is common, it's been going on for

22  years.  Here's who we want you to vote for, vote for it, boom.

23  There's no-- there's no discretion.  They're a directed

24  trustee, and that's-- that's how this has worked for-- for

25  many, many years.

1      THE COURT:  And then the amendment to the plan, you

2   know, Subsection 2(h) that you both have focused on; is

3   Subsection (h) a-- a brand-new-- is it a new piece of language

4   or does it represent a modification?  Because you've told me

5   that there's this prefatory language, "For the avoidance of

6   doubt, it's the company," in other words, acting as plan

7   administrator, "shall have the power to direct the trustee as

8   to voting of company stock under Section 8."

9      Is that a brand-new section or is that just a

10   modification to say it's the company as plan administrator that

11   has that power?

12      MR. BURLINGAME:  That's a new section, again designed

13   to demonstrate-- again this, I'll put it back up on the ELMO,

14   this from the trust agreement, Section 2.2.3 [sic], powers and

15   duties as directed-- 2.3(d), "Powers to vote as directed by the

16   plan administrator to vote stocks."

17      THE COURT:  And that language was already there before

18   the amendment.

19      MR. BURLINGAME:  That's in the original trust

20   agreement, Your Honor.

21      And then in the plan documents, the plan documents, we

22   wanted to just clarify, "For the avoidance of doubt, the

23   company as plan administrator."  This was done, Your Honor,

24   because the plan administrator is two people and it's changed

25   over time, but a company employee.  And in some regular and

1    routine cleanup, a very smart ERISA attorney said, hey, we

2    ought to be sure that in the event of a Section 8, you know,

3    acquisition, major-- major event that-- that it's not just the

4    plan administrator-- two people from the plan administrator who

5    directs, we can't have just two people going out telling the

6    trustee how to-- how to vote on major things, it's got to be

7    the company.

8           This didn't reduce GreatBanc's very constrained

9    ability in any way, shape, or form.

10          Yeah, thank you.  That's why-- and, Your Honor, just--

11   Jim Griffin has been great and he just came to my rescue here.

12   But here's what it amended, this is the original language from

13   the plan administration.  "The plan administrator referred to

14   in Section 1.3 shall consist of one or more individuals

15   appointed by the board of directors."

16          So it is perfectly logical that in a regular and

17   routine cleanup we'd say, well, for the avoidance of doubt, the

18   company as plan administrator.  Again, we don't want just two

19   plan administrators being able to direct the trustee.  But the

20   notion that this amendment-- that this amendment was some--

21   some plot to gain more control over a-- an at-will directed

22   trustee, it's fiction.

23          Just like the fiction in their brief where they said

24   that they-- they've never receive any-- any direction.  I just

25   showed you one example of-- of how it works time and again and

1  again and again.

2       Your Honor, the plan documents, the trust agreement

3  are clear, unambiguous.  The-- there's no violation of ERISA

4  done.  Let the clock run on them, Your Honor.  Preserve the

5  status quo.  Do not let this looming cloud of uncertainty-- and

6  further proceedings-- further proceedings over matters of-- of

7  corporate governance, corporate strategic planning that are

8  going to become the subject of discovery, that are going to be

9  subject to public filings in front of this court with financial

10  vultures - and I mean that in, frankly, respectful terms.  I

11  don't mean to be that pejorative, Your Honor - who are

12  listening in to-- to pick up whatever pieces of information

13  they can extract - and I don't blame them, I'd be doing the

14  same thing if I were in their shoes - whatever pieces of

15  information they could use to gain strategic leverage in these

16  very, very critical high-stakes negotiations, that can't be in

17  the best interests of the employees, Your Honor.  It can't be

18  in the best interests of the plan participants.

19       THE COURT:  Well, yet you're the one that filed this

20  lawsuit.

21       MR. BURLINGAME:  Well, we did that, Your Honor, to

22  protect.  To protect the employees, to protect the plan

23  participants.  We have a-- a rogue trustee saying, "I get to

24  direct who the board of directors is because of these amorphous

25  concerns about breaches of fiduciary duty.  Oh my goodness,

1    look at the stock price.  Look at this looming debt."

2          Of course we know that.  We've known it.  We're

3    attempting to deal with it square on, Your Honor.  And we're

4    doing that in the best interests of the company and these

5    employees.

6          You know, the company-- by the employees, they

7    themselves, they call it the Ferrell family.  They're family,

8    Your Honor.  They're Jim Ferrell's family, they're family to

9    the board.  Jim Ferrell came out of retirement to put up with

10   all of this, to work tirelessly with board members, with the

11   company officers.

12         But to have discovery on an expedited basis and have a

13   full-blown preliminary injunction proceeding so that Your Honor

14   would direct us-- issue a mandatory injunction to us to approve

15   whatever slate that the trustee wants, because if-- they

16   concede that if we don't approve a slate and they get their

17   way, they just-- they unlawfully impose a new board.  They

18   haven't disputed that that would be a change of control.

19         A change of control that would do what?  It would

20   immediately accelerate about 372 million, as I recall, Your

21   Honor, and then that would trigger an acceleration of another

22   couple hundred million.  And then that, both of those or either

23   one of those, would trigger the acceleration of $2.2 billion in

24   debt.

25         It wipes out the company.  It leaves these plan

1   participants with no hope.  Yes, the value of that ESOP has

2   dropped.  It's dropped because of these looming notes, because

3   of a misguided diversification effort by prior management to

4   expand into the midstream business which GreatBanc was part of

5   as a discretionary trustee and received $500,000 for its role

6   in that.

7          We get this long-term debt problem solved that this

8   board has been working tirelessly on, those plan participants

9   will realize, hopefully, values of their shares that are back

10  to historical levels, Your Honor.  If GreatBanc remains, the

11  irreparable harm to the employees and the plan participants

12  will be swift and certain.  Swift and certain.

13         And GreatBanc as a directed at-will trustee says, "We

14  know better.  This new trustee who's qualification [sic] and

15  who's without conflict can come in, but he just don't know

16  enough.  We need-- we need to be in control, we need to have,

17  you know, our cherry-picked board because we've got real

18  concerns about how this very sophisticated board of directors

19  is approaching these-- this crescendo moment with respect to

20  these negotiations."

21         And do you know what, Your Honor, because of that, all

22  we want you to do is just keep us in place and so we can go

23  through discovery and get into who's right and who's wrong.

24  Not on matters of ERISA fiduciary duties, on matters of clear

25  corporate governance, strategic direction, business judgment.

1          Your Honor, on behalf of Ferrell Companies, Inc., I

2     urge you, I urge you, deny this TRO.  Let the new trustee come

3     in.  If he has a whiff of concerns, a whiff-- this was

4     GreatBanc.  I was sitting there and they-- you know, they said

5     it in their brief, "Well, you know, we've got litigation

6     liability and, oh, we have-- we have co-fiduciary duties

7     responsibility."  This is a prophylactic effort by GreatBanc to

8     try to gain insulation from potential liability.

9          Your Honor, I appreciate the-- the serious and studied

10    consideration that you've given this on very short notice.

11    Thank you, Your Honor.

12         THE COURT:  Sure.  We've been going about an

13    hour-and-a-half.  I'll let you have the last word but would you

14    like a break first?

15         MR. SMITH:  It's entirely up to you, Your Honor.  If

16    you'd prefer a break first, that's fine with me.  I'm also

17    happy to make my remarks now.

18         THE COURT:  All right.  Does anyone need a break?  If

19    not, I'll hear from you and then we'll take-- do you need a

20    break?

21         MR. BURLINGAME:  No, Your Honor.  I was about to stand

22    up and say we don't.

23         THE COURT:  Okay.  Go ahead and then we'll take a

24    break.

25         One-- one question I have for you goes to, well, your

1    argument that-- and you've both just sort of talked about a

2    history of events leading up to the filing of this lawsuit.

3    But your argument that GreatBanc requested direction from

4    Ferrell and didn't receive a response.

5         Is there something in the trust document and/or the

6    plan that addresses the trustee's rights to-- to specifically

7    ask for certain directions?

8         MR. SMITH:  Yes, Your Honor.  And I think I had

9    pointed that out during my earlier remarks, but I'll just bring

10   Your Honor back to it now because I think it came up in your--

11   in your discussion with the other side.

12        So that's Exhibit B to the complaint, which is the

13   trust document itself.  And under Section 2.6 if Your Honor

14   takes a look at the last sentence of that where it says, "If

15   the trustee requests any directions hereunder and does not

16   receive them, the trustee shall act or refrain from acting as

17   it may determine and shall be indemnified by the company for

18   such action or inaction pursuant to Section 4.11."  So--

19        THE COURT:  All right.  But Section 2.3(d) does have

20   this language, and it's, you know, the list of the trustee's

21   general powers.  Some of them there's no language that says at

22   the direction of the plan administrator.  But as far as voting

23   stocks, it says, "As directed by the plan administrator."

24        MR. SMITH:  It says that at the beginning of the

25   provision, Your Honor.  I think it's not insignificant that in

1    a parenthetical broken out from the rest of the provision it

2    addresses the voting of the company stock.  So the company

3    stock is a defined term which means Ferrell stock.  And there,

4    as I walked Your Honor through, it very pointedly refers to

5    Section 8 of the plan document.

6         And Section 8 is the one that was amended in July.

7    And if Your Honor recalls, it's Section 8-- I'm sorry, that's

8    Exhibit A to the complaint, Your Honor.  So in Section 8 there

9    is no limiting language in Section 8 until it was amended or

10   purportedly amended in July.

11        THE COURT:  Is it Page 35?  I'm still trying to find

12   Section 8.  Yeah, here we go.

13        MR. SMITH:  And it's really just the very first

14   sentence, it's Page 35, Your Honor.

15        THE COURT:  All right.

16        MR. SMITH:  "Subject to the provisions of this

17   Section 8, all company stock held in trust shall be voted by

18   the trustee."  Okay.  That's what it said until July.

19        If you go back to the amendment that happened in July,

20   Your Honor-- and that's the last page of this exhibit, Your

21   Honor.  Your Honor was focused on the addition of (h), which

22   was, "For the avoidance of doubt, the company as plan

23   administrator shall have the power to direct the trustee as to

24   the voting of the company stock under Section 8."

25        Again, admitted that wasn't there before it was

1    amended in July.  We heard the professed reason that this was

2    done as some sort of plumbing to-- to correct who was giving

3    the direction.  But if you look at it in the context of the

4    very first thing that's done in this amendment, what they did,

5    go back to Section 8, it didn't say "as directed by the plan

6    administrator" at the end of Section 8, it said, "it shall be

7    the voted by the trustee.  They dropped that in.

8            Now, the timeline during which all this occurred is

9    not insignificant, because in July we were going back and forth

10   with them repeatedly requesting information about the plan,

11   passing on to them proposals that people made with respect to

12   solutions under the plan.  And that amendment was dropped in

13   the midst of that.  The next day they sent us a letter and

14   basically said, "Leave us alone, you're a directed trustee.

15   And by the way, we just made this enhancement and here it is."

16           So that's the sequence of events that led to this

17   amendment to the plan.  And it's quite clear I think to us,

18   Your Honor, that the-- the amendment is recognition that prior

19   to that there was-- well, the trustee is admittedly directed

20   for a number of purposes under the plan documents.  On voting

21   the company's stock, at an absolute minimum, Ferrell believed

22   that that was an ambiguity and under the circumstances were

23   concerned that Ferrell might exercise its right to vote the

24   stock, precisely as Your Honor was walking through before, and

25   made this amendment to the plan.

```
 1              THE COURT:  Okay.  I think I understand the two
 2     arguments on that.
 3              Let's focus on what you're seeking at this point,
 4     because I've heard a lot of arguments obviously that-- well,
 5     you know, I have to reach the likelihood of success on the
 6     merits even at the TRO stage.  But I've heard a lot of
 7     arguments here about, you know, the-- the relief sought, the
 8     merits of the respected positions.
 9              I think you told me at the outset what-- and you may
10     not use the word "tolling" but the plaintiff uses the word
11     "tolling," tolling the termination date by-- you know, the
12     termination date of-- of the trustee under the trust document
13     is what you're seeking right now.
14              But my question is:  What are you seeking at the
15     preliminary injunction stage?  What relief would you be asking
16     for at that point?
17              MR. SMITH:  Well, at the preliminary injunction stage,
18     Your Honor, it would really be the same.  It would just be to
19     continue-- I think Your Honor could put a TRO in place for 14
20     days.  I don't know if that's long enough to have a speedy
21     hearing on our DJ action.  If it is, so be it and I guess it's
22     not an issue.  But the preliminary injunction would just be a
23     matter of continuing the TRO, maintaining our status and our
24     standing to litigate the underlying claim to its conclusion.
25     So that's the distinction there.
```

1         The ultimate relief on the merits, and this has been

2    confused not only in the papers but again during argument, the

3    ultimate relief on the merits we're seeking is a declaration

4    from Your Honor that because of ERISA and because of the plan

5    documents and because of our fiduciary duties, that we are

6    permitted - exercising our rights, voting rights - to replace

7    the trustee and then taking that action which we believe that

8    we could take sitting here right now.

9         The mandatory injunction that's in there, the only

10   mandatory injunction that's in there was as an alternative to

11   the extent that, for whatever reason, Your Honor thought the

12   better approach after grappling with the underlying merits was

13   to instruct the trustee to give us a direction to do precisely

14   that.

15        Now, on this question of directed trustee which Your

16   Honor was focusing on, 403.  403 of ERISA addresses a directed

17   trustee situation.  But even a directed trustee maintains this

18   duty of prudence under ERISA and under 404 maintains its

19   fiduciary duties as well.  And the only obligation that a

20   directed trustee has is to follow proper directions that don't

21   conflict with ERISA fiduciary duties or with the plan

22   documents.

23        It's very interesting to me to hear GreatBanc's

24   position characterized as seeking to avoid liability.  If the

25   argument is we're trying to avoid liability for breaching our

1   fiduciary duties, yeah, because what that means is we're trying

2   to do our fiduciary duty.  That's exactly right.  That's all

3   we're trying to do here is exercise the fiduciary duties

4   imposed on us by ERISA to do the right thing for this plan and

5   its beneficiaries.

6        It is also absolutely right that there's no harm to

7   GreatBanc, per se, involved here.  The harm, the irreparable

8   harm here that requires the TRO we're requesting to keep us in

9   place is harm to the plan and its beneficiaries, not to

10   GreatBanc.

11        And, again, I have to stress that that relief, keeping

12   us in place long enough to maintain standing to litigate to

13   conclusion and give Your Honor's ultimate decision any force

14   and effect, the issue that they've brought before you by filing

15   this lawsuit, that's all we're looking for here.  It's not a

16   mandatory injunction, it's maintaining the status quo.  The

17   status quo has been GreatBanc as the trustee of this trust for

18   13 years.

19        THE COURT:  All right.  So at the preliminary

20   injunction stage you'll again be asking to continue in the role

21   of trustee pending a hearing on your declaratory judgment

22   claim, which you think can be expedited.  But in order to

23   decide the merits of a declaratory judgment claim, am I not

24   going to have to get into these issues about who-- which

25   fiduciary breached and when or did one fiduciary's breach cause

1    the other fiduciary to perhaps breach as well?  I mean, all-- I

2    mean, essentially I have to try the whole lawsuit in order to

3    reach the declaratory judgment issue, would I not?

4          MR. SMITH:  Well, Your Honor, we believe there's--

5    there are a narrow set of legal issues that would allow you to

6    determine it in our favor.  I-- I don't disagree that there's

7    issues associated with whether there's been a fiduciary breach.

8    But as I said during my presentation, what we're not attempting

9    to put on trial here is the board of directors' exercise of its

10   business judgment, apart from Ferrell wearing its fiduciary

11   hat.  And I enumerated during my original presentation all the

12   ERISA fiduciary breaches that we think rolled up into putting

13   GreatBanc in the untenable position of having to take the step

14   of removing the board.  And, you know, we heard--

15          THE COURT:  Let me-- let me ask you this.

16          MR. SMITH:  Yes, Your Honor.

17          THE COURT:  So address the sort of-- the balance of

18   harms argument in the context of me granting a TRO which-- and

19   maybe perhaps a PI, that would continue you in your role for

20   some indefinite period until I-- until, you know, really

21   there-- discovery has been completed or whatever needs to

22   happen before I can truly reach the merits of this, in an

23   environment where the company is engaged in it sounds like

24   workout negotiations, they're dealing with a financial advisor,

25   they're taking-- the board is taking a path that is-- conflicts

1   with what GreatBanc wants.  I mean, I guess that's one reason

2   we're all here.  You all have not had a meeting of the minds

3   for some period of time about what the company needs to do to

4   deal with its-- its financial issues.

5          But yet, you know, so I guess I'm trying to figure out

6   how-- how that would work.  If we're talking another year or

7   two of what sounds like is becoming a somewhat hostile, if not

8   already a hostile, relationship between the two fiduciaries of

9   this-- of this trust.

10          MR. SMITH:  Yeah, we would really hope, Your Honor,

11   that regardless of what discovery someone might ultimately

12   determine was necessary to get this case to its ultimate

13   resolution, it would not be anywhere near a year to do.  We

14   really believe that this can and should be done on a very

15   accelerated basis.

16          But in terms of the balance of the harms, Your Honor,

17   you know, we were told that this board of directors at Ferrell

18   is working tirelessly to correct the problems.  Well, we're

19   tired.  I mean, this has been going on for years.

20          You heard a reference to this Bridger acquisition

21   which precipitated some of the company's issues and Mr. Ferrell

22   coming out of retirement to save the company.  That was four

23   years ago, Your Honor.  And over that course of time, the stock

24   price has plummeted.  The debt situation has gotten worse.  I

25   didn't write this script, nor did GreatBanc.

1          On October 15th, there was a public filing saying that

2     TPG, one of the primary lenders, had declared an event of

3     default.  We heard talk about the potential acceleration if two

4     or three different things happened, including the board

5     choosing not to approve a new slate after Your Honor ordered

6     that it was appropriate.  We heard about that.

7          Right now $275 million of debt has been accelerated.

8     The company is hovering below and has been for a long period of

9     time, the-- the publicly-traded limit partnership, below $0.60

10    a share, below a dollar, it's going to get delisted.  So that's

11    what's going on on this watch, the tireless work that's been

12    done.

13         You know, you were told that they're not going to

14    reveal this plan that they have in place.  Your Honor, you know

15    right now as much as GreatBanc, the trustee for the trust,

16    knows about what this plan is.  For the last five years it has

17    been nothing but these precise high-level platitudes, included

18    in what was filed by Ferrell with their opposition.

19         They have a board resolution - once again, Your Honor,

20    I think not coincidentally - in the July time frame when this

21    amendment was done and when there was significant back and

22    forth going on with GreatBanc trying to get information.  That

23    board resolution, which is undated although it has a July 22nd

24    date in it - this is Mr. Ferrell's affidavit at Exhibit D -

25    it's as high-level as what we've been told today with respect

1   to the company's plan.  There are zero specifics.  There

2   haven't been for five years.

3          And let me just go back to this Bridger situation

4   which somehow, you know, there's been an attempt to suggest

5   that that's on GreatBanc.  There was discussion of board

6   turnover.  I believe that as we sit here today five of the

7   seven members of the board of directors of Ferrell were the

8   ones on whose watch that calamitous transaction was done,

9   negotiated, approved.

10          And, yes, GreatBanc was asked to come in and

11   effectively give a fairness opinion on the thing at the end,

12   which it did.  But it's those members of the board of directors

13   who sought out that transaction, did the transaction.

14   GreatBanc is supposedly trying to insulate itself from

15   litigation.  Ferrell has been sued as a result of the Bridger

16   transaction with I believe something like $140 million claimed

17   for the mismanagement after the acquisition.  And the company

18   purchased for in excess of $800 million was sold for like $90

19   million.  That's on the watch of the current board.

20          So the-- the balance of the harms and the potential

21   risk for whatever period of time it takes to get to the merits

22   of this lawsuit are substantially greater if GreatBanc is

23   relegated to the sidelines.  Again, no disrespect of any kind

24   intended to Mr. Urbach, but he just can't conceivably with the

25   company in the situation it's in right now get to the point

 1    where he's going to make the decision that GreatBanc has made,

 2    that the only thing that can be done now to preserve assets for

 3    this plan is get this board out of there.

 4            So we think-- and, again, I want to go back.  What

 5    we're-- I appreciate Your Honor's questions about whether it

 6    takes a year to try this case and what circumstance that might

 7    create.  But we really think that this can be done and should

 8    be done as quickly as possible.  And we think it's the only

 9    thing that can be done at this point for GreatBanc to exercise

10    its fiduciary duties.

11            I want to address one more point that was made on the

12    direction issue, which I know Your Honor has been spending some

13    time with.  And I pointed you to 2.6 and what the plan

14    documents themselves say that GreatBanc is permitted to do when

15    it requests a direction and doesn't get one.

16            The case law is also in support of this.  We've cited

17    to Your Honor the *Hurtado* case that, among other things, points

18    out that a directed trustee like us, there comes a point you

19    have a duty to investigate, and we have been trying strenuously

20    over the last couple of years to investigate and getting no

21    information in response, and to-- to explore alternative

22    courses of action.

23            There is risk again, yes, risk because we will not

24    have done our fiduciary duties.  There is risk to-- in failing

25    to act under those circumstances.  And under the *Herman* case

1    which we've cited to Your Honor, when a trustee seeks direction

2    as under 2.6 we're entitled to do and you get a non-response,

3    that's enough.  So the non-response here was a lawsuit which

4    got filed the next day.  That is enough for us to determine

5    under ERISA that that's not a proper direction and that we can

6    act.

7            That's the situation that we find ourselves in, Your

8    Honor.  We-- the company has manufactured a situation up to and

9    including the filing of this lawsuit that has left the trustee

10   with no choice.  And for GreatBanc to be out tomorrow, Your

11   Honor, given precisely the same precarious situation that I

12   think both sides agree that the company is in-- and, again,

13   nobody knows what the plan is if there is a plan, but we've

14   been hearing the same things you're hearing today, "We've got a

15   plan, we're going to get it done" for five years.  We've seen -

16   you know, the facts don't lie - what happened to the company

17   over that period of time.

18           To sit here and accept that on faith, "Well, now is

19   the time.  Now it's really going to happen," it's interesting

20   that that comes within two weeks of this public announcement of

21   the company being in the situation that it's in.

22           We think clearly, Your Honor, clearly the balance of

23   the harms tips in favor of keeping us in our seat long enough

24   for Your Honor to reach the merits of this issue.

25           THE COURT:  All right.  Let's--

19-2656   Ferrell Companies v. GreatBanc   11.07.19          61

```
 1          MR. BURLINGAME:  Your Honor-- Your Honor, may I just

 2    make one factual clarification?

 3          THE COURT:  Okay.  Okay.

 4          MR. BURLINGAME:  I will not argue, and I respect that

 5    Mr. Smith as the moving party gets the last word, but it goes

 6    right to one of the points Your Honor is concerned about.  If I

 7    may approach and present it, Your Honor.

 8          THE COURT:  Go ahead, sure.

 9          MR. SMITH:  I may stick up here if that's all right

10    with Your Honor.

11          THE COURT:  Okay.

12          MR. BURLINGAME:  That's fine, come on over, you can

13    read with me.

14          So this is a letter from Mr. Smith's partner,

15    August 27.  This goes to the amendment.  "Plan clarification as

16    to voting matters.  We understand that as a result of the

17    amendments to the plan adopted July 29, 2019, but effective

18    August 1, 2019, the company through its board of directors has

19    clarified that it will instruct the trustee with regard to the

20    voting of the shares of the company stock for any matters not

21    involving corporate merger, consolidation, or other

22    transactions listed in the second paragraph of Section 8 of the

23    plan."

24          So I just wanted the-- the trustee approved, and I

25    just wanted to point that out, Your Honor.
```

1          MR. SMITH:  Is that in the record by the way?

2          MR. BURLINGAME:  No.

3          MR. SMITH:  Okay.  What's the date of the letter?

4          MR. BURLINGAME:  August 27th.  Well, as I said, the

5     date of the letter, Your Honor, August 27th, 2019.

6          MR. SMITH:  Okay.

7          THE COURT:  And that's a letter from Mr. Smith to who?

8          MR. SMITH:  No, no, it's not from me, Your Honor.

9          MR. BURLINGAME:  It's not from Mr.--

10         MR. SMITH:  Although it is-- I believe it's from my--

11    my corporate partner.

12         THE COURT:  Just a minute.  Who is it-- who are the

13    parties?

14         MR. BURLINGAME:  This is from GreatBanc's lawyer, Your

15    Honor, the trustee's lawyer.

16         THE COURT:  Okay.

17         MR. SMITH:  So August 27th, Your Honor, is-- is again

18    on the heels of the back and forth I mentioned in July.  I

19    think I noted before that they were supposed to have an

20    election of directors on August 4th under the bylaws which they

21    didn't hold.

22         So to go back to the trustee's ability to act under

23    circumstances created by the company, the company is in breach

24    of the bylaws.  They haven't had an election of directors.

25    They had it every other year.  And by the way, you were shown a

1   bunch of other documents that I don't believe that are in the
2   record, which is the annual election of directors.
3            They're not in the record, I wasn't given a copy.  I
4   don't have it in front of me, but I don't believe Your Honor
5   will see in there a direction to vote for the slate.  I think
6   you'll see a slate provided as opposed to a direction.  I just
7   note that in closing for Your Honor, unless Your Honor has any
8   other questions.
9            THE COURT:  No, I don't.
10           All right.  So it's noon, why don't we reconvene at
11   12:45.  All right?
12           MR. BURLINGAME:  Yes, Your Honor.  Thank you.
13           MR. SMITH:  Thank you, Your Honor.
14           (Recess).
15           THE COURT:  All right.  You can be seated.
16           All right.  So we're here on a motion for temporary
17   restraining order filed by GreatBanc Trust.  And just to
18   quickly review the standards under which I have to decide this;
19   the purpose of a TRO is to preserve the status quo and prevent
20   immediate and irreparable harm until the court has an
21   opportunity to pass on the merits of a demand for preliminary
22   injunction.  And there is such a motion as well.
23           The movant seeking a preliminary injunction or in this
24   case a temporary restraining order must establish that he is
25   likely to succeed on the merits, that he is likely to suffer

1   irreparable harm in the absence of preliminary relief, that the

2   balance of equities tips in his favor, and that the restraining

3   order is in the public interest.  The standard requires the

4   court to consider all four factors with respect to a motion for

5   temporary restraining order.

6           So first of all, with respect to the public interest

7   factor, there are public interests in play here.  Obviously

8   there's a-- a public interest in protecting the plan

9   participants, plan beneficiaries.  There's a public interest in

10  upholding the terms of the trust agreement as well as the terms

11  of the plan.  There's a public interest in having an

12  independent qualified trustee serve to protect the interests of

13  the plan participants and beneficiaries.

14          This factor I-- I view as neutral.  There are

15  interests in protecting the plan beneficiaries, also interests

16  in upholding the terms of the trust agreement which call for

17  this trust to be-- trustee to serve for a particular term

18  unless the-- Ferrell seeks to extend the term of GreatBanc,

19  which they-- it has not.  So there's-- the public interest I

20  guess I should say really reflects on the interest of all

21  parties in this case.

22          GreatBanc must show that absent a TRO there will be

23  irreparable harm.  And in that regard, I mean, it's clear that

24  this company, it's undisputed that this company is in financial

25  distress.  There's been a market value-- a declination in value

1   of the stock since 2014, about 98 percent.  The plan depends

2   heavily on Ferrellgas Partners for its value.

3          Ferrellgas Partners has defaulted on loans or at least

4   there's been a lender that has declared a default, rightly or

5   wrongly.  There are other loans that are coming due.  And so

6   it's clear that there-- that the plan beneficiaries and the

7   value of their-- of their plan benefits is-- is in distress,

8   but it has been for some time.

9          The real question is will there be irreparable harm if

10  the court does not allow GreatBanc to continue as the trustee.

11  And in the short-term, the court cannot find on this record

12  that there will be irreparable harm if GreatBanc is not allowed

13  to continue and the new trustee is appointed.

14         In the short-term, this company is going to be in

15  financial distress.  There are ongoing negotiations with

16  lenders.  There is a financial plan, although there's no

17  evidence as to its particulars, and GreatBanc has expressed

18  concern that it-- it doesn't know what the particulars are.

19         In the short-term if the court were to grant this TRO,

20  there would not be any change in the board because, of course,

21  that's one of the ultimate issues in this case as to what the

22  trustee's powers are under the trust agreement and under the

23  plan, whether the trustee either under direction of the plan

24  administrator and/or the company can effectively change the

25  entire board or not, either under direction or directly, all of

1    which, you know, are issues that are going to be litigated in

2    this case.

3          One thing that's clear, though, is that there's a

4    great risk of more declarations of default under an argument of

5    change of control if-- if the board membership were to change,

6    and particularly I would think if it were to completely change

7    as opposed to just a change that happens organically by virtue

8    of the bylaws as-- as board members cycle on and off under

9    their-- under the terms of the bylaws.

10         So the evidence that I've heard demonstrates that

11    the-- that there's some real issues here, financial distress,

12    et cetera, and potential harm to the plan beneficiaries are

13    tied to the financial circumstances that have been ongoing for

14    some time.

15         But in my mind and based on this record, not tied to

16    who the trustee is, it's undisputed that Mr. Urbach is

17    qualified, that he's willing to serve as a trustee in good

18    faith.  He's experienced and he stands ready.  The court agrees

19    with GreatBanc that he doesn't have the long history with this

20    company that GreatBanc does, although he has the ability to

21    consult with GreatBanc and certainly with the company to get up

22    to speed as quickly as possible.

23         There is no dispute that under the terms of the trust

24    agreement itself Ferrell has the authority to determine that

25    this trustee's term has ended and to appoint a new trustee.

 1          Under the balance of harms factor, the harms in

 2     granting the TRO versus denying the TRO, denying the TRO again

 3     would lose a trustee that's been serving for 13 years and

 4     knows-- knows a lot about this company.  And apparently it at

 5     some point has been actively engaged in its own attempts to

 6     develop a financial plan for re-organization or compromise

 7     and-- negotiation, compromise of debt.

 8          At the same time, denying the TRO-- or granting the

 9     TRO does not mean that GreatBanc can't continue to pursue its

10     arguments in this litigation that there's been a breach of

11     fiduciary duties by the company and that it-- it in effect

12     abided by its fiduciary duties and was impaired by certain

13     things the company did in terms of being allowed to or being

14     able to abide by its various fiduciary duties as trustee.  In

15     other words, GreatBanc can still pursue its claims in this

16     lawsuit.

17          Granting the TRO does potentially cause some harm in

18     the fact that, again, although that doesn't mean there will be

19     a new board appointed because all the grant of the TRO would do

20     would be to allow GreatBanc to stay in place, there's still

21     these ultimate issues and the TRO wouldn't address those.  And

22     that is, does GreatBanc have the ability to, again either

23     directly or by direction, oust a board and appoint a

24     replacement board.

25          Also keeping GreatBanc on board it's clear to me could

1   cause some harm in the sense that it's really undisputed that

2   the company and GreatBanc do not see eye-to-eye and have not

3   had a meeting of the minds for some time as to the right

4   direction to take in view of some bad investments and-- and

5   corresponding incredible debt load that the company is under at

6   this time.

7           Keeping GreatBanc on as trustee also doesn't change

8   the fact that generally, and it's a general rule, business

9   decisions are left to the company.  And under ERISA there is

10  the business decision rule, although, of course, that's subject

11  to certain exceptions.

12          The last factor is the likelihood of success on the

13  merits.  And the movant does have to show this by clear and

14  convincing evidence, which I find the movant has not.

15          At best on this record the court can say this:

16  There's questions as to the extent of-- of the trustee's powers

17  under the trust agreement, the plan, and the plan amendment.  I

18  certainly can understand the basis for the parties'

19  inconsistent interpretations of these documents.  I'm not in

20  a-- I'm not prepared to rule as to whose interpretation is

21  correct.  I'm certainly not prepared on this record to find

22  that there's a likelihood that GreatBanc's interpretation of

23  the trust agreement and plan and the powers that it accords

24  GreatBanc is correct.

25          There's also, you know, no clear language under--

1   under any of these documents that the trustee has the power to

2   replace an entire board as opposed to voting for members that

3   are up for election by virtue of their terms under the bylaws.

4          There's also a serious question as to whether the

5   court under the-- whatever the record might be at the close of

6   all of this and at the-- at the trial on the merits, whether

7   the court would have the power to grant a mandatory injunction

8   that would direct Ferrell to oust a board and completely

9   replace another board.  That's a serious question and one that

10  I'm not at this point willing to say there's a likelihood of

11  success on the merits of that.  Understanding the alternative

12  argument is that there doesn't need to be a mandatory

13  injunction, that by virtue of the trust agreement and the plan

14  and plan amendments themselves, GreatBanc would have that

15  power.

16         So for all of these reasons, I deny the motion for

17  TRO.  Of course, this motion is in the alternative or in

18  addition it's asking for preliminary injunction.  And assuming

19  that GreatBanc wants to proceed with a-- a preliminary

20  injunction hearing, we need to talk about scheduling that.

21         But, of course, with this ruling, the term of

22  GreatBanc will expire tomorrow.  I mean, I don't think that

23  precludes a preliminary injunction hearing if GreatBanc wants

24  to proceed with that.  I leave that to GreatBanc to decide at

25  this point what its next step is.

1    So those are my oral findings of fact and conclusions

2  of law on the record.  We'll just enter a very short order that

3  just, you know, references that I made these findings orally

4  today.

5    Mr. Smith, do you want to talk about scheduling a

6  preliminary injunction hearing at this point?

7    MR. SMITH:  Your Honor, with the court's indulgence,

8  we'd like to take that under advisement and discuss with our

9  clients and maybe save people some time that way.

10    THE COURT:  Okay.  I understand.

11    All right.  Well, I thank you all for-- again, for

12  your cooperation and collegiality and I was glad I was able to

13  accommodate you today.  And, you know, this-- I've heard enough

14  already today to know that this-- this lawsuit is going to be

15  an interesting one.  It presents a lot of issues.

16    And I understand-- well, I understand that there's a

17  lot of history and I understand that there's-- you know, I

18  think all parties come to this litigation out of concern,

19  heartfelt and genuine and authentic concern for the-- for the

20  company itself and its employees.

21    So I look forward to presiding over this case and

22  going forward with this case.

23    All right.  So we'll be in recess.

24    MR. BURLINGAME:  Thank you, Your Honor.

25    MR. SMITH:  Thank you, Your Honor.

1              (1:01 p.m., proceedings concluded).

2

3                              *  *  *

4

5

6                    C E R T I F I C A T E

7        I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   November 7, 2019.

11

12

                         /s/ Kelli Stewart_____
13                       KELLI STEWART, CSR, RPR, CRR, RMR
                         United States Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25